No. 24-1467

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

GAMEVICE, INC.,

*Plaintiff-Appellant*

v.

NINTENDO CO. LTD., NINTENDO OF AMERICA, INC.

*Defendants-Appellees*

Appeal from the United States District Court for the District of Northern California, No. 18-cv-01942-RS

## OPENING BRIEF OF GAMEVICE, INC.

Smith R. Brittingham IV
Erik R. Puknys
James R. Barney
 FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

*Counsel for Gamevice, Inc.*

## REPRESENTATIVE CLAIMS

Claim 1 (U.S. Patent No. 9,808,713).  A combination comprising:

a computing device, the computing device providing an upper, lower, left and right side, collectively the sides of the computing device, and an electronic display screen, the electronic display screen having a corresponding side adjacent each of the sides of the computing device;

a pair of confinement structures, the pair of confinement structures adjacent to and confining the computing device on at least two opposing sides, but not more than three sides of the sides of the computing device, and in which a first confinement structure of the pair of confinement structures provides a first communication link, while a second confinement structure of the pair of confinement structures provides a second communication link;

a structural bridge disposed between the pair of confinement structures, the structural bridge comprising, a passageway between the pair of confinement structures, the passageway promotes communication between the first communication link and the computing device, the passageway further promotes communication between the second communication link and the computing device;

fastening mechanisms, the fastening mechanisms secure the first confinement structure to a first side of the structural bridge, and further in which the fastening mechanisms secure the second confinement structure to a second side of the structural bridge; and

an input device, the input device comprising a pair of control modules, each control module of the pair of control modules secured to a corresponding confinement structure of the pair of confinement structures, each control module in electronic communication with the communication link of its corresponding confinement structure, each of the pair of control modules providing input module apertures, each input module aperture secures an instructional input device, wherein said input module apertures are adjacent each of the at least two opposing sides of the sides of the computing device, and wherein the input device is a separate and distinct structure from either of the pair of confinement structures, forming no structural portion of either of the pair of confinement structures, and in which the confinement structures are separate and distinct structures from the structural bridge, forming no structural portion of the structural bridge.

2.    The combination of claim 1, in which the structural bridge is a rigid structural bridge, the rigid structural bridge supports electronics associated with the computing device.

3.    The combination of claim 2, in which the computing device further comprising a back, the back provides an internal surface, an external surface, and upper, lower, left and right sides, collectively the sides of the back of the computing device, the back of the computing device cooperating with the sides of the computing device.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number:**  24-1467

**Short Case Caption:**  Gamevice, Inc. v. Nintendo Co., Ltd.

**Filing Party/Entity:**  Gamevice, Inc.

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date:  May 15, 2024

Signature:    /s/ Smith R. Brittingham IV

Name:     Smith R. Brittingham IV

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities. ☒ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities. ☒ None/Not Applicable |
| Gamevice, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐   Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this **court** for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| Ji Hye Christina Yang<br>Finnegan Henderson, Farabow, Garrett & Dunner, LLP | Christopher Anthony Mathews<br>Quinn Emanuel Urquhart & Sullivan, LLP | Jordan Brock Kaericher<br>Quinn Emanuel Urquhart & Sullivan, LLP |
| Justin Cornelius Griffin<br>Quinn Emanuel Urquhart & Sullivan, LLP | Razmig Hagop Messerian<br>Quinn Emanuel Urquhart & Sullivan, LLP | Richard Hull Doss<br>Quinn Emanuel Urquhart & Sullivan, LLP |
| Scott Alan Florance<br>Quinn Emanuel Urquhart & Sullivan, LLP | Tigran Guledjian<br>Quinn Emanuel Urquhart & Sullivan, LLP | Enoch H. Liang<br>LTL Attorneys LLP |
| Prashanth Chennakesavan<br>LTL Attorneys LLP | Vincent Martin Pollmeier<br>LTL Attorneys LLP | Michael J. Song<br>Munck Wilson Mandala, LLP |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐   Yes (file separate notice; see below)      ☒   No      ☐   N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☒   None/Not Applicable          ☐   Additional pages attached

| | | |
|---|---|---|
| | | |

# TABLE OF CONTENTS

## Contents

REPRESENTATIVE CLAIMS ................................................................. i

TABLE OF CONTENTS ....................................................................v

STATEMENT OF RELATED CASES ....................................................x

STATEMENT OF JURISDICTION........................................................1

STATEMENT OF THE ISSUES.............................................................2

I.     PRELIMINARY STATEMENT ................................................4

II.    STATEMENT OF THE CASE ...................................................7

    A.  Gamevice .........................................................................7

    B.  Overview of the Asserted Patents...................................8

    C.  Representative Claims ...................................................10

    D.  Overview of the Accused Nintendo Switch .................13

    E.  The Proceedings Below .................................................15

        1.  Nintendo moved for summary judgment of invalidity on the ground that the Switch pre-dated all the claims and thus anticipated them. ....................................................15

        2.  The district court only granted Nintendo's motion for anticipation in part because the Switch pre-dated some claims, but post-dated others. ...........................................16

        3.  Nintendo's only non-infringement arguments involved elements in the remaining claims that had already been resolved as being in the Switch by the finding of anticipation. ......................................18

        4.  The district court granted summary of non-infringement on the ground that the Switch lacks elements in the remaining claims also recited in claims the Switch allegedly anticipated.....................20

III.   SUMMARY OF THE ARGUMENT...........................................21

IV.    STANDARD OF REVIEW.......................................................24

V.    ARGUMENT .......................................................................................24

A.  The district court erred in finding that the Switch practices the
    limitations at issue for invalidity, but not for infringement. ......................24

    1.  Anticipation and infringement turn on the same facts. .......................24

    2.  Nintendo's procedural maneuver did not excuse the district court
        from performing the same element-by-element analysis this
        Court requires for both anticipation and infringement........................28

    3.  Neither *Gammino* nor *Archer* supports Nintendo. ..............................31

B.  The district court erred in granting Nintendo's motion for summary
    judgment of non-infringement.....................................................................36

    1.  Gamevice's expert showed there was a material dispute of fact
        concerning whether the Switch possessed the claimed
        "confinement structures."................................................................37

    2.  The district court construed "hold" in a way that contradicts the
        intrinsic record and without providing Gamevice an opportunity
        to address it.......................................................................................40

    3.  Gamevice's expert also showed that there was a material dispute
        over whether the Switch possessed "input module apertures, each
        input module aperture secures an instructional input device." ...........43

VI.   CONCLUSION .........................................................................................47

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

## Cases

*Amgen Inc. v. F. Hoffmann–La Roche Ltd*,
  580 F.3d 1340 (Fed. Cir. 2009) ...............................................25

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)......................................................36, 38

*Apple Inc. v. Corephotonics, Ltd.*,
  81 F.4th 1353 (Fed. Cir. 2023) ...............................................42

*Apple Inc. v. Samsung Elecs. Co.*,
  839 F.3d 1034 (Fed. Cir. 2016) (en banc) ......................................25

*Baxter Int'l, Inc. v. Cobe Lab'ys, Inc.*,
  88 F.3d 1054 (Fed. Cir. 1996) ...............................................30

*Capon v. Eshhar*,
  418 F.3d 1349 (Fed. Cir. 2005) ...............................................30

*Centricut, LLC v. Esab Grp., Inc.*,
  390 F.3d 1361 (Fed. Cir. 2004) ...............................................30

*Core Wireless Licensing S.A.R.L. v. Apple Inc.*,
  899 F.3d 1356 (Fed. Cir. 2018) ...............................................46

*Crown Packaging Tech., Inc. v. Ball Metal Beverage Container
  Corp.*,
  635 F.3d 1373 (Fed. Cir. 2011) ...........................................36, 40

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) ...............................................45

*Eolas Techs. Inc. v. Microsoft Corp.*,
  399 F.3d 1325 (Fed. Cir. 2005) ...............................................28

*Eon-Net LP v. Flagstar Bancorp*,
  249 F. App'x 189 (Fed. Cir. 2007) ...............................................41

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
  796 F.3d 1312 (Fed. Cir. 2015) .................................24, 37, 40, 47

*Evans Cooling Systems, Inc. v. General Motors Corp.*,
125 F.3d 1448 (Fed. Cir. 1997) ...................................................*passim*

*Gammino v. Sprint Commc'ns Co.*,
No. 10-2493, 2011 WL 3240830 (E.D. Pa. July 29, 2011) .........................31, 33

*Gammino v. Sw. Bell Tel., L.P.*,
267 F. App'x 949 (Fed. Cir. 2008) ....................................................33

*Gammino v. Sw. Bell Tel., L.P.*,
512 F. Supp. 2d 626 (N.D. Tex. 2007), *aff'd*, 267 F. App'x 949
(Fed. Cir. 2008) .......................................................................31, 32, 33

*Gart v. Logitech, Inc.*,
254 F.3d 1334 (Fed. Cir. 2001) ....................................................24, 36

*Hormone Rsch. Found., Inc. v. Genentech, Inc.*,
904 F.2d 1558 (Fed. Cir. 1990) ........................................................26

*Int'l Seaway Trading Corp. v. Walgreens Corp.*,
589 F.3d 1233 (Fed. Cir. 2009) ....................................................24, 35

*Intel Corp. v. Tela Innovations, Inc.*,
No. 3:18-cv-02848-WHO, 2021 WL 783560 (N.D. Cal. Mar. 1,
2021) ................................................................................27, 34, 35

*Knapp v. Morss*,
150 U.S. 221 (1893)................................................................34, 35

*Martin v. Henley*,
452 F.2d 295 (9th Cir. 1971) ....................................................27, 31, 35

*Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*,
527 F.3d 1330 (Fed. Cir. 2008) ........................................................37

*Microsoft Corp. v. I4I Ltd. P'ship*,
564 U.S. 91 (2011)......................................................................35

*Ocean Innovations, Inc. v. Archer*,
145 F. App'x 366 (Fed. Cir. 2005) ..............................................31, 34, 35

*Polaroid Corp. v. Eastman Kodak Co.*,
789 F.2d 1556 (Fed. Cir. 1986) ........................................................24

*SRAM Corp. v. AD-II Eng'g, Inc.*,
    465 F.3d 1351 (Fed. Cir. 2006) ...................................................25

*Sterner Lighting, Inc. v. Allied Elec. Supply, Inc.*,
    431 F.2d 539 (5th Cir. 1970) .....................................................29

*TecSec, Inc. v. Adobe Sys. Inc.*,
    658 F. App'x 570 (Fed. Cir. 2016) ........................................24, 41

*Teva Pharm. Indus. Ltd. v. AstraZeneca Pharms. LP*,
    661 F.3d 1378 (Fed. Cir. 2011) ...............................................29

*TNS Media Rsch., LLC v. Tivo Rsch. & Analytics, Inc.*,
    629 F. App'x 916 (Fed. Cir. 2015) ............................................41

*Vanmoor v. Wal-Mart Stores, Inc.*,
    201 F.3d 1363 (Fed. Cir. 2000) ........................................*passim*

*Vas-Cath Inc. v. Mahukar*,
    935 F.2d 1555 (Fed. Cir. 1991) ...............................................30

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
    721 F.2d 1540 (Fed. Cir. 1983) ...........................................26, 32

*Zetwick v. Cnty. of Yolo*,
    850 F.3d 436 (9th Cir. 2017) .................................................36

**Statutes**

28 U.S.C. § 1295(a)(1) ..................................................................1

28 U.S.C. § 1338(a) .......................................................................1

35 U.S.C. § 102(g)(2) ....................................................................29

## STATEMENT OF RELATED CASES

Under Fed. Cir. R. 47.5(a), counsel for Appellant certifies that no other appeal from the same proceeding at the United States District Court for the District of Northern California was previously before this Court or any other appellate court, whether under the same or a similar title.

Under Fed. Cir. R. 47.5(b), counsel for Appellant states that the Court's decision in this appeal may affect the following judicial and administrative matters:

*Nintendo Co., Ltd. v. Gamevice, Inc.*, IPR2023-00643 (PTAB).

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this patent-infringement case under 28 U.S.C. § 1338(a). Appellant Gamevice, Inc. appeals from the order (Appx1-13) from the United States District Court for the District of Northern California dated October 31, 2023, denying Gamevice's motion for summary judgment of infringement as to claims 3, 4, 7, and 16 of U.S. Patent No. 9,808,713 ("'713 patent") and claim 6 of U.S. Patent No. 10,391,393 ("'393 patent"), and granting Nintendo's motion for summary judgment of non-infringement as to those same claims as well as claim 6 of the '713 patent. Earlier in the litigation, in two orders issued on March 14, 2023 (Appx14-25), and June 14, 2023 (Appx684-691), the district court had entered summary judgment that claims 1, 2, 8, and 17-19 of the '713 patent, claims 1 and 2 of the '498 patent, and claims 1-4, and 7 of the '393 patent were invalid as being anticipated. And in the claim construction ruling, the district court found claim 12 of the '393 patent invalid as indefinite. As a result of these combined orders, all of Gamevice's asserted claims were found either anticipated, not infringed, or in the case of claim 12, indefinite.

The district court entered final judgment on November 21, 2023. Appx965-967. Appellant Gamevice filed a timely notice of appeal on December 19, 2023. This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.    Early in the case, Nintendo convinced the district court to grant summary judgment of anticipation on the ground that the accused product, Nintendo's Switch gaming device, pre-dated some, but not all, of the claims. Later, Nintendo convinced the district court to grant summary judgment of non-infringement for the remaining pending claims (which had effective filing dates before the release of the Switch) because the Switch lacked two claim elements—"confinement structures" and "input module apertures"—that also appear in the claims the district court previously found, at Nintendo's urging, to be anticipated by the Switch.

Did the district court err in allowing Nintendo not only to argue, but to succeed in arguing, that the Switch lacked the claimed "confinement structures" and "input module apertures" for its non-infringement defense after Nintendo obtained a judgment of anticipation, which necessarily relied on a finding that these elements are present in the Switch?

2.    Assuming that Nintendo was not estopped from arguing non-infringement, did the district court err in granting Nintendo's summary judgment motion of non-infringement with respect to the "confinement structures" element because it failed to consider Gamevice's competing expert testimony and applied a new and erroneous construction of the term "hold" in its construction for the

"confinement structures" without providing Gamevice an opportunity to brief this issue?

3.    Again assuming that Nintendo was not estopped from arguing non-infringement, did the district court err in granting summary judgment of non-infringement with respect to the "input module apertures" element, which requires that "each input module aperture secures an instructional input device," where Gamevice presented expert testimony showing how this limitation is met by apertures in the Switch that are sized to secure flanged input buttons within the Switch's game controllers?

## I.    PRELIMINARY STATEMENT

In federal court, a party is allowed to plead inconsistent theories, but it is not allowed to obtain inconsistent judgments. The two judgments at the center of this appeal, one for anticipation and one for non-infringement, are indisputably inconsistent.

Nintendo raised its anticipation defense first. This defense was based on the accused Switch product. According to Nintendo, the asserted claims were not entitled to the earliest filing date in the chain of applications leading to the patents-in-suit. Instead, Nintendo argued, the effective filing date for the asserted claims was *after* the Switch was released, so the Switch is prior art. Then, accepting Gamevice's allegation that the Switch possesses every limitation of the asserted claims "for the purposes of [its] motion only," Nintendo argued that the Switch anticipated them all.

The district court granted summary judgment on this ground for most of the claims, but not all of them. Specifically, instead of finding that the Switch pre-dated all the asserted claims, the district court found that some claims were entitled to a filing date that pre-dated the Switch. So, while most of the claims were found anticipated, these claims were not.

At that point, Nintendo's anticipation argument was no longer a defense pleaded in the alternative; it was the district court's judgment, the law of the case. And it had consequences. The consequence for Gamevice was that it lost valuable

property rights. But there were consequences for Nintendo too. Or at least there should have been. Because if the Switch possesses all the claim elements for the purpose of anticipating the post-dated claims, it also possesses those same claim elements for the purpose of infringing the pre-dated claims. That which anticipates if earlier, infringes if later. This has been the law for more than a century.

Nintendo, faced with the reality that its strategy only partially succeeded, immediately tried to avoid its consequences. So, it filed a second summary judgment motion, this time on non-infringement. Contrary to the court's earlier anticipation judgment, which was necessarily premised on a finding that the Switch possesses every claim limitation, Nintendo now argued that the Switch, in fact, lacks several limitations that appear in both sets of claims, including "confinement structures" and "input module apertures."

Given the way Nintendo chose to litigate this case, it should have been estopped from arguing that the Switch lacks any claim limitations that were necessary for the judgment of anticipation. But the district court not only allowed Nintendo to argue that the Switch lacks "confinement structures" and "input module apertures"—elements in claims that were supposedly anticipated by the Switch—it granted summary judgment of non-infringement on those grounds. This was legal error, and Gamevice seeks an order from this Court reversing the judgment of non-infringement and instructing the district court to find on remand that Nintendo

5

cannot assert that limitations in claims found to be anticipated by the Switch are not present in it for the purposes of its non-infringement defense for the remaining claims.

But even putting aside whether Nintendo should have been estopped from arguing that the Switch lacks "confinement structures" and "input module apertures," Gamevice presented expert testimony showing that the Switch, in fact, possesses these elements. This testimony, at a minimum, demonstrated that there was a disputed issue of material fact concerning whether the Switch infringes the remaining claims. For this additional reason, the judgment of non-infringement should be vacated and the case remanded for trial.

## II.    STATEMENT OF THE CASE

### A.    Gamevice

Gamevice is a California startup company founded in 2008 that designs, develops, and manufactures handheld controllers attachable to mobile devices, so that users can seamlessly convert their mobile devices into gaming consoles. Gamevice has launched numerous successful products, including Gamevice for iPhone, iPad, and Android; Razer Kishi; and FLEX for iPhone, iPad, and Android.



Gamevice for iPhone

Gamevice for iPad

Razer Kishi

FLEX for iPhone

Gamevice has expended millions of dollars in research and development relating to these products. Gamevice obtained numerous patents to protect its inventions, including U.S. Patent Nos. 9,808,713 ("'713 patent) and 10,391,393 ("'393 patent"), the claims of which are at issue on appeal.

**B.    Overview of the Asserted Patents**

The '713 and the '393 patents relate to an innovative system that allows users of a handheld computing device to play video games or engage in other computerized activities without being limited to the computing device's screen-based touch controls. *See* Appx46 (Abstract). Specifically, the '713 patent discloses a combination of a computing device with a display screen (e.g., a smartphone or a tablet computer) and a back, and a pair of control modules with instructional input devices (e.g., buttons and joysticks) for providing inputs to the computing device for various purposes, including playing games. Appx88 (1:24-46).

The patented combination also includes a pair of confinement structures (element 316), shown below, that confine the computing device (element 302) on at least two opposing sides to hold the computing device between the control modules (element 252) while playing games. Appx92 (9:26-31); Appx63 (Fig. 16).



FIG. 16

Appx63 (Fig. 16) (annotated).

Each control module has input module apertures, which secure instructional input devices, such as buttons, as shown in Figure 13 below. Appx91 (8:18-20). The specification describes holes in the control modules (element 254) as securing the buttons (element 256). *Id*.



FIG. 13

Appx60 (Fig. 13).

### C.    Representative Claims

For the purposes of this appeal, the asserted claims can generally be grouped into two categories: claims that the district court found have written description support in the earlier priority patent application because they either recite a computing device with both a back and a screen or, in the case of independent claim 16 of the '713 patent, do not call for a computing device at all (all of which the district court eventually found to have an effective filing date pre-dating the Switch) and claims that the district court found do not have written description support in the priority application because they recite a computing device without any back and

10

screen limitations or with only one of those limitations, i.e., either a back or a screen but not both (which the district court found to have an effective filing date post-dating the Switch).

Claim 1 of the '713 patent is representative of the claims that recite a computing device, but do not require that computing device to have both a back and a screen. Specifically, claim 1 requires the computing device to have a screen, but does not further require a back. The district court held those types of claims were not supported by the earlier priority document, and therefore they post-date the Switch:

> A combination comprising:
>
> a computing device, the computing device providing an upper, lower, left and right side, collectively the sides of the computing device, and an electronic display screen, the electronic display screen having a corresponding side adjacent each of the sides of the computing device;
>
> **a pair of confinement structures, the pair of confinement structures adjacent to and confining the computing device on at least two opposing sides, but not more than three sides of the sides of the computing device, and in which a first confinement structure of the pair of confinement structures provides a first communication link, while a second confinement structure of the pair of confinement structures provides a second communication link**;
>
> a structural bridge disposed between the pair of confinement structures, the structural bridge comprising, a passageway between the pair of confinement structures, the passageway promotes communication between the first communication link and the computing device, the passageway further promotes communication between the second communication link and the computing device;

11

fastening mechanisms, the fastening mechanisms secure the first confinement structure to a first side of the structural bridge, and further in which the fastening mechanisms secure the second confinement structure to a second side of the structural bridge; and

an input device, the input device comprising a pair of control modules, each control module of the pair of control modules secured to a corresponding confinement structure of the pair of confinement structures, each control module in electronic communication with the communication link of its corresponding confinement structure, **each of the pair of control modules providing input module apertures, each input module aperture secures an instructional input device, wherein said input module apertures are adjacent each of the at least two opposing sides of the sides of the computing device**, and wherein the input device is a separate and distinct structure from either of the pair of confinement structures, forming no structural portion of either of the pair of confinement structures, and in which the confinement structures are separate and distinct structures from the structural bridge, forming no structural portion of the structural bridge.

Appx96 (17:47-18:27) (emphasis added to highlight disputed terms).

Claim 3 of the '713 patent depends from claims 1 and 2 and is representative of the claims reciting a computing device with both a back and screen that were found to pre-date the Switch:

The combination of claim 1, in which the structural bridge is a rigid structural bridge, the rigid structural bridge supports electronics associated with the computing device [and] . . .

the computing device further comprising a back, the back provides an internal surface, an external surface, and upper, lower, left and right sides, collectively the sides of the back of the computing device, the back of the computing device cooperating with the sides of the computing device.

12

Appx96 (18:28-36) (combined with claim 2).

### D.    Overview of the Accused Nintendo Switch

Like the patented inventions of the '713 and '393 patents, the Nintendo Switch is a portable gaming console system with attachable handheld controllers. The Nintendo Switch comprises a computing device with an electronic display screen and a back cover, and a pair of control modules called "Joy-Cons" that slide into the rails ("side rails") attached to the sides of the computing device, as shown below.



Appx723.

The side rails are removably attached to the back cover of the computing device using screws, as shown below.



Pair of confinement structures

Appx936 (¶ 40).



Appx937 (¶41).

Each Joy-Con, shown below, comprises a cover with holes through which buttons extend. The holes are designed to be smaller than flanges and circuit boards attached to the buttons, so that they do not fall out or overextend.

14



Appx939-940 (¶¶ 48-49).

E.    **The Proceedings Below**

1.    **Nintendo moved for summary judgment of invalidity on the ground that the Switch pre-dated all the claims and thus anticipated them.**

Nintendo originally filed its summary judgment motion of non-infringement and invalidity on September 15, 2022, alleging that the asserted claims are not infringed and are invalid as anticipated based on the Switch. *See generally* Appx501-503. Shortly thereafter, on January 19, 2023, the district court issued an order construing several terms in the asserted claims and holding claim 12 of the '393 patent indefinite, and requested Nintendo to submit supplemental briefing as to the disposition of the motion based on the district court's constructions. Appx44-45. On February 9, 2023, Nintendo filed its supplemental brief. Appx581.

In its supplemental brief, Nintendo acknowledged that its original non-infringement arguments were moot in light of the claim construction rulings, but

15

continued to argue that the Nintendo Switch anticipated all asserted claims. Nintendo argued that the claims are not entitled to the priority date of the '119 patent because that patent lacks written description support for the "computing device" and "structural bridge" elements. Appx587. Regarding computing device, Nintendo argued that the '119 patent does not disclose a backless and screenless computing device, an embodiment covered by some of the asserted claims, because it describes only a structurally complete, functional computing device with a back and a screen. Appx587-588. Nintendo also argued that the '119 patent does not disclose a structural bridge that is inside the computing device. Appx587.

Nintendo then argued that "for the purposes of this motion *only*, and expressly and specifically denying infringement for any and all other purposes—Nintendo pleads in the alternative and accepts Gamevice's allegations that the Nintendo Switch satisfies each limitation of the asserted claims," relying on *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000), and *Evans Cooling Systems, Inc. v. General Motors Corp.*, 125 F.3d 1448 (Fed. Cir. 1997). Appx594-595 (emphasis in original).

### 2. The district court only granted Nintendo's motion for anticipation in part because the Switch pre-dated some claims, but post-dated others.

The district court initially granted-in-part and denied-in-part Nintendo's summary judgment motion, finding all asserted claims, except for claim 16 of

the '713 patent (which does not call for a computing device), invalid as anticipated by the Nintendo Switch. Appx24-25. The district court found that the claims are not entitled to the earliest priority date of the '119 patent because that specification does not disclose a backless and screenless computing device. Appx23. But the district court rejected Nintendo's argument regarding the structural bridge element. Appx23-24.

Gamevice subsequently filed a motion for reconsideration arguing that the district court's anticipation ruling improperly invalidated dependent claims that recite a complete computing device with both a screen and a back. *See generally* Appx631-645. Gamevice argued that claims 3, 4, 6, and 7 of the '713 patent and claim 6 of the '393 patent, which recite a computing device having both a back and a screen, are entitled to the earliest priority date because they fall squarely within the disclosures of the '119 patent even under the district court's narrow reading of that patent specification. Appx644.

The district court granted Gamevice's motion for reconsideration and held that claims 3, 4, 6, and 7 of the '713 patent and claim 6 of the '393 patent are entitled to the priority filing date of the '119 patent, and therefore are not anticipated by the Nintendo Switch. Appx691.

**3.    Nintendo's only non-infringement arguments involved elements in the remaining claims that had already been resolved as being in the Switch by the finding of anticipation.**

After the district court granted Gamevice's motion for reconsideration, Gamevice filed a motion for summary judgment of infringement. Appx692-716. Gamevice argued that Nintendo should be judicially estopped from arguing non-infringement because the only limitations genuinely disputed for infringement also appear in the claims found to be anticipated. *See generally* Appx701-704. Gamevice argued that the district court's anticipation ruling was now the "law of the case" for both parties—all the claim elements that were found to be present in the Switch for anticipation must also be found to be present for infringement. Appx704-706. These claim elements include the "confinement structures" recited in all of the remaining claims, and "input module apertures, each input module aperture secures an instructional input device" recited in claims 1, 3, 4, 6, and 7 of the '713 patent. Appx96. For claim 16 of the '713 patent, the analysis was academic.

Since the district court found the Switch anticipated dependent claim 17, which by definition has all the elements of claim 16, the Switch must necessarily satisfy all elements of claim 16. For the other dependent claims that were not anticipated, most of the elements are present in the anticipated claims, and for each of the claim elements that is not identically recited in the claims that the district court

had found anticipated, Gamevice provided an element-by-element infringement analysis, explaining why the Nintendo Switch infringes them. Appx707-714.

A month after Gamevice filed its motion for summary judgment of infringement, Nintendo filed a cross-motion for summary judgment of non-infringement. *See generally* Appx832-834. Nintendo argued that Gamevice cannot prove that the Nintendo Switch infringes the "passageway," "confinement structures," "input module apertures" that "secure," and "computing device" elements recited in the claims. *Id*. Regarding "confinement structures," Nintendo argued that Gamevice cannot prove infringement under the district court's construction, "physical components that hold a computing device," because the side rails, which are an integral part of the computing device, cannot hold the computing device. Appx853-854. Regarding "input module apertures" that "secure" an instructional input device, Nintendo argued that Joy-Con's instructional input devices (e.g., buttons and joysticks) are not secured by holes but rather by screws and a combination of a rubber flange and a circuit board. Appx856.

In response, Gamevice submitted expert testimony showing that the side rails of the Nintendo Switch infringe the "confinement structures" element because they hold the computing device using screws, which exert compressive load on the back cover of the computing device of the Nintendo Switch. Appx905-906 (citing Appx936-938 (¶¶ 40-45)). Gamevice's expert also explained that the Joy-Cons have

19

holes through which buttons extend up and prevent the buttons from falling out through the flanges' interaction with the hole edges, thereby securing them. Appx907-908. Gamevice pointed out that the Joy-Cons have the same type of arrangement of the apertures and instructional input devices that the specification describes as securing the instructional input devices. Appx908-910. Gamevice also argued that Nintendo's non-infringement arguments were precluded by the district court's anticipation ruling.

> ### 4. The district court granted summary of non-infringement on the ground that the Switch lacks elements in the remaining claims also recited in claims the Switch allegedly anticipated.

The district court issued an omnibus order for both parties' cross-motions for summary judgment, denying Gamevice's motion and granting Nintendo's. Appx1-13. Regarding Gamevice's motion for summary judgment, the district court held that under Federal Circuit law, Nintendo is permitted to plead in the alternative and simultaneously argue that the Nintendo Switch anticipates the asserted claims because it pre-dates the earliest priority date of the asserted claims, and that the Nintendo Switch does not infringe. Appx3-8. The district court further held that Gamevice's infringement allegations are binding on Gamevice, but not necessarily on Nintendo. Appx4-5. The district court also rejected Gamevice's arguments on judicial estoppel and the "law of the case" doctrine, reasoning that Nintendo did not concede infringement by pleading in the alternative. Appx7-8.

20

Turning to Nintendo's motion for summary judgment of non-infringement, the district court held that the Nintendo Switch does not satisfy the "confinement structures" and "aperture [that] secures an instructional input device." Appx10-12. The district court found that the Nintendo Switch's rails do not satisfy the claimed "confinement structures" because they "do not hold all components of what Gamevice asserts is the computing device." Appx11. The district court further held that "the back cover of the 'computing device' is not 'held' by the rails simply because they are in 'pressing contact with the computing device and fastened using screws.'" *Id*. According to the district court, "[s]imply attaching two rails to the sides of the device do [sic] not constitute 'confinement structures.'" *Id*. Regarding "aperture [that] secures an instructional input device," the district court held that "[e]ven if the Joy-Con's buttons, consisting of a flange and circuit board, comport with the claim limitation, the joysticks are not secured with the apertures but with screws." Appx12.

## III.    SUMMARY OF THE ARGUMENT

A.    The district court found that the Switch both does and does not have the claimed "confinement structures" and "input module aperture" for anticipation and infringement, respectively. This was legal error. Nintendo was entitled to argue in the alternative that either (a) the Switch has these features and anticipates the asserted claims, or (b) it does not have these features and does not infringe. But once

the district court found for Nintendo on anticipation, the facts had been found: the Switch necessarily has confinement structures and an input module aperture; otherwise, it could not anticipate the claims having these limitations. Because anticipation and infringement turn on the same underlying facts, Gamevice should have been allowed to rely on the same found facts that invalidated 13 of its patent claims for the purposes of its infringement analysis for the remaining claims.

B.    Even if Nintendo should not have been estopped from presenting its non-infringement arguments, the district court erred in granting Nintendo's motion for summary judgement of non-infringement on "confinement structures." Gamevice showed, with supporting expert testimony, that the side rails in the Nintendo Switch hold the back cover of the Switch console using screws that exert compressive force. The district court failed to provide any justifiable basis for granting Nintendo's summary judgment of non-infringement in the face of Gamevice's competing expert testimony.

The district court committed another independent error regarding this limitation that warrants reversal. It *sua sponte* construed the term "hold" in its construction for "confinement structures" as requiring holding "all components" of what Gamevice asserted is the computing device. Gamevice was not given an opportunity to present arguments on this claim construction issue, which was raised for the first time in the district court's summary judgment decision. Furthermore, the

district court's definition of "hold" lacks any basis in the record below and, in fact, contradicts the intrinsic record, which indicates that the confinement structures need not hold all components of the computing device. Thus, the district court's grant of summary judgment of non-infringement with respect to "confinement structures" should be vacated and remanded.

C.     The district court's grant of summary judgment of non-infringement of the phrase "input module apertures, each input module aperture secures an instructional input device" was also erroneous. The district court's finding that apertures cannot secure anything is contradicted by the intrinsic record, which indicates that the interaction between apertures and the buttons' flanges secures the buttons. To the extent the district court found that the Nintendo Switch does not infringe because its buttons are secured using the apertures and other components, such as flanges and circuits, it erred. The plain and ordinary meaning of the claim language does not preclude using the combination of apertures and additional components to secure the buttons.

The district court's alternative holding that even if the Joy-Con's buttons are secured by the input module apertures, the Nintendo Switch still does not infringe because the joysticks are secured by screws rather than the apertures was also erroneous. Nothing in the intrinsic record requires all instructional input devices to be secured solely by the input module apertures. Thus, the district court's concession

that the buttons are secured using the apertures forecloses its conclusion that the Nintendo Switch does not satisfy this element.

## IV.   STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment under the law of the regional circuit. *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1315 (Fed. Cir. 2015). The Ninth Circuit reviews a district court's grant of summary judgment de novo but reviews denial of a motion for summary judgment for abuse of discretion. *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338 (Fed. Cir. 2001). "At summary judgment, claim construction is reviewed de novo as an issue of law when based on intrinsic evidence without underlying factual findings." *TecSec, Inc. v. Adobe Sys. Inc.*, 658 F. App'x 570, 576 (Fed. Cir. 2016) (citing *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332-33 (2015)). This Court reviews "subsidiary district court fact-finding, if any, for clear error." *Id.*

## V.   ARGUMENT

### A.   The district court erred in finding that the Switch practices the limitations at issue for invalidity, but not for infringement.

#### 1.   Anticipation and infringement turn on the same facts.

"[I]t has been well established for over a century that the same test must be used for both infringement and anticipation." *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1239 (Fed. Cir. 2009); *Polaroid Corp. v. Eastman Kodak Co.*, 789 F.2d 1556, 1573 (Fed. Cir. 1986) ("[T]hat which infringes if later

24

anticipates if earlier." (citation omitted)). A single device cannot be found to simultaneously practice a patent limitation for infringement or anticipation, yet fail to practice that very same limitation for the other.[1] But that is exactly what the district court found in this case.

The district court found that the Nintendo Switch *does* have "confinement structures" and "input module apertures" for 13 claims of the asserted patents for purposes of resolving Nintendo's summary judgment motion on anticipation. *See* Appx15-16; Appx24-25. When it came to Gamevice's summary judgment motion on infringement, however, the district court went the other way, finding that the same Nintendo Switch has *neither* the claimed "confinement structures" *nor* "input module apertures." Appx10-12. These inconsistent findings are clear error under this Court's precedent on anticipation and infringement.

Anticipation and infringement are both questions of fact. *See SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1357 (Fed. Cir. 2006); *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1040 (Fed. Cir. 2016) (en banc). To find that the Nintendo Switch anticipates a claim, the district court needed to find, as fact, that the Switch

---

[1] Though not relevant here, product-by-process claims are the exception to this rule. *See Amgen Inc. v. F. Hoffmann–La Roche Ltd*, 580 F.3d 1340, 1370 (Fed. Cir. 2009) ("For product-by-process claims, that which anticipates if earlier does not necessarily infringe if later."). None of the claims here are product-by-process claims.

practices every element of that claim. *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1554 (Fed. Cir. 1983) ("Anticipation requires the disclosure in a single prior art reference of each element of the claim under consideration."). To find whether the Switch infringes a claim, the district court likewise must determine "whether each limitation of the properly construed claims is found in the accused product or process." *Hormone Rsch. Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed. Cir. 1990).

The district court relied on this Court's decision in *Vanmoor* and used the allegations in Gamevice's complaint to find that the Nintendo Switch anticipates each of the asserted claims for which it was found to be prior art. Appx16 (citing *Vanmoor*, 201 F.3d at 1366). When the district court made this anticipation ruling, it necessarily found, as fact, that each element of the claimed invention [was] disclosed by the Nintendo Switch for the 13 claims it found anticipated. Appx24-25; *W.L. Gore*, 721 F.2d at 1554. The district court stated as much in its summary judgment order. *See* Appx16 ("Anticipation occurs when a single prior art reference 'expressly or inherently describes each and every limitation set forth in the patent claim[s].'" (alteration in original) (quoting *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2002))).

Gamevice then relied on the district court's finding that the Nintendo Switch practices the limitations of these 13 claims for its infringement analysis of the

remaining claims with the same limitations, which it was entitled to do. Appx704-706; *see, e.g.*, *Martin v. Henley*, 452 F.2d 295, 300 (9th Cir. 1971) (parties are "entitled to rely on . . . earlier determination[s] under the 'law of the case' doctrine"); *Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-cv-02848-WHO, 2021 WL 783560, at *11 n.4 (N.D. Cal. Mar. 1, 2021) ("Because I found that the Accused Products do not infringe, they cannot anticipate.").

When infringement and anticipation are determined inconsistently, bizarre results are inevitable. The district court rulings with respect to claims 16 and 17 of the '713 patent are the clearest example. The district court found that the Nintendo Switch did not practice every limitation of claim 16 of the '713 patent for its infringement analysis. Appx9-12. Yet, in its earlier anticipation analysis, the district court found that the same Nintendo Switch practiced every limitation of claim 17, which depends from claim 16, and therefore includes all the limitations of claim 16, with *additional* limitations to a "computing device." Appx24-25; Appx97 (19:48-20:36 20:26-36).[2] The district court's infringement findings cannot be reconciled with its earlier invalidity findings.

---

[2] Claim 16 was found not anticipated because it does not include the term "computing device" and, therefore, was entitled to a priority date that precedes the Nintendo Switch. Appx19-25. Claim 17 adds the "computing device" limitation but does not require a back and a screen, so it was found to post-date the Nintendo Switch. *Id.*

**2.  Nintendo's procedural maneuver did not excuse the district court from performing the same element-by-element analysis this Court requires for both anticipation and infringement.**

Below, Nintendo attempted to escape the district court's anticipation finding by recasting that finding as a consequence-free litigation ploy bearing no relationship to the substantive law of anticipation. Appx790 (Nintendo arguing that "Nintendo's *Evans Cooling* motion made no such factual concessions."). What *Vanmoor* and its predecessor, *Evans Cooling*, allow a defendant in Nintendo's position to do is avoid the usual challenges of satisfying the high burden of proof associated with anticipation by accepting the patentee's infringement allegations and focusing only on the question of whether the Switch was prior art. But while these cases approved a shortcut for a patent challenger to satisfy the burden of proving anticipation with the patentee's infringement allegations, they did not change the rule that anticipation requires that every limitation be present in a given article.[3] *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1335 (Fed. Cir. 2005) ("To anticipate, a single reference must teach each and every limitation of the claimed invention.").

---

[3] *See Vanmoor*, 201 F.3d at 1366 (tying the use of a patentee's allegations to the defendant's "burden of proving" anticipation, not to any modification on what anticipation actually *is*).

Indeed, as this Court noted in another *Evans Cooling*-style case where the patent owner maintained its infringement allegation, and the accused infringer conceded infringement but argued a prior invention under 35 U.S.C. § 102(g)(2) (pre-AIA), "it is undisputed for the purpose of this appeal that AstraZeneca's [accused and prior art] drug *is an embodiment within the scope of the asserted claims*." *Teva Pharm. Indus. Ltd. v. AstraZeneca Pharms. LP*, 661 F.3d 1378, 1382 (Fed. Cir. 2011) (emphasis added). That conclusion governed the result of the case, even through the appeal. It was not some legal fiction that could be relied on for some issues but disregarded for others, like a switch that can be turned on or off as the needs of the accused infringer change.

*Evans Cooling* and *Vanmoor* do not contradict Gamevice's position on this issue, despite Nintendo's claims below that those cases would be "turn[ed] . . . on their heads." Appx786. Instead, given this Court's precedent on the mirroring of infringement and invalidity, that same logic of procedural fairness that underpins *Evans Cooling* must apply when a defendant alleges—*and obtains*—anticipation of patent claims using its own products. "A patent may not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to find infringement." *Sterner Lighting, Inc. v. Allied Elec. Supply, Inc.*, 431 F.2d 539, 544 (5th Cir. 1970) (quoting *White v. Dunbar*, 119 U.S. 47, 51 (1886)). To be clear, in most situations, a defendant filing an *Evans Cooling* motion will either win the motion because the accused

29

product is prior art to all the asserted claims and the case is over, or lose the motion because it cannot prove the accused product is prior art, putting the parties back to square one. Here, Nintendo's prior art argument depended on first winning a written description priority argument, an analysis done on a claim-by-claim basis, *see Capon v. Eshhar*, 418 F.3d 1349, 1360 (Fed. Cir. 2005), and which allows for a possible split decision where some claims are anticipated but some pre-date the accused product, *see Vas-Cath Inc. v. Mahukar*, 935 F.2d 1555, 1567 (Fed. Cir. 1991). Under those circumstances, the defendant must live with its strategic choices and grapple with the factual findings that underpin an anticipation ruling it asked for *and* received, even if it only invalidated some of the claims asserted against it.

To the extent there should be *any* inconsistency between burdens placed on patentees and patent challengers, that inconsistency must favor *the patentee.* A patent challenger—here, Nintendo—must prove that patent claims are invalid by clear and convincing evidence. *See Baxter Int'l, Inc. v. Cobe Lab'ys, Inc.*, 88 F.3d 1054, 1057-58 (Fed. Cir. 1996). A patentee—here, Gamevice—need only prove that a patent is infringed by a preponderance of the evidence. *Centricut, LLC v. Esab Grp., Inc.*, 390 F.3d 1361, 1367 (Fed. Cir. 2004).

In short, Nintendo was entitled to argue that the Switch practiced the asserted claims and rendered them anticipated or, in the alternative, that it did not infringe those limitations. *See Evans Cooling*, 125 F.3d at 1451; *Vanmoor*, 201 F.3d at 1366

("[Defendants] denied that the accused cartridges infringe but have, 'by conceding infringement for purposes of the summary judgment motion and [their] on sale defense, properly pled *in the alternative*.'" (second alteration in original) (emphasis added) (citation omitted)). Once it *succeeded* on anticipation, however, the facts had been found: the Switch "expressly or inherently describes each and every limitation set forth in the [anticipated] patent claim[s]." Appx16 (second alteration in original) (quoting *Trintec*, 295 F.3d at 1295). Gamevice was entitled to rely on these established facts to argue the Nintendo Switch practices those same limitations for purposes of infringement. *See Martin*, 452 F.2d at 300. By holding the opposite and finding that the Nintendo Switch both does—and does not—have confinement structures and input module apertures, the district court erred.

### 3.  Neither *Gammino* nor *Archer* supports Nintendo.

In finding that the Nintendo Switch both does and does not have the "claimed confinement structures" and "input module apertures," the district court relied heavily on two *Gammino* cases: *Gammino v. Sw. Bell Tel., L.P.*, 512 F. Supp. 2d 626 (N.D. Tex. 2007) ("*Gammino/SWB*"), *aff'd*, 267 F. App'x 949 (Fed. Cir. 2008); and *Gammino v. Sprint Commc'ns Co.*, No. 10-2493, 2011 WL 3240830 (E.D. Pa. July 29, 2011) ("*Gammino/Sprint*"). Neither supports the inconsistent result below.

First, the district court found that "[i]n *Gammino/SWB*, the court 'adopt[ed], without deciding' the patentee's 'interpretation of the claims of his patents' for the

31

purposes of the defendant's motion for summary judgment of invalidity." Appx4-5 (quoting *Gammino/SWB*, 512 F. Supp. 2d at 632). It then found that "the Court separately turned to claim construction to do a noninfringement analysis for the remaining claims and held that the patentee had 'failed to meet his burden'" on infringement. Appx5 (quoting *Gammino/SWB*, 512 F. Supp. 2d at 638, 643).

The critical distinction between *Gammino/SWB* and the present case is that the *Gammino/SWB*'s prior art technology for invalidity and the accused technology for infringement were distinct services with distinct features. *Gammino/SWB*, 512 F. Supp. 2d at 643.[4] So it was not at all inconsistent for *Gammino/SWB* to find that the prior art technology *did* practice certain limitations of the asserted claims but that the accused technology did not. This case, on the other hand, involves a single device in both the invalidity and infringement analysis: the Nintendo Switch. One device cannot both have and not have confinement structures and input module apertures.

To the extent *Gammino/SWB* held that anticipation does not require a factual finding that each element be present in a given reference, that is inconsistent with this Court's precedent, *W.L. Gore*, 721 F.2d at 1554, and in any event, is non-binding. This Court affirmed *Gammino/SWB* only as to its invalidity finding and not

---

[4] In fact, the *Gammino/SWB* court made the very underlying factual finding corresponding to what the district court *should* have found below, i.e., that the Nintendo Switch satisfies each of the limitations it was found to anticipate. 512 F. Supp. 2d at 636 ("Gammino has, in effect, confirmed that SWB's call-blocking methods satisfy all the limitations of his patents.").

to its subsequent claim-construction and infringement rulings. *Gammino v. Sw. Bell Tel., L.P.*, 267 F. App'x 949, 949 (Fed. Cir. 2008) ("In light of our disposition of the invalidity claim, we need not address the district court's ruling on the motion for summary judgment of non-infringement.").

*Gammino/Sprint* is even less relevant to this dispute. There, the district court determined that because the *Gammino/SWB* court had earlier found the aforementioned patent claims invalid in a final and affirmed judgment, collateral estoppel prevented Gammino from asserting those same claims against other defendants. *Gammino/Sprint*, 2011 WL 3240830, at *8-10. As the court noted, estoppel made it "inappropriate to consider whether the *SWB* decision was either incorrect or subject to disagreement." *Id.* at *5. *Gammino/Sprint* is an unremarkable application of basic collateral estoppel principles.

The district court relied on *Gammino/Sprint* for two things. "First, . . . the patentee's infringement allegations are binding on it but not, necessarily, [on] the accused infringer." Appx6. "Second, . . . because the Court's holding was based on essentially a limited stipulation that the accused product was infringing, a finding of invalidity by the Court allowed it to forego its traditional infringement analysis." Appx6. But neither point supports the district court's holding in this case. The issue is not whether Gamevice was bound by its allegations of infringement. It was. *See* Appx24-25 (finding all asserted claims except claim 16 of the '713 patent anticipated

by the Nintendo Switch). Instead, the issue is that neither Nintendo nor the Court considered itself to be bound by the same found facts that rendered 13 of Gamevice's claims anticipated. *See Knapp v. Morss*, 150 U.S. 221, 228 (1893) ("If the Balch, Everett, Wilson, or Ferris patents, or even the umbrella, were subsequent in date to that of the Hall patent, *they would constitute an infringement thereof*, for the rule is well established 'that which infringes, if later, would anticipate, if earlier.'" (emphasis added) (citation omitted)); *Intel*, 2021 WL 783560, at *11 n.4.

The district court's reliance on *Ocean Innovations, Inc. v. Archer*, 145 F. App'x 366 (Fed. Cir. 2005), is also off point. *See* Appx6-7. In *Archer*, an accused infringer argued before the district court that its accused product did not infringe or, alternatively, that the accused product was an anticipating prior invention if it *was* found to infringe. *See* 145 F. App'x at 371 n.3. On appeal, the defendant argued that the infringement ruling was incorrect, while the patent owner argued that the defendant's unsuccessful anticipation argument was an admission of infringement. *Id.* at 369-71. This Court rejected the patent owner's position and characterized the anticipation argument as a permissible "alternative theory for non-liability." Appx6-7 (quoting *Archer*, 145 F. App'x at 371 n.3).

This Court's ruling in *Archer* thus stands only for the proposition that alternative arguments are permitted and that an unsuccessful argument will not create an estoppel. Here, though, Nintendo *won* on its invalidity argument that the

Nintendo Switch anticipates 13 claims of the patents-in-suit (Appx24-25), which necessarily means it practices every limitation of them.

If the Switch has "confinement structures" and "input module apertures," then it *has them*—whether for infringement or anticipation. *Int'l Seaway*, 589 F.3d at 1239 ("[T]he same test must be used for both infringement and anticipation."). An accused infringer may make the tactical decision of asserting that an accused product is actually anticipating prior art that practices all of the limitations of the claims asserted against it. *See Archer*, 145 F. App'x at 371 n.3.

This tactic, however, is not without consequence. If it succeeds on anticipation, the accused infringer will have established—by "clear and convincing evidence"—that its accused product practices every limitation of those invalidated claims. hat it does. *Microsoft Corp. v. I4I Ltd. P'ship*, 564 U.S. 91, 95, (2011). That was the bargain struck by the defendants in *Evans Cooling* and *Vanmoor*, and it is the bargain compelled by over a hundred years of precedent establishing that anticipation and infringement must be assessed the same way for the same products. *See Evans Cooling*, 125 F.3d at 1451; *Vanmoor*, 201 F.3d at 1366; *Knapp*, 150 U.S. at 228; *Int'l Seaway*, 589 F.3d at 1239.

Once the district court found that the Nintendo Switch anticipated 13 of Gamevice's claims, it was bound to apply the same found facts for infringement. *See Martin*, 452 F.2d at 300; *Intel*, 2021 WL 783560, at *11 n.4. By finding otherwise,

the district court erred. This Court should vacate the district court's grant of Nintendo's motion for summary judgment of non-infringement and denial of Gamevice's summary judgment motion on infringement and remand with instructions to reconsider both motions consistent with the facts that the district court found in resolving Nintendo's summary judgment motion on anticipation.

### B. The district court erred in granting Nintendo's motion for summary judgment of non-infringement.

Summary judgment is appropriate only if the movant proves there is no genuine dispute of material fact. *Gart*, 254 F.3d at 1339. To that end, a court is required to construe the evidence in the light most favorable to the non-movant and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For the non-movant, "what is required to defeat summary judgment is simply evidence 'such that a reasonable juror drawing all inferences in favor of the respondent could return a verdict in the respondent's favor.'" *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (quoting *Reza v. Pearce*, 806 F.3d 497, 505 (9th Cir. 2015)).

"[A]t the summary judgment stage[,] the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. Thus, "[w]here there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate." *Crown*

*Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011). When there is "a direct conflict in the declarations as to a material fact" under the patentee's "interpretation of the claims," it is improper for the court to resolve such credibility disputes because "[t]he conflict in declarations created a genuine issue of material fact that made summary judgment inappropriate." *Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*, 527 F.3d 1330, 1338-39 (Fed. Cir. 2008); *see also Ethicon*, 796 F.3d at 1326.

Here, ignoring the issues discussed above regarding whether Nintendo should have been permitted to even argue that limitations in the anticipated claims were absent from the Nintendo Switch, the district court erred in granting Nintendo's summary judgment motion because there were disputes of material fact in Gamevice's expert declarations, as explained below. Thus, when all justifiable inferences are drawn in Gamevice's favor, a reasonable juror could have found that the Nintendo Switch meets the "confinement structures" and "input module aperture" limitations.

> **1.    Gamevice's expert showed there was a material dispute of fact concerning whether the Switch possessed the claimed "confinement structures."**

The district court erred in granting Nintendo's summary judgment of non-infringement on "confinement structures" in the face of Gamevice's competing

expert testimony demonstrating that the side rails of the Nintendo Switch satisfy this element under the district court's construction. *Anderson*, 477 U.S. at 249.

In its *Markman* order, the district court construed "confinement structures" as "physical component(s) that hold(s) a computing device." Appx35-37. The central dispute between the parties was whether the side rails of the Nintendo Switch (shown below) "hold" the computing device.



Pair of confinement structures

Appx936 (¶ 40).

Gamevice argued, citing declaration testimony from its expert, Dr. Singhose, that the side rails hold the computing device using screws as a fastening mechanism. Appx936-938 (¶¶ 40-45). Referring to the annotated photograph below, Dr. Singhose testified:

The left and right rails ("side rails") **hold the computing device** because the side rails are screwed to the upper frame, i.e., the "structural bridge" using screws, i.e., "fastening mechanisms," one of which passes through a hole in the plastic back cover of the Switch console, part of the "computing device," as shown in the figures below. I have also inspected the side rails and found them to **hold the computing device by being in pressing contact with the computing device and fastened using screws**.



Appx936 (¶ 41) (emphases added).

Despite acknowledging that the side rails are in pressing contact with the back cover (which is indisputably part of the computing device) using screws, the district court held that this does not constitute "hold[ing] a computing device" because the rails do not hold "all components of what Gamevice asserts is the computing device." Appx11. According to the district court, "simply being in 'contact' with the

computing device cannot comport with this specification." Appx11. This was legal error.

The district court improperly resolved factual disputes regarding whether the screws fastening the side rails to the back constitute holding the computing device. *Ethicon*, 796 F.3d at 1326-27 (vacating district court's summary judgment of non-infringement because it "impermissibly resolved factual disputes in favor of [defendant] in order to reach its conclusions"). Notably, it did not provide any basis for ignoring Dr. Singhose's competing expert testimony that the side rails exert sufficient compressive load on the back cover to hold the computing device, improperly making credibility determinations and weighing the evidence at the summary judgment stage. *Crown Packaging*, 635 F.3d at 1384.

> **2.    The district court construed "hold" in a way that contradicts the intrinsic record and without providing Gamevice an opportunity to address it.**

The district court committed another independent legal error that justifies reversal of the grant of summary judgment. Its decision was premised on an erroneous interpretation of the term "hold" in the construction for "confinement structures." For the first time in its summary judgment decision, the district court construed "hold" to mean "hold[ing] *all components* of what Gamevice asserts is the computing device" in granting Nintendo's summary judgment. Appx11 (emphasis added).

As a procedural matter, it was improper for the district court to *sua sponte* construe a term in its construction for the first time in the summary judgment decision without providing Gamevice an opportunity to present its arguments. *TNS Media Rsch., LLC v. Tivo Rsch. & Analytics, Inc.*, 629 F. App'x 916, 939 (Fed. Cir. 2015) (reversing and remanding the district court's grant of summary judgment because it *sua sponte* construed a term without affording the parties an opportunity to present their claim-construction arguments); *accord Eon-Net LP v. Flagstar Bancorp*, 249 F. App'x 189, 194-95 (Fed. Cir. 2007); *TecSec*, 658 F. App'x at 585.

Moreover, the district court's construction of "hold" requiring the confinement structures to hold all components of the computing device has no basis in the record below and, in fact, contradicts the intrinsic record. For example, in Figure 16 (copied below), element 316 represents a pair of confinement structures, which interact only with the left and right edges of the computing device and do not interact with "all components" of what Gamevice asserts is the computing device, as the district court required.

41



FIG. 16

Appx63 (Fig. 16) (annotated).

Thus, the district court's construction of "hold" reads out a disclosed embodiment of the specification without any evidence to the contrary, contravening the well-established principles of claim construction. *Apple Inc. v. Corephotonics, Ltd.*, 81 F.4th 1353, 1359 (Fed. Cir. 2023) ("Our caselaw counsels against interpreting the claims in a way that would omit a disclosed embodiment absent clear evidence to the contrary."), and citing *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1327 (Fed. Cir. 2023) ("[W]e also recognize that 'a claim construction excluding a preferred embodiment is rarely, if ever correct.'" (alteration in original) (quoting *Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1372 (Fed. Cir. 2022) (cleaned up))).

In addition, the district court's new requirement of holding *all* components conflicts with the claims themselves. For example, claim 1 of the '713 patent limits

the confinement structures to confining at least two but no more than three sides of the computing device (Appx96 (17:54-57)), meaning the confinement structures must hold the computing device without touching all sides, or components, of it. And more fundamentally, the district court interpretation makes no sense, since one can certainly hold something complex like a computing device without literally interacting with all its external and internal components.

> **3.    Gamevice's expert also showed that there was a material dispute over whether the Switch possessed "input module apertures, each input module aperture secures an instructional input device."**

The district court held that Gamevice cannot show that the Switch infringes this element because "apertures themselves cannot secure anything," "the joysticks are not secured with the apertures but with screws," and "[t]he fact that a gap exists between the apertures and joysticks to facilitate their easy movement further supports Nintendo's argument that the apertures do not secure the joysticks." Appx11-12. Each of these bases is flawed and fails to justify the district court's grant of Nintendo's summary judgment motion.

First, the district court's conclusory statement that "apertures themselves cannot secure anything" contradicts the intrinsic record. The specification of the asserted patents discloses the same arrangement as the Joy-Cons in the Nintendo Switch (e.g., Figure 13, shown below), in which the buttons (instructional input devices 256) extend up through holes (input module apertures 254) in input modules.

43

The '713 patent states that, with this arrangement, "each input module aperture 254[] *secures* an instructional input device 256." Appx91 (8:18-23) (emphasis added); Appx940-941 (¶ 52); Appx875-876 (¶ 209).



Appx60 (Fig. 13).



Appx939-940 (¶ 49).

To the extent the district court construed "secure" to exclude the use of additional components, such as a flange or a screw, to hold the instructional input devices in place, it erred. The specification does not specify how the buttons are secured other than stating simply that an input module aperture secures an instructional input device. Appx91 (8:18-23). The specification is thus indifferent to the use of any additional components for securing the instructional input devices, including using the combination of the aperture and the flange or screw to secure the instructional input device. *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1342 (Fed. Cir. 2013) ("The ordinary meaning of 'connected to' encompasses indirect linkages. Indeed, the specification uses variations of the term 'connect' to describe indirect connections.").

The district court's order also fails to properly credit Gamevice's expert, who testified that "[w]hile there is a flange, it is the interaction of that flange with the holes, and the proper sizing of the holes, that allows the button to both protrude from the housing and yet still be secured in place. . . . [I]f the holes were bigger than the flange, the buttons would fall out, so the size of the holes secures the buttons in place." Appx941 (¶ 54). The district court erred in dismissing this factual testimony.

The district court also erred in focusing exclusively on the joysticks to justify granting Nintendo's summary judgment motion, ignoring the fact that the buttons are secured using the input module apertures. It is undisputed that "instructional

input devices" include both buttons and joysticks, and thus, infringement is shown if the buttons are secured with the apertures even if the joysticks are not. *Core Wireless Licensing S.A.R.L. v. Apple Inc.*, 899 F.3d 1356, 1363 (Fed. Cir. 2018) ("[I]nfringement is not avoided merely because a non-infringing mode of operation is possible." (alteration in original) (quoting *z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007))). In fact, the district court acknowledged that "the Joy-Con's buttons, consisting of a flange and circuit board," may "comport with the claim limitation." Appx12. Thus, the district court erred in finding that Gamevice cannot prove infringement of this limitation in the Nintendo Switch.

The district court justified its ruling by stating that "[t]he fact that a gap exists between the apertures and joysticks to facilitate their easy movement further supports Nintendo's argument that the apertures do not secure the joysticks." Appx12. Again, the district court fixates on the joysticks and ignores the buttons. Gamevice presented competing expert testimony by Dr. Singhose who opined that the holes also secure the buttons, which the district court ignored without any justification. Appx940 (¶ 50) ("[T]he buttons are not attached at their base to anything internal to the Joy-Con[,] so if the apertures were, for example, too large in diameter, the buttons would simply fall out of the Joy-Con." (citation omitted)). It was legal error for the district court to ignore this competing expert testimony—

without any justification—to reach its conclusion of non-infringement. *Ethicon*, 796 F.3d at 1326.

Therefore, the district court erred in granting summary judgment that the Switch lacks this limitation.

## VI.   CONCLUSION

Nintendo cannot have it both ways: having proved that the Switch has all the limitations of 13 anticipated claims, including the claimed "confinement structure" and "input module apertures" —it cannot change its mind and argue that the Switch does not infringe because those elements are missing. And the district court should not have allowed Nintendo to make those inconsistent arguments after it prevailed on one of them.

Gamevice submits that the judgment of non-infringement should be reversed and judgment of infringement be entered or, at a minimum, the denial of the summary judgment of infringement be remanded for further consideration in light of the earlier anticipation rulings, because Nintendo should face the natural consequences of its success in convincing the district court that the Switch anticipates most of Gamevice's claims.

But even if Nintendo were permitted to argue noninfringement positions inconsistent with the district court's anticipation judgment, the judgment of non-infringement still must be reversed. Because on this record, there is at least a material

dispute of fact concerning whether the Switch possesses the "confinement structure" and "input module apertures" limitations.

Thus, the Court should vacate the order granting Nintendo's summary judgment of non-infringement and denying Gamevice's motion for summary judgment of infringement as being inconsistent with the prior unchallenged judgment that Nintendo requested and received that the Switch anticipates 13 of the asserted patent claims. The Court should then remand with instructions that further arguments and rulings must be consistent with the factual findings inherent in the anticipation ruling.

Alternatively, the Court should reverse the grant of Nintendo's summary judgment of non-infringement because it improperly ignored genuine issues of material fact resulting from the competing opinions of Gamevice's expert on the confinement structure and apertures limitations and improperly added new and incorrect limitations for the confinement structure limitation.

Dated:  May 15, 2024           Respectfully submitted,

/s/  Smith R. Brittingham IV
Smith R. Brittingham IV
Erik R. Puknys
James R. Barney
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001-4413
(202) 408-4000

*Counsel for Gamevice, Inc.*

# ADDENDUM

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GAMEVICE, INC.,

        Plaintiff,

   v.

NINTENDO CO., LTD., et al.,

        Defendants.

Case No. 18-cv-01942-RS

**ORDER DENYING GAMEVICE'S MOTION FOR SUMMARY JUDGMENT AND GRANTING NINTENDO'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

This is a patent infringement action brought by Gamevice, Inc. ("Gamevice") against Nintendo of America, Inc. and Nintendo Co., Ltd. ("Nintendo"). The alleged infringing product is the Nintendo Switch ("Switch"). Parties now bring cross-motions for summary judgment. In its motion for summary judgment, Gamevice avers that Nintendo infringes on claims 3, 4, 7, and 16 of U.S. Patent No. 9,808,713 ("the '713 patent") and claim 6 of U.S. Patent No. 10, 391,393 ("the '393 patent") (together, the "asserted patents"). Conversely, Nintendo moves for summary judgment on the theory that the Switch does not infringe any of Gamevice's patents, seeking a judgment of noninfringement as a matter of law. For the reasons discussed below, Gamevice's motion is denied and Nintendo's motion is granted.

## II. BACKGROUND

Previously, Nintendo filed a motion for summary judgment against Gamevice, which was granted in part and denied in part. Specifically, the prior order concluded that all asserted claims

United States District Court
Northern District of California

except for claim 16 of the '713 patent were invalid as anticipated by the Switch. Gamevice then filed a motion for reconsideration as to the prior summary judgment order, arguing that the court neglected to analyze individually the validity of the asserted claims. The prior summary judgment order was consequently amended to reflect the correct mode of analysis and several claims were no longer deemed invalid because of anticipation by the Switch. As it stands, six of the remaining asserted claims are not invalid by anticipation: claims 3, 4, 6, 7, and 16 of the '713 patent and claim 6 of the '393 patent. These claims are entitled to a priority date preceding the Switch.

Gamevice and Nintendo now file cross-motions for summary judgment. Gamevice argues for summary judgment on the basis that Nintendo is precluded from asserting noninfringement because of judicial estoppel and law-of-the-case doctrine. Nintendo, conversely, argues that it is entitled to summary judgment because at least three of the claim limitations in the asserted claims are incongruous in the Switch and Gamevice's patents.

### III. LEGAL STANDARD

Summary judgment is appropriate if the pleadings, discovery, and affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). A genuine issue of material fact is one that could reasonably be resolved in favor of the nonmoving party, and which could "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of proof to "make a showing sufficient to establish…the existence of an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). If the movant succeeds in demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Id*. at 322 n.3; *see also* Fed. R. Civ. Proc. 56(c)(1)(B). Evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences must be drawn in its favor. *See Anderson*, 477 U.S. at 255. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citation omitted). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that

United States District Court
Northern District of California

1  precludes summary judgment. *Id.* If the nonmoving party fails to make this showing, "the moving

2  party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 322.

3  ## IV. DISCUSSION

4  ### A. Gamevice's Motion for Summary Judgment

5  Gamevice moves for summary judgment on the theory that the earlier finding of invalidity

6  by anticipation of thirteen of the asserted claims "necessarily establishes that the Switch satisfies

7  those same claim limitations for any claims that pre-date the Switch." Dkt. 255 at 1. Gamevice

8  argues that under either judicial estoppel or law of the case doctrine, the Court must rule that the

9  Switch infringes on the claims not deemed invalid by anticipation. *See* Dkt. 245. Nintendo

10  disagrees, citing *Evans Cooling Systems, Inc. v. General Motors Corporation* to argue that

11  Gamevice's accusations of infringement are only binding on Gamevice. Moreover, Nintendo

12  argues that Gamevice's averments of infringement permitted Nintendo to plead in the alternative

13  and assert infringement for its invalidity defense *only*, without losing its ability to maintain its

14  position of noninfringement. 125 F.3d 1448 (Fed. Cir. 1997).

15  As a threshold matter, anticipation occurs when a single prior art reference "expressly or

16  inherently describes each and every limitation set forth in the patent claim[s]." *Trintec Indus., Inc.

17  v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1295 (Fed. Cir. 2022). An accused infringer challenging

18  validity must prove its case by clear and convincing evidence. *Baxter Int'l, Inc. v. Cobe

19  Laboratories, Inc.*, 88 F.3d 1054, 1058 (Fed. Cir. 1996). The Federal Circuit has held that where

20  the entire basis of a patentee's suit is infringement, an accused infringer may assert anticipation by

21  its own product in the form of alternative pleading to establish a *prima facie* case of invalidity,

22  while still maintaining noninfringement as a defense. *See Evans Cooling*, 125 F.3d at 1451;

23  *Vanmoor v. Wal-Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000). This is because the

24  patentee's own allegations of infringement may be relied upon by an accused infringer to establish

25  their *prima facie* defense of invalidity by anticipation. *Id.*; *see also IXYS Corp. v. Adv. Power

26  Tech., Inc.*, No. C 02-03942 MHP, 2004 WL 540513, at *5 (N.D. Cal. Mar. 18, 2004) (In *Evans

27  Cooling*, "[t]he court's conclusion that the infringement claim itself fulfilled defendant's burden of

28

demonstrating identity…served principally to truncate litigation that was logically doomed to failure").

    i.    *The effect of the court's anticipation ruling*

In Gamevice's motion for summary judgment, the primary contention between the parties is whether the court's prior anticipation ruling necessitates a finding of infringement in the instant order. Gamevice argues that if a product does not infringe asserted claims, then it cannot invalidate them, and so the converse must be true. Dkt. 262 at 7. To support its argument, Gamevice cites to *ThinkOptics, Inc. v. Nintendo of America, Inc.*

> The Federal Circuit's decision in *Vanmoor* prohibits plaintiffs from arguing that "a product contains each and every element of the patented invention for infringement purposes, but that the same product does not contain each and every element of the patented invention for invalidity purposes." *U.S. Ethernet Innovations, LLC v. Texas Instruments Inc.*, No. 6:11–cv–491, 2014 WL 1347994, at *2 (E.D. Tex. Apr. 3, 2014)

No. 6:1-cv-455, 2014 WL 3347531 at *2 (E.D. Tex., Jul. 3, 2014). This rule ensures that the plaintiff's defense against invalidity is logically consistent with its own allegations in a patent infringement case. However, the patentee in *ThinkOptics, Inc.* was not asserting infringement. Instead, the patentee was insisting that, for its anticipation argument, the defendant had failed to show that the accused product had "disclosed every element of the claimed invention." *Id*. The Court held that "*Vanmoor* has not been extended to cases where the asserted reference and accused products differ in relevant respects." *Id*. Since the patentee in that case was not alleging infringement, the defendant could not rely on the patentee's allegations to make an *Evans Cooling/Vanmoor* pleading. *See id*. That is not the case here, where the basis of Gamevice's suit is patent infringement.

The *Gammino* cases are instructive. *Gammino v. Southwestern Bell Tel., L.P.*, 512 F. Supp. 2d 626 (N.D. Tex. 2007) ("*Gammino/SWB*") (affirmed only as to the invalidity claim by the Federal Circuit in *Gammino v. Southwestern Bell Tel., L.P* 267 Fed. App'x 949 (Fed. Cir. 2008)); *Gammino v. Sprint Comm'n Co. L.P.*, No. 10-2493, 2011 WL 3240830 (E.D. Pa. Jul. 29, 2011) ("*Gammino/Sprint*"). In *Gammino/SWB*, the court "adopt[ed], without deciding" the patentee's

United States District Court
Northern District of California

"interpretation of the claims of his patents" for the purposes of the defendant's motion for summary judgment of invalidity. *Gammino/SWB*, 512 F. Supp. 2d. at 632. However, the Court separately turned to claim construction to do a noninfringement analysis for the remaining claims and held that the patentee had "failed to meet his burden" that the accused product infringed the asserted patents in that case. *Id*. at 638, 643. Here, those claims are 3, 4, 6, 7, and 16 of the '713 patent, and claim 6 of the '393 patent. These claims (except for claim 6 of the '713 patent) are the basis of Gamevice's instant motion. Like Gammino, Gamevice may not receive the benefit of its infringement allegations without the necessary infringement analysis, which is precisely the result if its motion is granted. Gamevice insists that after finding invalidity, the *Gammino/SWB* court conducted claim construction for its noninfringement analysis of "ten *different* SWB services, which were not prior art to the Gammino patents." Dkt. 262 at 6 (emphasis in original). This argument confuses Gamevice's position. Gamevice seeks consistency with the court's prior summary judgment order, where the Switch was found to have anticipated most of the patents claims, but not for five of the remaining asserted claims for which Gamevice now seeks summary judgment. The five claims at issue now were given a priority date that pre-dated the Switch's introduction to the market. Indeed, if Gamevice's interpretation of *Gammino/SWB* is adopted, then the court should engage in a traditional infringement analysis of the six asserted claims, as, based on the court's prior summary judgment order, the Switch is not prior art to a claim with a priority date that precedes the Switch's on-sale date.

In *Gammino/Sprint*, which followed *Gammino/SWB*, the Court further explained this argument and stated that the patentee's infringement allegations allowed the Court to forego its traditional infringement analysis for a judgment of invalidity. 2011 WL 3240830 at *3. In that case, the Court made a collateral estoppel determination that a prior finding of invalidity could be raised as a defense to a "subsequent attempt to enforce the patent." *Id.* at *5. Where pertinent to the instant order, however, the court explained that, in *Gammino/SWB*:

> *Gammino's own interpretation* of the claims of his patents was a binding admission that prior art…[thus] invalidated the asserted claims of his patents. Importantly, because the court based its holding

> on Gammino's admissions, it did not perform the typical 'all-elements' analysis to determine if each component of Gammino's claims was present in Southwestern Bell's pre-existing products."

*Id.* at *3 (emphasis in original). This statement is instructive for two reasons. First, it explains what bears repeating, that the patentee's infringement allegations are binding on it but not, necessarily, the accused infringer. Second, it explains that because the Court's holding was based on essentially a limited stipulation that the accused product was infringing, a finding of invalidity by the Court allowed it to forego its traditional infringement analysis.[1] *Id.*; *see also id.* at *9 ("Because the Texas court invalidated Gammino's patents on the basis of his binding judicial admissions, it did not actually litigate the issues central to the validity of the unasserted claims" (internal citation omitted)). Gamevice correctly points out that in *Evans Cooling* and *Vanmoor*, all the asserted claims were invalidated and there was nothing left to litigate. This is not the case here. Six claims remain which were not determined to be invalid by anticipation. Gamevice insists that these claims be given the same treatment as any invalid claims in the cited cases. To the extent that Nintendo pled infringement for the purposes of its summary judgment motion of invalidity, Gamevice argues that pleading should be a binding admission by Nintendo and should permit the court to forego its traditional *Markman* infringement analysis. This argument is unworkable because it unfairly burdens the *Evans Cooling* pleader and allows the patentee to succeed on its infringement allegations, i.e. the entire basis of its suit, without satisfying its burden of proving infringement. *See Agawam Co. v. Jordan*, 74 U.S. 583, 609 (1868).

*Ocean Innovations, Inc. v. Archer* is also illustrative to reveal that an accused infringer does not admit infringement by arguing that the asserted patent is invalid. 145 F. App'x 366 (Fed. Cir. 2005). In that case, the Court rejected the patentee's argument that the accused infringer "admitted infringement" by "advancing [an] alternative theory for non-liability," that is, noninfringement or, otherwise, invalidity. *Id.* at 371 n.3. Gamevice points out that the accused

---

[1] In *Markman v. Westview Instruments, Inc.*, the Federal Circuit explained that "[a]n infringement analysis entails two steps. The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." 52 F.2d 967, 976 (Fed. Cir. 1995).

infringer in *Archer* lost its invalidity defense whereas Nintendo prevailed for most of the asserted claims, so this proposition is inapplicable. This argument is unpersuasive. First, to the extent that Gamevice's motion focuses on five of the remaining claims that were *not* successfully deemed invalid (i.e. for which Nintendo lost its invalidity defense), it conforms to Gamevice's own interpretation of the *Archer* proposition. However, even if Gamevice is correct that the surviving claims must receive the same treatment as the invalid ones because Nintendo prevailed on its anticipation argument *at all*, *Archer* makes no mention that the defendant is barred from advancing an alternative theory of non-liability once it is successful on one.

Where applicable, the cases above can be synthesized to stand for the proposition that if the basis of plaintiff's lawsuit is patent infringement by the "device that was put on sale," a defendant is allowed to rely on the plaintiff's allegations to assert a defense of invalidity based on anticipation. *See Evans Cooling*, 125 F.3d at 1451. This is because the analyses for anticipation and infringement are the same. *See Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889). Thus, because the Federal Circuit has provided defendants with a method to satisfy an evidentiary burden for their invalidity defense in the form of alternative pleading, it cannot require that raising a defense based on the plaintiff's allegations binds the defendant. This would turn the *Evans Cooling* rule, and, indeed, the principle of alternative pleading, on its head. If Gamevice's argument is accepted, it would render Nintendo's alternative pleading a concession of infringement, entirely collapsing Nintendo's ability to use the defense of invalidity and force it to abandon the position that it has maintained since the beginning – noninfringement of the asserted claims. Nintendo only pled satisfaction of all of the asserted patent claims to make a *prima facie* showing of invalidity, which it was permitted to do. Denying a defendant in a patent infringement suit the ability to raise objections of noninfringement where the Federal Circuit has provided a procedure to do so would be unjust.

> ii. *Judicial estoppel and law of the case doctrine*

Gamevice argues that judicial estoppel or law of the case doctrine require the Court to hold that for five of the remaining asserted claims, the Switch infringes. In that Nintendo did not

1 concede infringement by making an *Evans Cooling* pleading, Gamevice's judicial estoppel and

2 law of the case doctrine arguments must fail.

3         iii.        *Claims 3, 4, 7, and 16 of the '713 patent and claim 6 of the '393 patent*

4        The balance of Gamevice's motion is mostly premised on its unpersuasive argument that

5 Nintendo is bound by its alternative theory of non-liability, therefore the Court must hold the five

6 claims at issue in the instant motion as infringed by the Switch. For the reasons discussed above,

7 the remaining claims must undergo a traditional infringement analysis under *Markman*. *See* 52

8 F.2d at 976. Therefore, as to Gamevice's averments of infringement regarding claims 3, 4, 7, and

9 16 of the '713 patent and claim 6 of the '393 patent, the motion is denied for being premised on

10 Gamevice's rejected argument.

11     **B.  Nintendo's Motion for Summary Judgment**

12        Nintendo moves for summary judgment that the Switch does not infringe any of

13 Gamevice's asserted patent claims and seeks a judgment of noninfringement as a matter of law.

14 Pursuant to 35 U.S.C. § 271, direct infringement is the making, using, or selling of a patented

15 invention in the United States during the patent term. A patent is directly infringed if a product

16 practices "each and every element of the claimed invention." *BMC Res., Inc. v. Paymentech, L.P.*,

17 498 F.3d 1373, 1381 (Fed. Cir. 2007). A patent may be directly infringed in two ways, either by

18 literal infringement or the doctrine of equivalents, or non-textual infringement.

19        There are two steps to a literal infringement analysis. "The first step is determining the

20 meaning and scope of the patent claims asserted to be infringed. The second step is comparing the

21 properly construed claims to the device accused of infringing." *Markman I*, 52 F.3d at 976

22 (internal citation omitted). The first step involves claim construction, where the Court must

23 determine, as a matter of law, how a patent's claims must be construed. *Markman v. Westview*

24 *Instruments, Inc.*, 517 U.S. 370, 384-85 (1996); *see* Dkt. 241. The second step, whether the

25 accused device infringes the construed claims under either literal infringement of the doctrine of

26 equivalents, is a question of fact. *Markman II*, 517 U.S. at 384-85. Summary judgment of a literal

27 infringement assertion is appropriate if the court determines that "no reasonable jury could find

28

**Appx8**

United States District Court
Northern District of California

1    that every limitation recited in the properly construed claim either is or is not found in the accused

2    device." *Bai v. L & L Wings, Inc*., 160 F.3d 1350, 1353 (Fed. Cir. 1998) (citing generally *Cole v.*

3    *Kimberly-Clark Corp*., 102 F.3d 524 (Fed. Cir. 1996)).

4               i.    *ITC Investigations*

5               As a preliminary matter, parties disagree on the extent to which the ITC investigation may

6    be relied upon to show infringement. Gamevice's expert reports will form the basis of their

7    infringement contentions, and the ITC proceedings may be relied upon as persuasive authority,

8    particularly where the claims have been construed here consistent with the ITC's determinations.

9               ii.    *Claim limitations*

10              In its motion for summary judgment, Nintendo argues that Switch does not infringe on the

11   asserted patents because at least three of the asserted patent's claim limitations cannot be proven

12   by Gamevice. Nintendo argues that the "passageway" limitation, the "confinement structures"

13   limitation, and the "apertures" that "secure" limitation are not practiced by the Switch. In addition

14   to these limitations, Nintendo maintains that Gamevice incorrectly characterizes the "computing

15   device" limitation of its claims as an "arbitrary collection of parts" that cannot be considered a

16   computing device.

17              a.   Passageway

18              The first limitation Nintendo insists that Gamevice cannot prove is the "passageway"

19   limitation. The term "passageway" appears in claim 1 of each of the asserted patents and claim 16

20   of the '713 patent. This limitation was construed to mean "a space that accommodates a

21   communication wire" in accordance with Gamevice's construction. Further, the term was

22   construed this way because "the use of the article 'a'…connotes a discrete space rather than any

23   free-floating and ambiguous zone through which the wire may pass." The asserted patents recite a

24   "structural bridge" that is comprised of a "passageway." Claim 16 of the '713 patent, however,

25   differs slightly, calling for "an electronics communication passageway between the first and

26   second confinement structures."

27              Gamevice's expert witness, Dr. Singhose, contends that the "upper frame in the Switch," is

28

United States District Court
Northern District of California

the "structural bridge" that is comprised of the "passageway." Gamevice argues that the claim recites a structural bridge that merely "comprises" of a passageway, "so there is no requirement that the structural bridge be physically co-extensive with the passageway." Gamevice further contends that the passageway need not be straight as wire, by its nature, is flexible. Nintendo argues that there is a portion of the structural bridge that is "choked off" from any communication wires, and, thus, by definition, cannot accommodate the wires. This, Nintendo argues, runs afoul of the claim as construed. Nintendo also insists that the circuitous nature of the communication wires in the purported "structural bridge" indicates that there is no "passageway."

Whether the "passageway" must comprise entirely the space Gamevice defines as the structural bridge or whether it may just be a part of it is a disputed material fact. The claim recites "the passageway promotes communication between the first communication link and the computing device, the passageway further promotes communication between the second communication link and the computing device." The fact that a portion of the upper frame cannot accommodate a communication wire, and is therefore not a passageway, does not necessarily mean that the remainder of the upper frame, which can accommodate a communication wire, is not a passageway either. The term "comprises" means "including but not limited to" which requires the inclusion, at least, of what is recited. *See CIAS, Inc. v. All. Gaming Corp.,* 504 F.3d 1356, 1361 (Fed. Cir. 2007). Further, whether the passageway need be non-circuitous to be considered a passageway is also a disputed fact, because, as Gamevice points out, wires are flexible by nature. Thus, the "passageway" limitation cannot provide a basis for judgment as a matter of law.

b.   Confinement structures

The "confinement structures" limitation, however, breaks in the opposite direction. Nintendo insists that Gamevice cannot prove that the Switch practices the "confinement structures" limitation. This term was construed as "physical components that hold(s) a computing device." Dkt. 241. The term appears in claim 1 of each asserted patent and claim 16 of the '713 patent. Gamevice argues that the rails on the sides of the Switch are confinement structures that

are "separate and distinct components." Dkt. 267 at 12. To support its argument, Gamevice insists that the rails are screwed onto the "computing device" and a user must attach the Joy Con controllers to the rails and "hold[s] the controllers, which are connected to the [rails], which in turn are holding the computing device." Dkt. 267 11-12. Nintendo disagrees. It argues that the rails are part of the Switch and "do not hold or confine any part of the Switch that Gamevice says is the 'computing device.'" Dkt. 263-4 at 18.

Gamevice's arguments are unpersuasive. First, the rails do not hold all components of what Gamevice asserts is the computing device. Dkt. 263-4 at 19. Specifically, the back cover of the "computing device" is not "held" by the rails simply because they are in "pressing contact with the computing device and fastened using screws." Singhose Decl. ¶ 41. Furthermore, the patent specification language that the confinement structures are meant to apply "sufficient compression load…on the computing device" to hold them, but simply being "in contact" with the computing device cannot comport with this specification. Gamevice's observation that a user holds the Joy Con controllers which are attached to the console by the rails also does not translate to the rails holding the "computing device." Simply attaching two rails to the side of the device do not constitute "confinement structures" and Gamevice cannot prove this limitation in the Switch.

c.   "Apertures" that "secure"

Claims 1 and 16 of the '713 patent recite a "pair of control modules" with "input module apertures" that "secure[s] an instructional input device." The term "input module apertures" has not been construed by the court, however Gamevice contends that the Joy Con controllers contains features that satisfy the "input model apertures" limitations of the '713 patent. Specifically, Gamevice argues that the Joy-Con controllers are "a pair of control modules," each of which "has buttons and a joystick that extend up through the holes of the Joy-Con." Nintendo insists that the holes in the Joy-Cons do not secure the buttons and joysticks, only let them "pass through and move within" because there is a .2mm ring around the holes. Furthermore, the joysticks are secured by screws. Dkt. 263-4 at 20.

The plain and ordinary meaning of the term aperture is just "hole." While the apertures

United States District Court
Northern District of California

themselves cannot secure anything, the parties agree that the buttons are held in by a flange at the bottom. Nintendo argues that this means the flange, not the apertures, are securing the buttons. Gamevice disagrees because "if the holes were bigger than the flange, the buttons would fall out." Even if the Joy-Con's buttons, consisting of a flange and circuit board, comport with the claim limitation, the joysticks are not secured with the apertures but with screws. Gamevice concedes that the joysticks are part of what it deems the "pair of control modules" as recited by the patent but has failed to argue persuasively that the joysticks are secured by the "input model apertures" and not the screws. The fact that a gap exists between the apertures and joysticks to facilitate their easy movement further supports Nintendo's argument that the apertures do not secure the joysticks. Thus, Gamevice cannot prove this claim limitation.

    d.   Computing device

Nintendo argues that the Switch console itself is a computing device but insists that Gamevice's theory of what constitutes a "computing device" is overbroad and consists of elements that are not "electronic equipment[s] controlled by a CPU," per the claim construction. Dkt. 263-4 at 21-22 (quoting Dkt. 241 at 19). The ITC determined that Gamevice's "parts-of-the-Switch" theory, as Nintendo calls it, does not comport with the "computing device" limitation. Dkt. 268 at 11. This argument is immaterial for the purposes of a noninfringement analysis, which requires a two-step analysis: "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mech. Sys.*, Inc., 15 F.3d 1573, 1576 (Fed. Cir. 1993). The limitation "computing device," both parties agree, is present in the Switch. Whether Gamevice cannot show "distinct limitations" as recited by the patent is an issue of material fact a juror is entitled to make.

## V.   CONCLUSION

For the reasons above, Gamevice's motion for summary judgment is denied. Nintendo's motion for summary judgment is granted because Gamevice cannot raise a genuine issue of material fact as to the confinement structures and the "apertures" that "secure." Thus, claims 3, 4,

1   6, 7, and 16 of the '713 patent and claim 6 of the '393 patent, all of which recite those limitations,

2   are not infringed by the Switch. Nintendo's administrative motion to file under seal certain

3   exhibits attached to the declaration of David Pekarek Krohn and an unredacted version of its

4   Motion for Summary Judgment, Dkt. 263, is also granted. Nintendo's motion is narrowly tailored

5   and only requests sealing of "confidential and commercially sensitive information." *See In re Elec.*

6   *Arts, Inc.*, 298 F. App'x 568, 569 (9th Cir. 2008).

7

8   **IT IS SO ORDERED**.

9

10  Dated: October 31, 2023

11  _____

12  RICHARD SEEBORG
    Chief United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GAMEVICE, INC., | Case No. 18-cv-01942-RS |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT** |
| NINTENDO CO., LTD., et al., | |
| Defendants. | |

## I. INTRODUCTION

Following briefing by both parties in this patent infringement action, an order issued construing ten claims pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995). *See* Dkt. 241. Because Defendant Nintendo Co., Ltd. ("Nintendo"), had also filed a motion for summary judgment that turned on the construction of three of these terms, the order instructed the parties to file "supplemental briefing as to the disposition of the motion based on the adopted constructions." *Id.* at 18. This briefing having now been submitted, the motion is granted in part and denied in part. All of the asserted claims that incorporate the term "computing device" are not entitled to an earlier priority date, and they are thus invalid as anticipated by the Nintendo Switch.

## II. BACKGROUND

The background of this case is related in greater detail in prior orders. As relevant to this motion, Plaintiff Gamevice, Inc. ("Gamevice") asserts that Nintendo has infringed three of its patents (the "Asserted Patents"), all of which were filed between 2017 and 2019: U.S. Patent No.

United States District Court
Northern District of California

1    9,808,713 ("the '713 patent"), filed on July 28, 2017; U.S. Patent No. 9,855,498 ("the '498

2    patent"), also filed on July 28, 2017; and U.S. Patent No. 10,391,393 ("the '393 patent"), filed on

3    December 21, 2018. These patents were preceded by two other, related patents: U.S. Patent No.

4    9,126,119 ("the '119 patent"), filed on February 2, 2015; and U.S. Patent No. 9,592,453 ("the '453

5    patent"), filed on August 31, 2015. The parties agree that the Nintendo Switch, the accused

6    infringing product, was first sold in the United States on March 3, 2017. *See* Dkt. 230 ("Motion"),

7    at 9; Dkt. 233 ("Opp."), at 5.

8        Nintendo moved for summary judgment on two grounds, only one of which remains viable

9    following the entry of the claim construction order.[1] Because the Switch indisputably predates the

10   three Asserted Patents, Nintendo argues that it constitutes prior art and, therefore, that it is entitled

11   to summary judgment because the asserted claims are all anticipated. Gamevice, in turn, argues

12   that it is entitled to the priority filing date of the '119 patent — that is, February 2, 2015 —

13   because the patent provides written description support for the asserted claims.

### III. LEGAL STANDARD

15       Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if "there is no

16   genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

17   Fed. R. Civ. P. 56(a). While the moving party has the initial burden of identifying the portions of

18   the record which demonstrate the absence of a genuine issue of material fact, the non-moving

19   party must set forth "specific facts showing that there is a genuine issue for trial." *Matsushita*

20   *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must view the facts

21   and draw all reasonable inferences in the light most favorable to the non-moving party. *Scott v.*

22   *Harris*, 550 U.S. 372, 378 (2007). However, "[w]here the record taken as a whole could not lead a

23   rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'"

---

25   [1] Nintendo initially argued that it was entitled to summary judgment if its proffered construction of
26   "fastening mechanisms" was adopted. *See* Motion, at 3–5. Since a different construction was
adopted, this argument is moot. Nintendo's procedurally incorrect request for reconsideration
27   included in its supplemental briefing, *see* Dkt. 243, at 18–20, need not be entertained. *See* Civ.
L.R. 7-9.

1     *Matsushita*, 475 U.S. at 587, and "a scintilla of evidence in support of the [non-moving party's

2     position] will be insufficient" for the case to withstand summary judgment. *Anderson v. Liberty*

3     *Lobby, Inc.*, 477 U.S. 242, 252 (1986).

4                          **IV. DISCUSSION**

5          Nintendo moves for summary judgment on the grounds that the claims of the Asserted

6     Patents are invalid because they are all anticipated by prior art — that is, by the Nintendo Switch.

7     Anticipation occurs when a single prior art reference "expressly or inherently describes each and

8     every limitation set forth in the patent claim[s]." *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d

9     1292, 1295 (Fed. Cir. 2002). Nintendo here bears the "burden to prove facts establishing

10    anticipation by clear and convincing evidence." *Mentor H/S, Inc. v. Med. Device All., Inc.*, 244

11    F.3d 1365, 1377 (Fed. Cir. 2001). However, once Nintendo establishes a "prima facie case of

12    invalidity," its burden is met, and Gamevice is "obligated to come forward with evidence to the

13    contrary." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305 (Fed. Cir. 2008) (quoting

14    in part *Ralston Purina Co. v. Far-Mar-Co., Inc.*, 772 F.2d 1570, 1573 (Fed. Cir. 1985)). For the

15    purposes of this motion, Nintendo "pleads in the alternative and accepts Gamevice's allegations

16    that the Nintendo Switch satisfies each limitation of the asserted claims." Dkt. 243, at 10. This

17    suffices to establish a prima facie showing of invalidity. *See Vanmoor v. Wal-Mart Stores, Inc.*,

18    201 F.3d 1363, 1366 (Fed. Cir. 2000); *IXYS Corp. v. Adv. Power Tech., Inc.*, No. C 02-03942

19    MHP, 2004 WL 540513, at *5 (N.D. Cal. Mar. 18, 2004) (rationalizing this principle because

20    there is "no logical space between plaintiff's infringement allegation and defendant's invalidity

21    defense; the facts [cannot] support one without identically buttressing the other").

22         The key question, then, is whether Gamevice is entitled to the priority filing date of the

23    '119 patent. This question turns on whether the '119 patent provides written description support

24    for the terms "computing device" and "structural bridge," as those terms are used in the asserted

25    claims. Nintendo argues the '119 patent does not, while Gamevice argues it does, and that there

26    are disputes of fact bound up in this inquiry that render summary judgment inappropriate.

27    ///

28

United States District Court
Northern District of California

**A. The Written Description Requirement**

As the Federal Circuit has noted, it is "elementary patent law that a patent application is entitled to the benefit of the filing date of an earlier filed application only if the disclosure of the earlier application provides support for the claims of the later application." *In re Chu*, 66 F.3d 292, 297 (Fed. Cir. 1995). Not only is this an explicit requirement of federal law, *see* 35 U.S.C. § 112, it also simply makes sense as a way to "protect[] the quid pro quo between inventors and the public" that lies at the core of patent law: the public "receives meaningful disclosure" of the invention, and the inventor herself is granted the right to exclude the public "from practicing the invention for a limited period of time." *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1377 (Fed. Cir. 2009) (internal quotation marks omitted) (quoting *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 970 (Fed. Cir. 2002)). The written description requirement helps maintain this balance by "ensur[ing] that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000).

To satisfy the written description requirement, the party seeking entitlement to the earlier filing date must be able to "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention," where "the invention" means "whatever is now claimed." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991) (emphasis omitted). The earlier patent "need not recite the claimed invention [verbatim] but must do more than merely disclose that which would render the claimed invention obvious." *ICU Med.*, 558 F.3d at 1377. In other words, the earlier patent "must describe the claimed invention with all its limitations." *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998) (citing *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997)); *see Martin v. Mayer*, 823 F.2d 500, 505 (Fed. Cir. 1987) ("It is not a question of whether one skilled in the art *might* be able to construct the patentee's device from the teachings of the disclosure. . . . Rather, it is a question whether the application necessarily discloses that particular device." (internal quotation marks omitted)), *superseded on other grounds as recognized by Kubota v. Shibuya*, 999 F.2d 517 (Fed. Cir. 1993).

1    Whether the written description requirement is met in a particular case is a question of fact, but it

2    is "amenable to summary judgment in cases where no reasonable fact finder could return a verdict

3    for the non-moving party." *PowerOasis*, 522 F.3d at 1307.

4         A consistently thorny issue in applying this standard is determining whether an earlier

5    patent discloses a "species" sufficient to support later claims within the "genus" of the earlier

6    species — in other words, whether an early, narrow disclosure can support a later, broader one. As

7    a general matter, "disclosure of a species may be sufficient written description support for a later

8    claimed genus including that species," but the question ultimately depends, again, on what the

9    disclosure reasonably conveys to a person skilled in the art. *Bilstad v. Wakalopulos*, 386 F.3d

10   1116, 1124–25 (Fed. Cir. 2004). For instance, in *Tronzo v. Biomet, Inc.*, the Federal Circuit

11   reversed a jury finding that the plaintiff's patent, relating to artificial hip sockets and "cup

12   implants," was entitled to the earlier filing date of its "parent application." 156 F.3d at 1158. The

13   parties disputed whether the parent application disclosed a device that was "generic as to the shape

14   of the cup," thus supporting the patent at issue, or whether it disclosed only a cup that was conical

15   in shape. *Id.* Reviewing the patent specification, the Federal Circuit found the parent application

16   referred to "*only* conical shaped cups and nothing broader," a conclusion bolstered by the fact that

17   the specification "specifically distinguishe[d] the prior art as inferior and tout[ed] the advantages

18   of the conical . . . cup." *Id.* at 1159. Expert testimony also supported this finding, and the Court

19   held that the plaintiff's patent claims were invalid as anticipated by intervening prior art.

20   **B.  The '119 Patent**

21        As noted above, both parties agree that the Nintendo Switch was on sale in the United

22   States before the Asserted Patents were filed. In light of Gamevice's averments (and Nintendo's

23   alternative pleading) that the Switch reads on the claims in the Asserted Patents, it is prior art, and

24   Gamevice's claims are anticipated unless they are entitled to the filing date of the '119 patent.[2]

25

26   _____

27   [2] It is no longer necessary to examine the '453 patent in light of the fact that claim 12 of the '393
     patent was held indefinite (and thus invalid) in the claim construction order. *See* Dkt. 241, at 9.

28

United States District Court
Northern District of California

1    Nintendo argues it is entitled to summary judgment because the '119 patent does not

2 provide written description support for two of the claim terms as construed by the *Markman* order:

3 (1) "computing device," meaning "electronic equipment controlled by a CPU," and (2) "structural

4 bridge," meaning "a physical apparatus that secures two or more components to each other across

5 a distance." Dkt. 241, at 19. In Nintendo's view, the '119 patent discloses far narrower versions of

6 each; Gamevice, meanwhile, contends that the '119 patent provides sufficient support for each of

7 these terms as they are used in the asserted claims.

8            1.   *"Computing Device"*

9    Nintendo first argues that the '119 patent does not demonstrate that the inventors of the

10 Asserted Patents had prior possession of a "backless, screenless computing device." Motion, at 14.

11 Instead, every figure "shows a computing device with both a back and a screen," while the

12 specification notes that the computing device "may take the form of a tablet computer,

13 smartphone, notebook computer, or other portable computing device" — language that is repeated

14 in the Asserted Patents. *Compare* Dkt. 230-11 ("'119 Patent"), at 3:17–197, *with* Dkt. 213-1

15 ("'498 Patent"), at 4:34–36, *and* Dkt. 213-2 ("'713 Patent"), at 4:34–36, *and* Dkt. 213-3 ("'393

16 Patent"), at 4:43–45. Gamevice contends that the '119 patent language is not so limited, and that it

17 adequately supports the adopted construction of "computing device" such that "[a] person of skill

18 in the art would . . . understand that disclosure to include many portable devices, such as the

19 single-board computers of the day that had no backs and no screens." Dkt. 244, at 12. In other

20 words, Gamevice argues that to the extent the '119 patent discloses only one species (a computing

21 device with a back and a screen), it nevertheless discloses the "broader genus of 'computing

22 devices.'" Opp., at 8.

23    Both parties acknowledge the salient differences here between the narrow and broad

24 readings of "computing device." On the narrow end are "complete, finished devices," that include

25 a back and a screen — picture an iPhone, an iPad, or an Amazon Kindle. The broad end includes a

26 range of devices "with the ability to perform computing functions, i.e., devices with a CPU, a

27 memory, and ways to input and output data from the CPU." *See* Motion, at 14–18; Opp., at 10–12.

28

A single-board computer, such as the Raspberry Pi, *see* Dkt. 229-7, would fit into the broad category but not the narrow one. The parties also both recognize that the '119 patent includes images of only "complete, finished" computing devices, but Gamevice contends these are merely preferred embodiments that should not be construed to limit the scope of the patent.

The claim language itself spells immediate trouble for Gamevice's argument. Claim 1 of the '119 patent describes the computing device as follows: "a computing device, the computing device providing a plurality of sides, each of the plurality of sides are disposed between an *electronic display screen of the computing device and a back of the computing device*." '119 Patent, at 9:64–67 (emphasis added). Compare this to how "computing device" is described in claim 1 of each Asserted Patent. The '713 patent defines it as "a computing device, the computing device providing an upper, lower, left and right side, collectively the sides of the computing device, and an electronic display screen, the electronic display screen having a corresponding side adjacent each of the sides of the computing device." '713 Patent, at 17:48–53. The '498 patent describes it as "a computing device, comprising an electronic display screen," while the '393 patent simply states that the invention includes "a computing device." '498 Patent, at 17:48–49; '393 Patent, at 17:54. The '119 patent is thus the only one of these patents that explicitly claims the computing device with reference to a screen and a back; those features are not added via subsequent dependent claims, as they are in the Asserted Patents.

The specification further supports the contention that the computing devices taught by the '119 patent are narrower than those in the Asserted Patents. As Nintendo observes, every depiction of a computing device in the '119 patent shows a device with a screen and a back. *See* '119 Patent figs. 1–4, 8–10, 12–16, 25. Gamevice cites to Figure 6 and its corresponding description as intrinsic evidence that the computing device need not include a back, but these are not to the contrary. Figure 6 is a "block diagram," which is simply a "functional diagram" that shows how the computing device interacts with other components of the invention via "hardware (a CPU and a screen), software (video game), firmware (device driver), and a communication protocol." Stein Decl. ¶ 301. The specification's statement that the computing device "may take the form of a

1   tablet computer, smart phone, notebook computer, or other portable computing device" further

2   reinforces that the inventors possessed only computing devices with screens and backs. '119

3   Patent, at 3:17–19. The fact that this identical list of devices is included in each of the Asserted

4   Patents is irrelevant: whereas these devices may just be preferred embodiments in the Asserted

5   Patents, and thus should not necessarily limit how "computing device" should be read in those

6   contexts, in the '119 patent they demonstrate the limited breadth of what the inventors possessed

7   and what the patent discloses. Finally, Nintendo's expert, Dr. Stein, reviewed the '119 patent and

8   concluded that a person of ordinary skill in the art "would understand that the computing device

9   recited in claim 1 is a complete computing device, such as a smartphone, tablet computer,

10   notebook computer, or other portable computing device." Dkt. 231-12 ("Stein Decl.") ¶ 302.

11   Gamevice's expert, Dr. Slocum, did not address the '119 patent in his declaration.

12       Further, it is unclear how the invention described in the '119 patent would function with a

13   screenless, backless computing device. As Nintendo points out, Dr. Slocum suggests it would not.

14   In his deposition, Dr. Slocum was asked if the Gamevice invention would work with a "backless

15   and screenless computing device." The following exchange occurred:

16       Q. [counsel for Nintendo] So in order to make this invention work,
         you have to put a back and sides on the computing device right? And
17       a screen?

18       A. [Dr. Slocum] Because a single-board computer by itself in this
         invention, you'll drip sweat on it and you'll have a mess.
19

20       Q. It won't work?

21       A. It will work for a little bit before it shorts out.

22   Dkt. 233-4, at 345–346. While Dr. Slocum was expressly reviewing the specification of one of the

23   Asserted Patents, there is no material difference between these specifications and the '119

24   specification that would support the notion that the earlier device *would* function with a backless,

25   screenless computing device. This evidence is persuasive, as exemplified by *Rivera v. ITC*, 857

26   F.3d 1315 (Fed. Cir. 2017). There, the plaintiff, who had designed a "pod adapter assembly" to be

27   used with a single-serve coffee brewer, accused the defendant of patent infringement based on the

28

defendant's "beverage capsules" that included an "integrated mesh filter." *Id.* at 1318. One of the relevant questions was whether the plaintiff's invention could accept loose coffee grounds, or whether it must accept coffee grounds contained in "pods." The Federal Circuit found persuasive an expert's statement that the plaintiff's invention "would not function, because inserting loose-grain coffee or loose-leaf tea into the containers shown in the embodiments would clog the brewing chamber." *Id.* at 1321. Likewise here, attempting to use a backless, screenless computing device would likely cause the invention not to function.

Gamevice insists at several points that, regardless of how the '119 patent discloses only computing devices with backs and screens, it should not be read to preclude the broader genus of computing devices since it was "well within the knowledge of a person of ordinary skill in the art that the claimed computing device need not be a complete, finished device," given what was known of single-board computers at the time. Opp., at 12. Thus, a person of ordinary skill in the art could simply "add[] either a back or a screen to a rudimentary computing device" to create the invention disclosed in the patent. However, the Federal Circuit has repeatedly stated that, while "[t]he knowledge of ordinary artisans may be used to inform what is actually in the specification," it may not "teach limitations that are not in the specification, even if those limitations would be rendered obvious by the disclosure in the specification." *Rivera*, 857 F.3d at 1322 (citing *Lockwood*, 107 F.3d at 1571). Thus, even if it would have concededly been "obvious" for a person of ordinary skill in the art to add a back or a screen, this does not suffice to show that the '119 patent inventors had possession of such a broad range of computing devices.

The immediate case bears a striking resemblance to *ICU Medical, Inc. v. Alaris Medical Systems, Inc.*, a case involving "medical valves used in the transmission of fluids to or from a medical patient." 558 F.3d at 1372. The plaintiff's patents claimed priority to a 1992 patent, which included only medical valves with a spike, while the infringement claims involved medical valves without a spike. The defendant argued the priority patent was limited only to medical valves with spikes, while the plaintiff argued the "specification's disclosure of valves with a spike support[ed] claims that [we]re neutral regarding whether the valve must include a spike." *Id.* at 1377. The

district court granted summary judgment of invalidity in favor of the defendant, and the Federal Circuit affirmed. The Court noted that the specification, figures, and descriptions described "only medical valves with spikes," *id.* at 1378, and the fact that it would have been "obvious" that the valve could function without a spike was not enough to show that the inventors possessed spikeless valves, *id.* at 1379. Analogously here, the specification reveals only computing devices with backs and screens, and the "obviousness" of adding these features to a backless, screenless computing device is not enough. Gamevice, perhaps tellingly, does not attempt to show why *ICU Medical*'s logic should not apply equally in this case.

Gamevice has therefore failed to show that there is a dispute of material fact as to whether the '119 patent provides written description support for "computing device" in the Asserted Patents. It does not. As such, the Asserted Patents are not entitled to the '119 patent's priority date, and the motion is granted in this respect.

### 2. *"Structural Bridge"*

Similar to its contentions regarding the use of the term "computing device," Nintendo argues that the '119 patent fails to provide written description support for the term "structural bridge" the way it is claimed in the Asserted Patents. More specifically it argues that the '119 patent "uses the term 'structural bridge' only with reference to a structural bridge that is external to the computing device and not as an internal part of a console." Dkt. 243, at 12. Thus, like with "computing device," this narrow disclosure of an external structural bridge cannot support the broader disclosure Gamevice ostensibly claims in the Asserted Patents. Gamevice disputes this, noting that nothing in the '119 patent requires "a specific positional relationship between the [structural] bridge and the computing device." Opp., at 17. As such, the external structural bridge is merely a preferred embodiment, and it should not be read to limit the scope of what was disclosed by the '119 patent.

While these arguments bear many similarities to the parties' dispute as to the breadth of the term "computing device," the '119 patent is not so limiting as to the term "structural bridge." Unlike with "computing device," which claim 1 of the '119 patent expressly requires to include a

1  screen and a back, none of the claim language in the '119 patent requires the structural bridge to
2  be "a physical apparatus that secures two or more components to each other across a distance *and*
3  *which is external to the computing device*" or the like. Nor does the specification state that the
4  structural bridge is even "preferably" external to the computing device. This is significant given
5  that the claims disclose several types of structural bridge — claim 9 discloses a "ridged structure,"
6  claim 10 discloses a "removable rigid structure," claim 11 discloses a "flexible structure," and
7  claim 12 discloses a "removable flexible structure" — but none of them require any specific
8  physical or geometric relationship to the computing device. '119 Patent, at 10:56–63. Indeed, as
9  Gamevice points out, the inventors did specify particular geometric relationships of different
10  components in other portions of the '119 patent. *E.g.*, *id.* at 8:15–21.

11     Nintendo relies primarily on the fact that the diagrams depict only an external structural
12  bridge, but this appears only to disclose a preferred embodiment, which need not be interpreted to
13  pigeonhole the claimed structural bridge. *See Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d
14  1365, 1378 (Fed. Cir. 2000) ("Although the patent drawings show only identical half-shells, that
15  does not compel the conclusion that the written description of the [prior] patent is so narrowly
16  tailored as to preclude [plaintiff] from claiming non-identical half-shells in the [instant] patent."
17  (citations omitted)). Further, to the extent the parties and their experts disagree as to how a person
18  of ordinary skill in the art would interpret the scope of a "structural bridge" as disclosed in the
19  '119 patent specification, this raises a dispute of fact that precludes summary judgment. *Compare*
20  Dkt. 244, at 9 ("A person of ordinary skill in the art would have reasonably understood that the
21  inventor had possession of a structural bridge that is internal or partially internal to the computing
22  device."), *with* Motion, at 24 ("Dr. Stein concluded . . . that '[a] person of ordinary skill in the art
23  . . . would not understand that the inventors possessed a "structural bridge" that was other than
24  part of the game controller as of the filing date of the '119 patent.'" (quoting Stein Decl. ¶ 282)).
25  The motion is therefore denied in this respect.

26                                    **V. CONCLUSION**

27     For the reasons discussed above, the asserted claims using the term "computing device" are

28

not entitled to the priority filing date of the '119 patent. The motion for summary judgment is granted in part, and these claims — i.e., all asserted claims except claim 16 of the '713 patent — are therefore invalid as anticipated by the Nintendo Switch. The motion is otherwise denied.

**IT IS SO ORDERED**.

Dated: March 14, 2023

RICHARD SEEBORG
Chief United States District Judge

1

2

3

4

5

6

7                     UNITED STATES DISTRICT COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9

| | |
|---|---|
| GAMEVICE, INC.,<br><br>               Plaintiff,<br><br>       v.<br><br>NINTENDO CO., LTD., et al.,<br><br>               Defendants. | Case No.  18-cv-01942-RS<br><br>**ORDER CONSTRUING CLAIMS AND REQUESTING SUPPLEMENTAL BRIEFING RE: MOTION FOR SUMMARY JUDGMENT** |

10

11

12

13

14

15

16                           **I. INTRODUCTION**

17        Plaintiff Gamevice, Inc. ("Gamevice"), filed this patent infringement suit against Nintendo

18   Co., Ltd., and Nintendo of America, Inc. (collectively "Nintendo"). In the operative First

19   Amended Complaint ("FAC"), Gamevice avers Nintendo has infringed three of its patents by

20   importing and selling the Nintendo Switch, a handheld gaming console. Pursuant to the Local

21   Patent Rules, the parties have presented the claim terms they contend should be construed by the

22   Court under *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc).

23   Nintendo also brings a motion for summary judgment, which turns on the claim constructions.

24        This order sets out the constructions that will be adopted and the reasons therefor. Further,

25   for the reasons discussed below, judgment is reserved on Defendant's motion for summary

26   judgment, and the parties are requested to provide supplemental briefing.

27   ///

28

## II. BACKGROUND

Founded in 2008, Gamevice describes itself as "a leading designer, developer and manufacturer of attachable handheld controllers for use with mobile devices such as mobile phones and tablets, including various generations of the Apple iPhone and Apple iPad." Dkt. 213 ("FAC") ¶ 16. Nintendo manufactures, imports, and sells the Nintendo Switch, a portable gaming console with detachable controllers. As described in the FAC, Gamevice asserts that Nintendo has infringed three of its patents — United States Patent Nos. 9,855,498 ("the '498 patent"), 9,808,713 ('the '713 patent"), and 10,391,393 ("the '393 patent") (collectively, the "Asserted Patents") — all of which have the same title: "Game Controller with Structural Bridge." *See* Dkt. 213-1 ("'498 Patent"); Dkt. 213-2 ("'713 Patent"); Dkt. 213-3 ("'393 Patent").[1] The immediate suit was preceded by two investigations before the U.S. International Trade Commission ("ITC"), each of issued claim construction orders: the "1111 investigation" order was issued in 2018, *see* Certain Portable Gaming Console Systems with Attachable Handheld Controllers and Components Thereof (*1111 Investigation*), Inv. No. 337-TA-1111 (USITC Dec. 7, 2018); and the "1197 investigation" order was issued in 2021, *see* Certain Portable Gaming Console Systems with Attachable Handheld Controllers and Components Thereof II (*1197 Investigation*), Inv. No. 337-TA-1197 (USITC July 2, 2021).[2]

## III. CLAIM CONSTRUCTION

### A. Legal Standard

Claim construction is a question of law to be determined by the court. *See Markman*, 52 F.3d at 979. "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to

---

[1] Specifically, Gamevice avers infringement of claims 1–2 of the '498 patent; claims 1–4, 6–8, and 16–19 of the '793 patent; and claims 1–4, 6, 7, and 12 of the '393 patent. *See* Dkt. 230-3.

[2] The parties have submitted excerpts of slip opinions from both *Markman* orders. *See* Dkt. 232-4 (1111 investigation *Markman* order in full); Dkt. 231-5 (excerpts of initial determination in 1197 investigation order, including claim construction); Dkt. 232-6 (different excerpts of the same).

*United States District Court*
*Northern District of California*

envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marpass Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Accordingly, a claim should be construed in a manner "most naturally align[ed] with the patent's description of the invention." *Id.*

The first step in claim construction is to look to the language of the claims themselves. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Id.* at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A disputed claim term should be construed in a manner consistent with its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312–13. "[T]he context in which a term is used in the asserted claim can be highly instructive" in determining the claim's ordinary and customary meaning. *See id.* at 1314. The use of a term in other claims may also provide guidance regarding its proper construction. *See id.*

A claim term should also be construed in a manner consistent with the patent's specification. *See Markman*, 52 F.3d at 979. Typically, the specification is the best guide for construing the claims. *See Phillips*, 415 F.3d at 1315; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). In limited circumstances, the specification may be used to narrow the meaning of a claim term that otherwise would appear to be susceptible to a broader reading. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001). Precedent forbids, however, term construction imposing limitations not found in the claims or supported by an unambiguous restriction in the specification or prosecution history. *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("[A] court may not import limitations from the written description into the claims."); *Comark Commc'ns., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir.

1  1985) ("It is the *claims* that measure the invention."). A final source of intrinsic evidence is the

2  prosecution record and any statements made by the patentee to the U.S. Patent and Trademark

3  Office regarding the scope of the invention. *See Markman*, 52 F.3d at 980.

4  Courts may also consider extrinsic evidence, such as expert testimony, dictionaries, or

5  technical treatises, especially if such sources are "helpful in determining 'the true meaning of

6  language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting *Markman*, 52 F.3d at

7  980). This is especially true where "claim construction . . . involves little more than the application

8  of the widely accepted meaning of commonly understood words." *Id.* at 1314. Ultimately, while

9  extrinsic evidence may aid the claim construction analysis, it cannot be used to contradict the plain

10  and ordinary meaning of a claim term as defined within the intrinsic record. *See id.* at 1322–23.

11  Under 35 U.S.C. § 112(f), certain claim terms are subject to "means-plus-function"

12  treatment, which limits the construction of the term. The absence of the word "means" to describe

13  a claim limitation creates a rebuttable presumption that § 112(f) does not apply. *Zeroclick, LLC v.*

14  *Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018). The party seeking application of § 112(f) bears

15  the burden of showing the claim term "fails to recite sufficiently definite structure or else recites

16  function without reciting sufficient structure for performing that function." *Id.* The essential

17  inquiry is whether a person of ordinary skill in the art would have understood the terms of the

18  claim to have a sufficiently definite structural (as opposed to functional) meaning. *See id.* The

19  disputed term need not be limited to a single structure "as long as the class of structures is

20  identifiable by a person of ordinary skill in the art." *Linear Tech. Corp. v. Impala Linear Corp.*,

21  379 F.3d 1311, 1322 (Fed. Cir. 2004). This analysis is conducted using traditional claim

22  construction principles. *Zeroclick*, 891 F.3d at 1007. Once it is determined that § 112(f) applies,

23  the claim term is limited "to only the structure, materials, or acts described in the specification as

24  corresponding to the claimed function and equivalents thereof." *Williamson v. Citrix Online, LLC*,

25  792 F.3d 1339, 1347 (Fed. Cir. 2015).

26  ///

27

28

**B. Discussion**

The parties present ten disputed terms for construction, which are each used in at least one of the Asserted Patents and which are discussed below.[3]

1. *"computing device"*

The term "computing device" appears in claim 1 of each of the Asserted Patents and in claim 17 of the '713 patent. Gamevice argues the term should be given its plain and ordinary meaning, "for example electronic equipment controlled by a CPU," and that further, "[t]o avoid confusion," the construction should specify the term is "not limited to a complete, finished device." Dkt. 228 ("Gamevice CC Brief"), at 8. Nintendo, meanwhile, contends the term should just be given its plain and ordinary meaning, full stop, since it is "a common term that a jury will have no trouble understanding." Dkt. 231 ("Nintendo CC Brief"), at 14.

While both parties agree that the term should be given its plain and ordinary meaning, their briefs belie a deeper dispute about what exactly this entails. Gamevice, through its multipart proffered construction, suggests a person of ordinary skill in the art would understand "computing device" to refer to "a broad array of devices with the ability to perform computing functions." Gamevice CC Brief, at 9. This construction seeks to preempt Nintendo from offering a "much narrower" plain and ordinary meaning. Dkt. 232 ("CC Reply Brief"), at 7–8. While Nintendo does not expressly offer such a narrow term, its expert, Dr. Jeffrey L. Stein, suggests the plain and ordinary meaning of "computing device" as used in the specifications should be understood as "namely a smartphone, tablet computer, notebook computer, or other portable computing device." Dkt. 231-12 ("Stein Decl.") ¶ 184. There does, then, appear to be a dispute as to the scope of the claims, even if posed indirectly, such that simply granting "computing device" its plain and ordinary meaning would be insufficient. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 355 F.3d

---

[3] The parties have also stipulated to the construction of two terms: (1) "adjacent," meaning "nearby but not necessarily next to," and (2) "contact adjacency," meaning "next to and touching."

United States District Court
Northern District of California

1  1361, 1367 (Fed. Cir. 2004) (purpose of claim construction is "to assign a fixed, unambiguous,

2  legally operative meaning to the claim"). The term will therefore be construed "to determine what

3  claim scope is appropriate in the context of the patents-in-suit" and to prevent this question from

4  being left to the jury. *O2 Micro*, 521 F.3d at 1361; *see id.* at 1362.

5         To this end, the first portion of Gamevice's proffered definition — "electronic equipment

6  controlled by a CPU" — is the appropriate construction. The claims at issue, as well as the claim

7  language in general, support each aspect of this construction: (1) claim 2 of each patent states that

8  the computing device is associated with electronics, *see, e.g.*, '393 Patent, at 18:22–24; (2) claim 1

9  of each patent teaches that the computing device has sides, thus indicating it is tangible

10 "equipment," *see, e.g.*, '498 Patent, at 17:50–55; and (3) figure 6 of each patent shows that the

11 computing device includes "at least a CPU" and that it can control "attendant electronics," *see,*

12 *e.g.*, '713 Patent fig.6. The ITC reached the same conclusion relying on very similar references.

13 *See 1111 Investigation*, slip op. at 19–22. Nintendo's argument that Gamevice has selectively

14 quoted from *PC Magazine* is unavailing because the full definition neither undercuts Gamevice's

15 position nor exclusively supports Nintendo's unstated (but evident) position as to the plain and

16 ordinary meaning of the term.[4] Further, the second portion of Gamevice's proffered definition —

17 "not limited to a complete, finished device" — is both unwieldy for the reasons Nintendo suggests

18 (namely, by introducing ambiguity as to what constitutes a "complete, finished device") and,

19 moreover, unnecessary since additional features are often provided by the claim language. *See,*

20 *e.g.*, '498 Patent, at 17:48–49 ("a computing device, comprising an electronic display screen");

21 '713 Patent, at 18:31–32 (claiming a computing device "further comprising a back"). Therefore,

22 "computing device" is hereby construed as "electronic equipment controlled by a CPU."

23 ///

24

25    [4] The full definition from *PC Magazine* is "[a]ny electronic equipment controlled by a CPU,

26 including desktop and laptop computers, smartphones and tablets. It usually refers to a general-
   purpose device that can accept software for many purposes in contrast with a dedicated unit of

27 equipment such as a network switch or router." Dkt. 229-2.

28

United States District Court
Northern District of California

2.   *"retention mechanism"*

"Retention mechanism" appears in claim 12 of the '393 patent. Gamevice argues the term should be construed as "a machine or mechanical appliance that secures components in a particular relationship." Nintendo, on the other hand, argues it is a means-plus-function term under 35 U.S.C. § 112(f), where its relevant function is "interacting with the spring member of the restraint to couple the structural bridge to at least one of the first and second game control modules," and its structure is indefinite.

The first, critical step is to determine whether § 112(f) applies. Because the term does not use the word "means," Nintendo bears the burden of rebutting the presumption against applying means-plus-function treatment. In support of this, Nintendo argues that, at least as used here, "mechanism" is a nonce term, and that "retention mechanism" does not refer to a recognized class of structures. Gamevice disagrees, proffering examples of "retention mechanism" being used in several other patents along with a declaration from its expert, Dr. Alexander Slocum, stating that a person of ordinary skill in the art would recognize the term. *See* Dkt. 229-3 ("Slocum Decl."), at 24–30.

Nintendo has satisfied its burden. As Nintendo notes, the Federal Circuit has recognized that "mechanism" is often (but not always) used as a generic, nonce term "in a manner that is tantamount to using the word 'means.'" *Williamson*, 792 F.3d at 1350. That is true here: the claim describes the term using largely functional language "without reciting sufficient structure for performing [its] function." *Id.* at 1349 (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). For instance, though claim 12 describes the retention mechanism as "providing at least a boss," the claim goes on to recite only its function: it "couples the structural bridge to at least one of the first and second electronic game modules." '393 Patent, at 19:42–47. Gamevice's extrinsic evidence is unpersuasive, and its own construction would seem to encompass such a broad array of structures that a person of ordinary skill in the art could not readily identify what the term is

Order Construing Claims and Requesting Supp'l Briefing Re: Summary Judgment
Case No. 18-cv-01942-RS

Appx32

United States District Court
Northern District of California

United States District Court
Northern District of California

1    intended to refer to.[5] Finally, the fact that the ITC in the 1197 investigation concluded that

2    "retention mechanism" is subject to means-plus-function treatment is persuasive here. *See 1197*

3    *Investigation*, slip op. at 51–54.

4            Section 112(f) therefore applies, and the next step is to identify the relevant function. As

5    noted above, Nintendo argues the function is "interacting with the spring member of the restraint

6    to couple the structural bridge to at least one of the first and second game control modules." This

7    stands in contrast to the function identified by the ITC in the 1197 investigation, and which

8    Gamevice agreed to adopt in the alternative at oral argument: "securing the structural bridge to the

9    control modules." *Id.* at 51; *see* Dkt. 240, at 24:10–25:3 (Brittingham). Nintendo argues the ITC

10   erred by adopting a functional definition that was "not explicitly recited in [c]laim 12." Nintendo

11   CC Brief, at 10 n.6. As a matter of law, Nintendo is correct: the Federal Circuit has, on several

12   occasions, stated that § 112(f) "does not permit limitation of a means-plus-function claim by

13   adopting a function different from that *explicitly recited* in the claim." *In re Teles AG*

14   *Informationstechnologien*, 747 F.3d 1357, 1367–68 (Fed. Cir. 2014) (emphasis added) (quoting

15   *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999)). Nintendo's

16   functional definition, which is expressly recited in claim 12, will therefore be adopted.

17           The final step, then, is to identify the relevant structure. Nintendo asserts there is no

18   corresponding structure that can perform the recited function, and therefore that the claim is

19   indefinite as a matter of law. The only alternative structural definition that would seem to be

20   available (though, again, this was embraced by Gamevice only at oral argument), would be the one

21   the ITC adopted: "the mechanical arrangement, as shown in Figure 14, using a confinement boss

22   262 having a fastening detent 264 that interacts with a retention member 266 that is responsive to

23   a catch 268 to secure the structural bridge 258 to the pair of control modules 252." *1197*

24

25   _____

     [5] Indeed, "securing components in a particular relationship" is not meaningfully different from
26   Gamevice's proffered construction for "confinement structures," *see infra* section III.B.4, nor of
     Dr. Slocum's description of "fastening mechanisms," that is, "mechanical systems used to non-
27   destructively mechanically hold together at least two items," *see* Slocum Decl. ¶ 52.

28

*Investigation*, slip op. at 51. Having closely reviewed the patent specification, there are no corresponding structures that fully embrace the function recited by the claim. Figures 14 and 27 both perform aspects of the function adopted here, but both are inconsistent with this function in crucial respects, as detailed by Nintendo. *See* Nintendo CC Brief, at 10–11. As there is thus no corresponding structure, claim 12 is indefinite.

3. *"fastening mechanisms"*

The term "fastening mechanisms" appears in claims 1 and 16 of the '713 patent and claim 1 of the '498 patent. Gamevice argues the term should be construed under its plain and ordinary meaning, namely, "a fastener or fasteners." Nintendo argues this term is also subject to means-plus-function treatment under § 112(f). It further notes that the ITC reached this conclusion in the 1111 investigation, and the Federal Circuit affirmed; thus, Nintendo argues, that path should be followed here as well.

Because the claim term does not use the word "means," Nintendo has the burden of rebutting the presumption against applying means-plus-function treatment. It has not done so. Unlike with "retention mechanism," Gamevice here has provided compelling evidence supporting its position that (1) "fastening mechanisms" and "fasteners" are synonymous, and (2) "fasteners" describes "a class of structures . . . namely mechanical systems used to non-destructively mechanically hold together at least two items." Slocum Decl. ¶ 52. This includes caselaw along with a number of other patents that equate the two terms. *See* Gamevice CC Brief, at 14–15 (citing, e.g., *Blackbird Tech LLC v. ELB Elecs.*, No. 15-cv-56 (RGA), 2016 WL 7451622, at *5 (D. Del. Dec. 28, 2016), *rev'd on other grounds*, 895 F.3d 1374 (Fed. Cir. 2018)). While this evidence is extrinsic to the patents themselves, this is to be expected. *See Phillips*, 415 F.3d at 1314 ("Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent . . . the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" (quoting *Innova/Pure Water*, 381 F.3d at 1116)). Neither the claim language nor the specifications describe "fastening mechanisms" as having a function broader, narrower, or otherwise different

**Appx34**

than fasteners. Finally, although the claims use the word "mechanism" and speaks in terms of its function — that is, the fastening mechanisms "secure" the confinement structures to the structural bridge, *e.g.*, '713 Patent, at 18:4–8 — this does not *ipso facto* subject the term to means-plus-function treatment. *See MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1341–42 (Fed. Cir. 2019).

Nintendo relies heavily on the argument that its construction should be adopted because the Federal Circuit summarily affirmed the ITC's ruling in the 1111 investigation, which had concluded the term was subject to § 112(f). It points out that district courts are obliged to follow the Federal Circuit absent "unusually compelling circumstances," and it argues none are present here. Nintendo CC Brief, at 3–4 (quoting *Alloc, Inc. v. Norman D. Lifton Co.*, No. 03 Civ. 4419(PAC), 2007 WL 2089303, at *10 (S.D.N.Y. July 18, 2007)). While this rule clearly applies when the Federal Circuit has issued a written opinion, Nintendo does not explain why it should apply where the Federal Circuit has issued only a *summary* affirmance. That is precisely what occurred here: the Federal Circuit upheld the ITC's opinion in its entirety, without indicating its views as to any specific aspect of it — including its conclusions about "fastening mechanisms." *See Gamevice, Inc. v. ITC*, 847 Fed. App'x 929, 929–30 (Fed. Cir. 2021) (per curiam). The decision itself clearly states, "This disposition is nonprecedential," *id.*, and the Federal Circuit has elsewhere noted that a Rule 36 affirmance "does not endorse or reject any specific part of the trial court's reasoning." *Rates Tech., Inc. v. Mediatrix Telecom, Inc.*, 688 F.3d 742, 750 (Fed. Cir. 2012). Indeed, none of the cases cited by Nintendo for this proposition involved summary affirmances by the Federal Circuit. The ITC's ruling is thus afforded whatever persuasive value is warranted. *See Tex. Instruments v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996). Here, Gamevice has proffered different evidence than was before the ITC in the prior investigation, which justifies departing from its conclusion. Nintendo has thus failed to carry its burden, and "fastening mechanisms" will be construed under its plain and ordinary meaning, that is, "a fastener or fasteners."

### 4. *"a pair of confinement structures" / "confinement structures"*

The terms "confinement structures" or "a pair of confinement structures" appear in claim 1

United States District Court<br>Northern District of California

1    of each of the Asserted Patents, as well as claims 16 and 17 of the '713 patent. Gamevice proffers

2    the construction "components that keep other components in place," while Nintendo asserts this is

3    a means-plus-function term under § 112(f) with different proposed functions depending on the

4    claim. Like several of the terms already discussed, the ITC also construed this term in both prior

5    investigations, and it twice concluded that § 112(f) did not apply.

6        Gamevice's proffered construction must be dismissed out of hand. As Nintendo notes, the

7    construction "components that keep other components in place" is "so generic that it is

8    indistinguishable from Gamevice's proposed constructions for other terms." Nintendo CC Brief, at

9    13. Gamevice does not address this in its brief, nor explain how a jury could be expected to

10   distinguish between a "confinement structure" and, for instance, a "fastening mechanism"

11   (discussed above). Unlike with "fastening mechanisms," Gamevice's extrinsic evidence that the

12   term refers to a commonly recognized class of structures is unavailing.

13       Nintendo once again bears the burden of rebutting the presumption against applying

14   means-plus-function treatment to this term, since the term does not include the word "means." It

15   argues that "structure" is another commonly recognized nonce term and that "confinement

16   structures" does not refer to a particular class of structures within the art. Gamevice proffers some

17   testimony to the contrary, though it is not particularly compelling and is contradicted by

18   Nintendo's evidence. Still, the salient question is not whether the claim fails to identify a class of

19   structures, per se, but whether it "fails to recite sufficiently definite structure or else recites

20   function without reciting sufficient structure for performing that function." *Williamson*, 792 F.3d

21   at 1349 (internal quotation marks omitted).

22       In both prior ITC investigations, the ITC concluded that the claim cleared this bar. After

23   first concluding that the term "does not have a commonly understood meaning to one of ordinary

24   skill in the art," the ITC observed that "the figures clearly depict a confinement structure, and the

25   specification provides sufficient description of confinement structures." *1111 Investigation*, slip

26   op. at 27–28; *accord 1197 Investigation*, slip op. at 40–41. In both investigations, the ITC found

27   the descriptions of figures 16 and 17 to be particularly instructive, noting that they "inform the

reader, and a person of skill in the art, that a confinement structure is a component that holds the computing device." *1111 Investigation*, slip op. at 30; *accord 1197 Investigation*, slip op. at 40. Thus, both administrative law judges adopted the same construction: "components that hold a computing device." *1111 Investigation*, slip op. at 32; *accord 1197 Investigation*, slip op. at 41.

Having reviewed the claim language and specifications, it is clear this is a borderline case. However, in light of the ITC having reached the same conclusion in two different instances; the absence of good cause to depart from these conclusions; the presumption against applying means-plus-function treatment; and the sufficient (if not abundant) detail included in the patents, § 112(f) does not apply, and Nintendo's construction is rejected. Instead, the following construction, borrowed largely from the ITC, will be adopted: "physical component(s) that hold(s) a computing device."

5. *"passageway"*

The term "passageway" appears in claim 1 of each of the Asserted Patents, as well as claim 16 of the '713 patent. The parties offer constructions that differ by only one word. Gamevice proposes that the term be construed as "a space that accommodates a communication wire," while Nintendo proposes it be construed as "a *defined* space that accommodates a communication wire." Gamevice CC Brief, at 17 (emphasis added). Nintendo argues that adding "defined" gives meaning to the term since "all communication wires necessarily exist in space that accommodates them." Nintendo CC Brief, at 25; *see also id.* ("Where else could a communication wire be, except in space that accommodates it?").

This somewhat metaphysical argument is unconvincing. For one, Gamevice's proposed construction was initially crafted by the ITC, drawing from a careful review of the patent specifications. *See 1111 Investigation*, slip op. at 59–64. The word "defined," as Gamevice argues, does not add any meaningful clarity to what is otherwise a straightforward construction; in fact, it could lead to jury confusion by failing to define "defined" itself. Finally, at a granular, semantic level, the use of the article "a" in Gamevice's construction — that is "*a* space" rather than simply "space" — would seem to address Nintendo's concerns, in that it connotes a discrete space rather

United States District Court
Northern District of California

than any free-floating and ambiguous zone through which a wire may pass. Gamevice's construction, "a space that accommodates a communication wire," is therefore adopted.

### 6. *"communication link"*

The term "communication link" appears in claim 1 of each of the Asserted Patents and in claim 16 of the '713 patent. The parties agree the term should be construed as "a component for [the] reception and transmission of data," but Nintendo's proposed construction adds that such reception and transmission occurs "between the control modules."

The claim language, always the key starting point in this analysis, undercuts Nintendo's argument right off the bat. Claim 1 of each patent includes the following language:

> the passageway promotes electrical communication between the communication link of a first confinement structure of the pair of confinement structures and the *computing device*, the passageway further promotes electrical communication between the communication link of a second confinement structure of the pair of confinement structures and the *computing device*.

*E.g.*, '393 Patent, at 17:66–18:6 (emphasis added). Granted, Nintendo's construction does not preclude this arrangement — that is, the communication link may facilitate communication "between the control modules" *and* from the control modules to the computing device. Yet its construction certainly conveys this as an incidental function of the communication links, rather than one specifically contemplated by the patentee.

The specifications further support a broader construction of the term. Nintendo points to various portions of the specifications that reveal the communication links facilitate communication between the two control modules. *See, e.g.*, '713 Patent, at 8:40–42 ("[T]he structural bridge 258 provides a communication link 270, which passing [sic] signals between the pair of control modules 252."). Other parts of the specification, however, cut in Gamevice's favor, indicating the communications links further facilitate communication between the control modules and the computing device. *See, e.g.*, *id.* at 15:10–16 ("In a preferred embodiment, . . . a communication link 519, is provided by the input device 500, which facilitating [sic] communication between the pair of control modules (502, 504) and the computing device 506 . . . ."). The specifications go on

ORDER CONSTRUING CLAIMS AND REQUESTING SUPP'L BRIEFING RE: SUMMARY JUDGMENT
CASE NO. 18-cv-01942-RS

13

to discuss various modes of communication that the communication links may accommodate, including both wired (e.g., metallic wires or fiber optic conductors) and wireless (e.g., Bluetooth) signal transmission. *See, e.g.*, *id.* at 8:49–9:13. Finally, the summary of the invention in each patent describes the communication link broadly as "facilitating communication between the pair of control modules and the computing device." *Id.* at 1:33–35. As noted above, Nintendo's proffered construction does not necessarily preclude communication between the control modules and the computing device, but it would seem to require communication between the control modules in the first instance — a notion that is not adequately supported by the claim language. Gamevice's construction, "a component for reception and transmission of data," is thus adopted.

### 7. *"structural bridge"*

"Structural bridge" appears in claim 1 of each of the Asserted Patents, claim 12 of the '393 patent, and claim 16 of the '713 patent. Gamevice proposes the construction "a physical apparatus that connects other components," which it argues is consistent with the term's plain and ordinary meaning. Nintendo meanwhile proffers "a component of the game controller that connects its two sides." Gamevice notes that its construction was adopted by the ITC in both prior investigations. *See 1111 Investigation*, slip op. at 65–71; *1197 Investigation*, slip op. at 82–87.

The term "structural bridge" is indeed "a simple combination of two ordinary words," CC Reply Brief, at 12, yet its precise meaning is somewhat difficult to capture. The parties agree, and the claims themselves clearly indicate, that the structural bridge plays a central role in connecting different components of the claimed inventions. This is further reflected throughout the myriad references to the structural bridge in the specifications and in the fact that the term is included in the title of each patent. *See, e.g.*, '393 Patent, at 14:52–54 ("[W]hen joined together, by way of a structural bridge 522, the input device 500, and the computing device 506, form an electronic gaming system 511 . . . ."); *id.* at 15:5–7 ("[T]he structural bridge 522, secures the pair of control modules (502, 504) one to the other."); *id.* at 15:23–24 ("[T]he structural bridge 522, masks a mid-portion of the back of the computing device."); *id.* at 17:15–19 (game control apparatus provides the two control modules and the structural bridge, "which collectively secures [sic] the computing

device"). While the parties dispute whether the term carries any plain and ordinary meaning, the term certainly would be "readily understood by persons of ordinary skill in the mechanical arts, particularly given the examples and descriptions in the specification." CC Reply Brief, at 12. In fact, the term is almost straightforward enough for its meaning to be "readily apparent even to lay judges." *Phillips*, 415 F.3d at 1314. However, given the dispute between the parties, and the fact that this term will likely not be familiar to a jury (unlike "computing device," by contrast), construction is appropriate, even if it consists of "little more than the application of the widely accepted meaning of commonly understood words." *Id.*

Neither proffered construction seems like exactly the right fit. Gamevice's construction, as Nintendo notes, is overly broad and potentially unhelpful to the jury. As with Gamevice's proffered constructions for several other terms, "a physical apparatus that connects other components" could be read to describe a range of claim terms besides the structural bridge (like, for instance, "fastening mechanisms"). Moreover, Gamevice's construction appears to ignore the use and significance of the word "bridge" in the term. Although the ITC adopted Gamevice's construction in both prior investigations, its actual analyses were quite cursory, and they are of only limited persuasive value in this regard. On the other hand, Nintendo's construction would unnecessarily import the term "game controller," which is itself undefined and could tend to confuse the jury.

Therefore, the term shall be construed as "a physical apparatus that secures two or more components to each other across a distance." This construction is consistent with the way the term is used throughout the claims and the specifications. Moreover, it captures the "bridge" concept that is lacking from Gamevice's construction, while also avoiding the introduction of new terms that would require further construction, unlike Nintendo's construction. Finally, it is worth noting that this construction is in line with that of the ITC Staff in the 1197 investigation. *See 1197 Investigation*, slip op. at 85–86.

       8.   *"promotes"*

"Promotes" is recited in claim 1 of each of the three Asserted Patents. The parties propose

very similar constructions: Gamevice suggests the term should be given its plain and ordinary meaning of "facilitates," and Nintendo argues the term should be given its plain and ordinary meaning with no further construction. It is unclear how Gamevice's construction meaningfully differs from Nintendo's, especially given that it explicitly notes its construction is "consistent with a lay definition of the word 'promote[s].'" Gamevice CC Brief, at 22 (alteration in original). Nintendo's argument that this is an ordinary term that "the jury can readily understand and apply" is compelling. Nintendo CC Brief, at 23. Since there is no apparent dispute as to the scope of the claims that include "promotes," the term need not and will not be construed. *See O2 Micro*, 521 F.3d at 1361.

### 9. *"electrical communication" / "electronic communication"*

"Electrical communication" appears in claim 1 of the '498 patent and the '393 patent, while "electronic communication" appears in claim 1 of all three Asserted Patents as well as claim 16 of the '713 patent. The parties again propose similar constructions for both terms. Gamevice suggests "electrical communication" should be construed as "flow of information between two components represented by the use of electricity," and that "electronic communication" should be construed as "flow of information between two components represented by the use of electrons." Nintendo suggests "electrical communication" should be construed as "the flow of information by electricity from the sender to the receiver," and "electronic communication" should be construed as "the flow of information by electricity through a semiconductor in the sender to a semiconductor in the receiver." There are therefore two main disputes: first, whether "the flow of information is between two components or between 'the sender' and 'the receiver,'" Gamevice CC Brief, at 22; and second, what distinction there is between "electric" and "electronic." These are discussed in turn.

First, Nintendo argues that communication necessarily entails the transmission of information between a source (or sender) and a receiver. In support of this, it cites a statement from Dr. Stein, who in turn points to the definition of "communication" from the IEEE Dictionary: "[t]he flow of information from one point, known as the source, to another, the receiver." Stein

United States District Court
Northern District of California

Decl. ¶ 258 (alteration in original) (citing IEEE 100: THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS (7th ed. 2000) [hereinafter IEEE DICTIONARY]). However, this is only one of two definitions of "communication" that the IEEE Dictionary offers. The other (in fact, the first definition) is "[t]he transmission of information from one point to another by means of electromagnetic waves," which clearly supports Gamevice's position. IEEE DICTIONARY 197. Moreover, as Gamevice notes, figure 6 of each of the Asserted Patents includes bidirectional arrows when depicting the relevant components. While a given component could technically operate as both a "sender" and a "receiver," Nintendo's definition could confuse the jury by suggesting the terms are mutually exclusive.

Second, while "electrical" and "electronic" are closely related, the separate use of both terms in the Asserted Patents strongly suggests the terms have different meanings. *See, e.g.*, *Innova/Pure Water*, 381 F.3d at 1119. Gamevice's proffered constructions plainly do not reflect any difference between the two: as Nintendo correctly (and succinctly) notes, "electricity just is the flow of electrons." Nintendo CC Brief, at 23. The difference appears to lie in the role played by "electron devices," which mediate the flow of electrons. This is supported by numerous dictionary definitions, including those proffered by both parties. *See, e.g.*, Dkt. 231-16 (IEEE Dictionary defining "electronic" as "[o]f, or pertaining to, devices, circuits, or systems utilizing electron devices"); Slocum Decl. ¶ 97 (citing a definition of "electronic" from the Wiley Electrical and Electronics Engineering Dictionary as "[p]ertaining to components and devices which conduct electrons . . . through a vacuum, gas, or semiconductor"); *id.* ¶ 98 (citing a definition of "electronic" from the McGraw-Hill Dictionary of Electrical and Computer Engineering as "[p]ertaining to electron devices or to circuits or systems utilizing electron devices, including electron tubes, magnetic amplifiers, transistors, [etc.]"); *id.* ¶ 99 (citing a definition of "electronic" from The Free Dictionary by Farlex as "[o]f, based on, operated by, or otherwise involving the controlled conduction of electrons . . . , especially in a vacuum, gas, or semiconducting material); *cf.* OXFORD DICTIONARY OF ELECTRONICS AND ELECTRICAL ENGINEERING 186 (5th ed. 2018) (defining "electronic device" as "[a] device that utilizes the properties of electrons . . . moving in a

**Appx42**

vacuum, gas, or semiconductor"). These stand in contrast to dictionary definitions of "electrical," which do not mention such devices. *See, e.g.*, *Electrical*, The Free Dictionary by Farlex, https://www.thefreedictionary.com/electrical (last visited Jan. 13, 2023) (defining "electrical" as "[o]f, relating to , producing, or operated by electricity"); OXFORD ENGLISH DICTIONARY (3d ed. 2008) (defining "electrical" as "[r]elating to or of the nature of electricity; involving electricity," though noting that "electric" is typically interchangeable or preferred); *cf.* IEEE DICTIONARY 358 (defining "electric" as "[c]ontaining, producing, arising from, actuated by, or carrying electricity, or designed to carry electricity and capable of so doing").

Based on these observations, "electrical communication" shall be construed using Gamevice's proposed construction: "the flow of information between two components represented by the use of electricity." "Electronic communication" shall be construed as "the flow of information between two components represented by the use of electricity controlled by and/or mediated through an electron device, such as a vacuum, gas, transistor, or semiconductor."

### IV. MOTION FOR SUMMARY JUDGMENT

Nintendo simultaneously filed a motion for summary judgment on two separate grounds, both of which turn on claim constructions. First, it argues that if the ITC's construction of "fastening mechanisms" is adopted, then it is entitled to summary judgment of noninfringement of the '713 and '498 patents. Second, it argues that if Gamevice's proposed constructions for either "computing device" or "structural bridge" are adopted, then it is entitled to summary judgment of invalidity for all three Asserted Patents, on the grounds that the asserted claims are anticipated.

For the reasons discussed above, none of the constructions contemplated by the motion will be adopted. However, many of the arguments outlined by the parties in their briefs on the motion for summary judgment would seem to apply to the adopted constructions as well. Judgment on the motion is therefore reserved, and the parties are requested to provide supplemental briefing as to the disposition of the motion based on the adopted constructions. The schedule for this supplemental briefing is discussed below.

///

**V. CONCLUSION**

For the reasons discussed above, the following constructions will be adopted for the ten claims the parties have submitted:

- "computing device": electronic equipment controlled by a CPU.
- "retention mechanism": subject to 35 U.S.C. § 112(f). The function is "interacting with the spring member of the restraint to couple the structural bridge to at least one of the first and second game control modules," and the structure is indefinite.
- "fastening mechanism": plain and ordinary meaning, i.e., "a fastener or fasteners."
- "a pair of confinement structures / confinement structure": physical component(s) that hold(s) a computing device.
- "passageway": a space that accommodates a communication wire.
- "communication link": a component for reception and transmission of data.
- "structural bridge": a physical apparatus that secures two or more components to each other across a distance.
- "promotes": plain and ordinary meaning; no construction necessary.
- "electrical communication": the flow of information between two components represented by the use of electricity.
- "electronic communication": the flow of information between two components represented by the use of electricity controlled by and/or mediated through an electron device, such as a vacuum, gas, transistor, or semiconductor.

Furthermore, judgment on the pending motion for summary judgment is reserved. The parties are requested to submit supplemental briefing discussing how, if at all, their respective arguments are affected by the adopted constructions. Nintendo's supplemental brief must be submitted within 21 days of the entry of this Order; Gamevice's supplemental brief must be submitted within 14 days of the filing of Nintendo's supplemental brief. Each brief is limited to a maximum of twenty (20) pages each, including memoranda of points and authorities. The motion will then be submitted for decision and an order will issue.

United States District Court
Northern District of California

1

2    **IT IS SO ORDERED**.

3

4    Dated: January 19, 2023

5    _____

6    RICHARD SEEBORG
     Chief United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

US009808713B1

(12) **United States Patent** (10) **Patent No.:** **US 9,808,713 B1**
Townley et al. (45) **Date of Patent:** *Nov. 7, 2017

(54) **GAME CONTROLLER WITH STRUCTURAL BRIDGE**

(71) Applicant: **Wikipad, Inc.**, Simi Valley, CA (US)

(72) Inventors: **Fraser Townley**, Pembroke, MA (US); **Kelly D. Gamble**, Simi Valley, CA (US)

(73) Assignee: **Wikipad, Inc.**, Simi Valley, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **15/663,094**

(22) Filed: **Jul. 28, 2017**

**Related U.S. Application Data**

(63) Continuation of application No. 15/457,571, filed on Mar. 13, 2017, which is a continuation-in-part of
(Continued)

(51) **Int. Cl.**
*A63F 9/24* (2006.01)
*A63F 13/24* (2014.01)
(Continued)

(52) **U.S. Cl.**
CPC ................ *A63F 13/24* (2014.09); *A63F 9/24* (2013.01); *A63F 13/20* (2014.09);
(Continued)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,391,444 A | 7/1983 | Bromley |
| 5,967,898 A | 10/1999 | Takasaka et al. |

(Continued)

OTHER PUBLICATIONS

Chartier; "Preorders begin for iPhone, iPod touch game controller." Published Feb. 8, 2011; In Macworld website (online); http://www.macworld.com/article/1157741/icontrolpad.html; entire document especially p. 1.

(Continued)

*Primary Examiner* — Jason Yen
(74) *Attorney, Agent, or Firm* — Hall Estill Attorneys at Law

(57) **ABSTRACT**

A device directed to a combination computing and input device. The computing device providing a plurality of sides, each of the plurality of sides are disposed between an electronic display screen and a back of the computing device. The input device communicates with the computing device and provides a pair of control modules adjacent to and confining the computing device on at least two opposing sides of the computing device. The input device further provides a structural bridge securing the pair of control modules one to the other, and a touch sensitive input module. The structural bridge adaptively and snugly accommodate the length of the computing device. A first of the pair of control modules features a retention mechanism communicating with the structural bridge. The retention mechanism adaptively secures the structural bridge such that the pair of control modules snugly accommodate the length of the computing device.

**20 Claims, 40 Drawing Sheets**



**US 9,808,713 B1**

Page 2

### Related U.S. Application Data

application No. 14/840,184, filed on Aug. 31, 2015, now Pat. No. 9,592,453, which is a continuation-in-part of application No. 14/611,804, filed on Feb. 2, 2015, now Pat. No. 9,126,119, which is a continuation-in-part of application No. 13/681,153, filed on Nov. 19, 2012, now Pat. No. 8,944,912, which is a continuation-in-part of application No. 13/494,801, filed on Jun. 12, 2012, now Pat. No. 9,005,026.

(60) Provisional application No. 61/577,709, filed on Dec. 20, 2011.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 13/10* | (2006.01) |
| *G06F 3/02* | (2006.01) |
| *A63F 13/92* | (2014.01) |
| *A63F 13/31* | (2014.01) |
| *A63F 13/2145* | (2014.01) |
| *A63F 13/98* | (2014.01) |
| *A63F 13/235* | (2014.01) |
| *A63F 13/23* | (2014.01) |
| *G06F 1/16* | (2006.01) |
| *G06F 13/40* | (2006.01) |
| *A63F 13/20* | (2014.01) |
| *A63F 13/50* | (2014.01) |

(52) **U.S. Cl.**

CPC .......... *A63F 13/2145* (2014.09); *A63F 13/23* (2014.09); *A63F 13/235* (2014.09); *A63F 13/31* (2014.09); *A63F 13/50* (2014.09); *A63F 13/92* (2014.09); *A63F 13/98* (2014.09); *G06F 1/1632* (2013.01); *G06F 1/1692* (2013.01); *G06F 3/0219* (2013.01); *G06F 13/102* (2013.01); *G06F 13/409* (2013.01); *G06F 13/4022* (2013.01); *G06F 13/4068* (2013.01); *A63F 2009/2457* (2013.01); *A63F 2300/1043* (2013.01); *A63F 2300/204* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,976,018 A | 11/1999 | Druckman | |
| 6,290,565 B1 | 9/2001 | Galyean, III et al. | |
| 6,530,838 B2 * | 3/2003 | Ha ...................... | A63F 13/06 |
| | | | 345/169 |
| 6,584,382 B2 | 6/2003 | Karem | |
| 6,710,764 B1 | 3/2004 | Burgel et al. | |
| 7,200,702 B2 | 4/2007 | Keely et al. | |
| 7,298,613 B2 | 11/2007 | Yin et al. | |
| 7,653,771 B2 | 1/2010 | Liberty | |
| 7,733,637 B1 * | 6/2010 | Lam ...................... | G06F 1/1626 |
| | | | 361/679.08 |
| 7,746,629 B2 | 6/2010 | Assouad et al. | |
| 7,758,424 B2 | 7/2010 | Riggs et al. | |
| 7,774,155 B2 | 8/2010 | Sato et al. | |

| | | | |
|---|---|---|---|
| 7,818,668 B2 | 10/2010 | Michelstein et al. | |
| 7,833,097 B1 * | 11/2010 | Maddox ................. | A63F 13/24 |
| | | | 455/556.1 |
| 7,933,118 B2 | 4/2011 | Chiu et al. | |
| 7,942,745 B2 | 5/2011 | Ikeda et al. | |
| 8,018,098 B2 | 9/2011 | Lu et al. | |
| 8,100,769 B2 | 1/2012 | Rabin | |
| 8,100,770 B2 | 1/2012 | Yamazaki et al. | |
| 8,180,295 B2 | 5/2012 | Mao | |
| 8,188,977 B2 | 5/2012 | Kuwaki et al. | |
| 8,192,285 B2 | 6/2012 | Cheng et al. | |
| 9,529,447 B2 * | 12/2016 | Hodges ................. | G06F 1/1632 |
| 9,711,980 B2 * | 7/2017 | Hodges ................. | H02J 7/0042 |
| 2002/0155890 A1 | 10/2002 | Ha et al. | |
| 2003/0147008 A1 | 8/2003 | Liu | |
| 2003/0231189 A1 | 12/2003 | Williams | |
| 2004/0222970 A1 | 11/2004 | Martinez et al. | |
| 2005/0092590 A1 | 5/2005 | Sakou | |
| 2005/0227761 A1 | 10/2005 | Yoshino et al. | |
| 2005/0255915 A1 * | 11/2005 | Riggs ...................... | A63F 13/06 |
| | | | 463/37 |
| 2005/0272471 A1 | 12/2005 | Sherman | |
| 2006/0291156 A1 | 12/2006 | Allen | |
| 2007/0054736 A1 | 3/2007 | See | |
| 2007/0268247 A1 | 11/2007 | Quatro | |
| 2009/0209288 A1 | 8/2009 | Rofougaran | |
| 2009/0280863 A1 | 11/2009 | Shin et al. | |
| 2009/0291760 A1 | 11/2009 | Hepburn et al. | |
| 2010/0069160 A1 | 3/2010 | Barrett et al. | |
| 2010/0081505 A1 | 4/2010 | Alten et al. | |
| 2010/0250815 A1 * | 9/2010 | Street ...................... | G06F 1/1626 |
| | | | 710/303 |
| 2011/0076003 A1 | 3/2011 | Cho et al. | |
| 2011/0118022 A1 | 5/2011 | Aronzon et al. | |
| 2011/0143835 A1 | 6/2011 | Sizelove | |
| 2011/0230178 A1 | 9/2011 | Jones et al. | |
| 2011/0249394 A1 | 10/2011 | Nielsen et al. | |
| 2011/0260969 A1 | 10/2011 | Workman | |
| 2012/0108335 A1 * | 5/2012 | Liotta .................... | A63F 13/235 |
| | | | 463/36 |
| 2012/0169597 A1 | 7/2012 | Liotta | |
| 2012/0236485 A1 | 9/2012 | Staats et al. | |
| 2012/0315989 A1 * | 12/2012 | Young ...................... | A63F 13/06 |
| | | | 463/37 |
| 2013/0120258 A1 | 5/2013 | Maus | |
| 2013/0178285 A1 | 7/2013 | Joynes et al. | |
| 2016/0001176 A1 * | 1/2016 | Chen ...................... | A63F 13/24 |
| | | | 463/37 |

OTHER PUBLICATIONS

Wattanajantra; "iControlPad unofficial iPhone gamepad coming soon." In c/net UK website (online); Published Aug. 27, 2010; http://crave.cnet.co.uk/mobiles/icontrolpad-unofficial-iphone-gamepad-coming-soon-50000514; entire document, especially pp. 3, 4.

Atari Arcade; Website Printout; http://atari.com/buy-games/arcade/atari-arcade-ipad; Nov. 30, 2011; pp. 1-3.

Ion iCade Arcade Cabinet; Website Printout; http://www.ionaudio.com/products/details/icade; 2012; pp. 1-6.

\* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4



**FIG. 5**



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11



FIG. 12



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17



FIG. 18



FIG. 19

FIG. 20



FIG. 21



FIG. 22



FIG. 23



FIG. 24



FIG. 25



FIG. 26



FIG. 27



FIG. 28



FIG. 29



FIG. 30



FIG. 31





FIG. 35



FIG. 36



FIG. 37



FIG. 38



FIG. 39



FIG. 40



FIG. 41



FIG. 42



FIG. 43



FIG. 44

US 9,808,713 B1

1

# GAME CONTROLLER WITH STRUCTURAL BRIDGE

## RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 15/457,571 filed Mar. 13, 2017, which is a continuation-in-part of U.S. patent application Ser. No. 14/840,184 filed Aug. 31, 2015, which is a continuation-in-part of U.S. patent application Ser. No. 14/611,804 filed on Feb. 2, 2015, now U.S. Pat. No. 9,126,119 issued on Sep. 8, 2015, which is a continuation-in-part of U.S. patent application Ser. No. 13/681,153 filed on Nov. 19, 2012, now U.S. Pat. No. 8,944,912 issued on Feb. 3, 2015, which is a continuation-in-part of U.S. patent application Ser. No. 13/494,801 filed on Jun. 12, 2012, now U.S. Pat. No. 9,005,026 issued on Apr. 14, 2015, which in turn claims priority to U.S. Provisional Patent application Ser. No. 61/577,709 filed on Dec. 20, 2011.

## SUMMARY OF THE INVENTION

In a preferred embodiment, a combination includes at least, but is not limited to, a computing device, the computing device providing a plurality of sides, each of the plurality of sides are disposed between an electronic display screen of the computing device and a back of the computing device, an input device interacting with the computing device, and a communication link. The input device communicates with the computing device and providing a pair of control modules adjacent to or confining the computing device on at least two opposing sides of the computing device. The communication link facilitating communication between the pair of control modules and the computing device. The input device further provides a structural bridge securing the pair of control modules one to the other, and a touch sensitive input module. The touch sensitive module is preferably a touch screen, which relays instructions to the computing device to alter an image displayed on the electronic display. The structural bridge adaptively and snugly accommodates the length of the computing device by way of a retention mechanism of a first of the pair of control modules. The retention mechanism adaptively secures the structural bridge such that the pair of control modules snugly accommodates the length of the computing device.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a front perspective view, with partial cutaway, of an embodiment an electronic game control apparatus constructed and operated in accordance with various embodiments disclosed.

FIG. 2 shows a back plan view of the apparatus of FIG. 1.

FIG. 3 displays a right side plan view, with partial cutaway, of the apparatus of FIG. 1, constructed in accordance with various embodiments disclosed and claimed herein.

FIG. 4 depicts a right side plan view of the apparatus of FIG. 1, constructed in accordance with various embodiments disclosed and claimed herein.

FIG. 5 illustrates a top perspective view of an embodiment of an input device of FIG. 1, constructed in accordance with various embodiments disclosed and claimed herein.

FIG. 6 is a block diagram of an embodiment of the apparatus of FIG. 1.

2

FIG. 7 is a block diagram of an alternate embodiment of the apparatus of FIG. 1.

FIG. 8 displays a front perspective view, with partial cutaway, of a combination electronic game control and information input device constructed and operated in accordance with various embodiments disclosed and claimed herein.

FIG. 9 depicts a back plan view of the combination of FIG. 8.

FIG. 10 illustrates a front perspective view, with partial cutaway, of an alternate embodiment of a combination electronic game control and information input device constructed and operated in accordance with various embodiments disclosed and claimed herein.

FIG. 11 shows a top perspective view of an embodiment of an input device with an integrated point of sale device, the input device is constructed in accordance with various embodiments disclosed and claimed herein.

FIG. 12 displays a front perspective view, with partial cutaway, of an alternate embodiment of a combination electronic game control and information input device, the information input device provides the integrated point of sale device.

FIG. 13 displays a front perspective view, with partial cutaway, of an alternative embodiment of a combination computing device and electronic game control, the electronic game control includes a pair of control modules linked one to the other by a bridge member.

FIG. 14 shows a back plan view of the combination computing device and electronic game control of FIG. 13.

FIG. 15 illustrates a top perspective view of the alternative embodiment of the combination computing device and electronic game control of FIG. 13.

FIG. 16 shows a back plan view of an alternative combination computing device with a communication port secured thereon, and an input device attached to the communication port.

FIG. 17 shows a top plan view of the communication port of FIG. 16.

FIG. 18 shows a side view in elevation of the communication port of FIG. 16.

FIG. 19 shows front and back views in elevation of a first selected confinement structure of the pair of confinement structures of the communication port of FIG. 16.

FIG. 20 shows front and back views in elevation of a second selected confinement structure of the pair of confinement structures of the communication port of FIG. 16.

FIG. 21 shows a bottom plan view of a first control module adjacent to a selected confinement structure of the pair of confinement structures of the communication port of FIG. 16.

FIG. 22 shows a bottom plan view of a first control module secured to a selected confinement structure of the pair of confinement structures of the communication port of FIG. 16.

FIG. 23 shows a side views in elevation of a first control module secured to a selected confinement structure of the pair of confinement structures of the communication port of FIG. 16.

FIG. 24 shows a view in perspective of a fastening mechanism of the communication port of FIG. 16.

FIG. 25 shows a back plan view of the combination computing device and electronic game control of FIG. 16 revealing, in cutout, a data storage device and an auxiliary power source.

FIG. 26 shows a front perspective view, with partial cutaway, of an alternate embodiment of an electronic game

US 9,808,713 B1

**3**

control apparatus constructed and operated in accordance with various embodiments disclosed and claimed herein.

FIG. 27 shows an exploded view in perspective of a first control module of an input device of the electronic game control apparatus of FIG. 26.

FIG. 28 shows an exploded view in perspective of a second control module of the input device of the electronic game control apparatus of FIG. 26.

FIG. 29 shows a back perspective view of the electronic game control apparatus of FIG. 26.

FIG. 30 shows a front perspective view of the electronic game control apparatus of FIG. 26, configured to accommodate computing devices of varying size.

FIG. 31 shows a back perspective view of the electronic game control apparatus of FIG. 26, configured to accommodate computing devices of varying size.

FIG. 32 shows a front perspective view of the second control module of the electronic game control apparatus of FIG. 26, with a computing devices of maximum size staged to engage the first control module.

FIG. 33 shows a front perspective view of the second control module of the electronic game control apparatus of FIG. 26, with the computing devices of maximum size commencing engagement with the first control module.

FIG. 34 shows a front perspective view of the second control module of the electronic game control apparatus of FIG. 26, with the computing devices of maximum size fully engaged with the first control module.

FIG. 35 shows a front view of an alternative embodiment of an electronic game control apparatus constructed and operated in accordance with various embodiments disclosed and claimed herein.

FIG. 36 shows a front view of an alternative embodiment of an electronic game control apparatus, and a front perspective view of a computing device, which interfaces with the electronic game control apparatus to form an electronic gaming system.

FIG. 37 shows a front perspective view, with partial cutaway, of the alternative embodiment of then electronic game control apparatus of FIG. 36, constructed and operated in accordance with various embodiments disclosed and claimed herein.

FIG. 38 shows an exploded view in perspective of a control module of the input device of the electronic game control apparatus of FIG. 37.

FIG. 39 shows a front view of the alternative embodiment of the electronic gaming system of FIG. 36, with a keyboard integrated into the control module of the input device of FIG. 38.

FIG. 40 shows a front view of the alternative embodiment of the electronic gaming system of FIG. 39, interacting with wirelessly with a display.

FIG. 41 shows a back view of the alternative embodiment of the electronic gaming system of FIG. 37, with a touch sensitive module attached to a back side of the structural bridge of the electronic gaming controller.

FIG. 42 shows a back view of an alternate, alternative embodiment of the electronic gaming system of FIG. 37, with a touch sensitive module attached to a back side of one of the control modules of the electronic gaming controller.

FIG. 43 shows a back view of the alternate, alternative embodiment of the electronic gaming system of FIG. 35, with a touch sensitive module attached to a back side of the structural bridge of the electronic gaming controller.

FIG. 44 shows a back view of an alternate, alternative embodiment of the electronic gaming system of FIG. 35, with a touch sensitive module attached to a back side of the control module of the electronic gaming controller.

**4**

DETAILED DESCRIPTION

The present disclosure generally relates to a combination game controller and information input device directed to controlling electronic games and entry of information to a computing device, also referred to herein as video games, computer and applications games. The apparatus preferably includes a computing device, an electronic game communicating with the computing device, and an input device for controlling movement of a virtual object provided by the electronic game, and entry of information into the computing device. In a preferred embodiment, the input device includes a pair of opposing side structures adjacent opposing sides of plurality of sides of the computing device. The input device further preferably includes a plurality of input switches, wherein said input switches are adjacent each of the at least two opposing sides of the plurality of sides of the computing device, and a bridge structure disposed between the pair of sides to form a three sided structure. The third structure mitigates inadvertent removal of the computing device from the three sided structure when the computing device is fully nested within the three sided structure.

Turning to the drawings, FIG. 1 provides an exemplary game controller and information entry device ("G&D") 100 capable of being used in accordance with various embodiments of the present invention. The exemplary G&D 100 has at least a computing device 102 (also referred to herein as a computing device 102), which provides a plurality of sides, such as 104, 106, 108, and 126. Each of the plurality of sides 104, 106, and 108 are disposed between an electronic display screen 110, of the computing device 102, and a back 112 (shown by FIG. 2) of the computing device 102 operates. The G&D 100 further preferably includes an input device 114. The computing device 102 may take the form of a tablet computer, smart phone, notebook computer, or other portable computing device,

In a preferred embodiment, the input device 114 provides a pair of side structures, 116 and 118, with a bridge structure 115 disposed there between. One of the pair of side structures, for example 116, is adjacent to and confines the computing device 102 on a first side, such as 104 of the plurality of sides 104, 106, 108, and 126 of the computing device 102. The second side structure of the pair of side structures, such as 118, is adjacent to and confines the computing device 102 on a second side, such as 108, of the plurality of sides 104, 106, 108, and 126 of the computing device 102, wherein the first and second sides, such as 104 and 108, of the plurality of sides 104, 106, 108, and 126 of the computing device 102 are opposing sides of the plurality of sides 104, 106, 108, and 126, of the computing device 102.

In a preferred embodiment, the input device 114 further provides a plurality of removable game control modules 120 and 122, wherein the removable game control modules 120 and 122 are adjacent each of the at least two opposing sides 104 and 108, of the plurality of sides 104, 106, 108, and 126, of the computing device 102, and a bridge structure 124, disposed between the pair of side structures 116 and 118, and adjacent the third side 126, of the plurality of sides 104, 106, 108, and 126, of the computing device 102.

In a preferred embodiment, the removable game control modules 120 and 122 may be removed from the input device 114, and replaced by removable keyboard modules 164 and 166, of FIG. 8. To facilitate the exchange of modules, the input device preferably provides a pair of input module apertures 170. The removable keyboard modules collectively form a full function keyboard and each provide an

US 9,808,713 B1

5

auxiliary electronic display screen ("ADS") **168**, each ADS **168** having at least the functionality of the electronic display screen **110**.

In an alternate embodiment, shown by FIG. **10**, the removable keyboard modules **164** and **166** are a pair of touch responsive electronic display screens **172** and **174**, each of the touch responsive electronic display screens having at least the functionality of the electronic display screen **110**, include the functionality of a mouse pad portions **176** and **178**, and selectively presents keys of a keyboard **180** and **182** for information entry. Preferably, the keys are virtual keys that respond to a touch by a user.

Returning to FIG. **1**, preferably, the bridge structure **124** in combination with the pair of side structures **116** and **118** form a three sided structure **128** (of FIG. **5**) (also referred to herein as a u-shaped structure **128** of the input device **114**), in which the computing device **102** nests, such that the computing device **102** is confined by the u-shaped structure **128**, and the u-shaped structure **128** mitigates inadvertent removal of the computing device **102** from the u-shaped structure **128** when the computing device **102** is fully nested within the three sided structure **128**.

The G&D **100** of FIG. **1**, further preferably includes a video game **130**.

Preferably, the video game **130** provides a virtual object **132** displayed by the electronic display screen **110**, the virtual object **132** is responsive to input from the input device **114**. An example of a response of the virtual object **132** would be movement of the virtual object **132**, or the loading of an alternate computer game, based on a predetermined signal provided by the input device **114**, or an appearance of a character. It is noted that FIG. **1** displays the housings of the plurality of switches, whereas at least some of the plurality of switches are shown in the partial cutaway of FIG. **3**.

FIG. **2** depicts and reveals the back **112** of the computing device **102**. Further shown by FIG. **2**, is the input device **114**, which provides a pair of trigger switches **136** and **138**, supported by their corresponding side structures **116** and **118** respectively.

FIG. **3** shows that a predetermined number of the plurality of switches **140**, collaborate with each other to form an input apparatus **142**, the input apparatus **142** controls display of virtual objects displayed on the electronic display screen **110** of the computing device **102**. Preferably, the input apparatus **142** is a joystick **142**. FIG. **3** further shows that the input device **114** provides a plurality of buttons **144** and **119** of the removable game control modules **120**, which activate corresponding switches **145** and **121**. The main function of the trigger **138**, the joystick **142**, and the buttons **144** and **119** of the removable game control modules **120** is to govern the movement/actions of a playable body/object or otherwise influence events in a video game **130** (of FIG. **1**) or an alternate computer game.

FIG. **4** shows the G&D **100**, further includes a second joystick **146**, and a second button **148**, which are provided on the side structure **116**, adjacent the trigger **136**. While FIG. **5** shows the central processing unit (CPU) **150**, of the input device **114**.

FIG. **6** shows the input device **114** includes the CPU **150**, interacting with the plurality of switches **152**, which preferably include at least switches **119** of the removable game control modules **120** (of FIG. **1**), switches **117** of the removable game control modules **122** (of FIG. 1), **136**, **138**, **142**, **144**, **146**, and **148** (of FIGS. **2** and **3**). FIG. **6** further shows the input device **114** includes a communications protocol **154** providing the communication link between the

6

computing device **102**, and the input device **114**. In a preferred embodiment, a Universal Serial Bus (USB) communications protocol is utilized. However, as those skilled in the art will recognize, the communications protocol **154** is not limited to a USB protocol.

FIG. **6** further shows that the computing device **102** preferably includes at least a CPU **156**, interacting with the electronic display screen **110**, the video game **130**, a device driver **158**, which facilitates the interaction between the computing device **102** and the input device **114**, and a communications protocol **160** providing the communication link between the computing device **102**, and the input device **114**. In a preferred embodiment, a Universal Serial Bus (USB) communications protocol is utilized. However, as those skilled in the art will recognize, the communications protocol **160** is not limited to a USB protocol.

FIG. **7** shows an alternative embodiment of an exemplary game controller **162**, in which the device driver **158** and the video game **130** are located in the input device **114**.

FIG. **8** shows in a preferred embodiment, the G&D **100** includes a first camera **184**, on a first side of the computing device **102**, a second camera **186**, on the back side of the computing device **102** (shown by FIG. **9**), a third camera **188** on a first side of the input device **114**, and a fourth camera **190** on the back side of the input device **114** (shown by FIG. **9**).

In a preferred embodiment, each of the four cameras may selectively function independently, or may be used in conjunction with one another, and each of the four cameras **184**, **186**, **188**, and **190** are fully functional in capturing still and video images. Additionally, and preferably, the first and second cameras **184** and **186** are fully operative, even when the computing device **102** is detached from the input device **114**, while the third and fourth cameras **188** and **190** are fully functional, even when the input device **114** is detached from the computing device **102**.

In a preferred embodiment, when the computing device **102** is nested in the input device **114**, the first and second cameras, **184** and **186**, are responsive, either independently or simultaneously, to input from either the computing device **102**, or the input device **114**, depending on which device is selected for control of the first and second cameras, **184** and **186**. Further, in the preferred embodiment, each the computing device **102** and the input device **114**, are configured with a Bluetooth protocol stack communication feature, which permits the user to operate the first and second cameras, **184** and **186**, of the computing device **102** with the input device **114**, even when the computing device **102** is detached from the input device **114**. Likewise, when the computing device **102** and the input device **114** are configured with a Bluetooth protocol stack communication feature, the user may operate the third and fourth cameras, **188** and **190**, of the input device **114**, using the computing device **102**. In other words, in the preferred embodiment, each of the four cameras **184**, **186**, **188**, and **190**, may be selectively operated, individually or collectively, whether or not the computing device **102** is nested within the input device **114**.

FIG. **9** shows that in a preferred embodiment, the input device **114** includes an auxiliary power source **192**, and an auxiliary data storage device **194**, which preferably includes a cache portion **196**. Preferably, the auxiliary power source **192** is a lithium ion battery, which provides power to the input device **114**, and the computing device **102**, when the power source of the computing device **102** is depilated; and the auxiliary data storage device **194** is a solid state hard drive.

US 9,808,713 B1

7

In the preferred embodiment, the cache 196 is sized to buffer synchronized input from each of the cameras 184, 186, 188, and 190, such that the auxiliary data storage device 194 may store and retrieve images, still or video, for display seamlessly, including a simultaneous output of video images recorded by each of the cameras 184, 186, 188, and 190.

In a non-limiting exemplary application of utilizing the cameras 184, 186, 188, and 190, the first camera 184 could be trained on an information presenter, while the second camera 186 is trained on a portion of an audience attending the presentation. The third camera 188 could be trained on a screen used by the presenter for presenting their information to the audience, while the fourth camera is trained on an alternate portion of the audience. By simultaneously replaying the recorded presentation, a response of the audience to the information, and sequence of information being presented, may be analyzed for fostering improvements to the presentation.

FIG. 11 shows an alternative embodiment of a video game controller 200, which provides an integrated transaction card input feature 202. Preferably, the integrated transaction card input feature 202, includes a transaction card slot 204, and a transaction card reader 206. In a preferred embodiment, the transaction card reader 206 is a magnetic strip reader, but as those skilled in the art will recognize, the transaction card reader can be, in the alternate: is an optical character recognition reader; a barcode reader; an object recognition reader, or a pattern recognition reader.

FIG. 12 shows that in a preferred embodiment, a combination computing device and electronic game controller with an integrated point of sale device 210 preferably includes a computing device 212, having a plurality of sides 214, each of the plurality of sides 214, are disposed between an electronic display screen 216, of the computing device and a back 218 of the computing device, and an input device 220, in electronic communication with the computing device 212. The input device 220 preferably provides side structures 222, adjacent to and confining the computing device on at least two opposing sides of the plurality of sides 214 of the computing device 212. The input device 220, further preferably provides input module apertures 224, each input module aperture 224, selectively accepts either a game control module, such as 102 and 122 of FIG. 1, or a removable keyboard module, such as 226 and 228. Preferably, the input module apertures 224 are adjacent each of the at least two opposing sides of the plurality of sides 214 of the computing device 212.

FIG. 12 further shows that in a preferred embodiment, the combination computing device and electronic game controller with an integrated point of sale device 210 preferably includes a camera 230, communicating with each the input device 220, and the computing device 212. The camera 230, selectively captures either still or video images, and that the input device 220, further provides an integrated transaction card input feature 232, which interacts with a transaction card 234, and that preferably, the input device is an electronic game controller 220. Preferably, the camera 230 is a first camera, having a lens facing the user while the user is facing the electronic display screen 216, and includes at least a second camera, such as 186 or 190 (of FIG. 9), having a lens facing in a direction opposite that of the first camera 184.

FIG. 12 additionally shows an application 236, displayed on the electronic display screen 216, of the computing device 212. Preferably, the application 236, displayed on the electronic display screen 216 of the computing device 212,

8

is a point of sale transactional computer application, which interacts with the electronic game controller 220 and the computing device 212.

FIG. 13 shows an alternative embodiment of a combination computing device and electronic game control 240 (also referred to herein as a device 240). The computing device 242, preferably provides a plurality of sides 244, each of the plurality of sides are disposed between an electronic display screen 246, of the computing device 242, and a back 248 of the computing device 242.

Preferably, the electronic game controller 250 (also referred to herein as input device 250), is in electronic communication with the computing device 242. Preferably, the input device 250 provides a pair of control modules 252. The pair of control modules 252, are adjacent to and confining the computing device 242, on at least two opposing sides of the plurality of sides 244, of the computing device 242. The pair of control modules 252 preferably provide input module apertures 254, each input module aperture 254, secures an instructional input device 256. Preferably, the input module apertures 254 are adjacent each of the at least two opposing sides of the plurality of sides 244, of the computing device 242.

FIG. 14 shows the back 248, of the computing device 242, and the computing device 242, partially positioned within the input device 250. FIG. 14 further shows a structural bridge 258, securing the pair of control modules 252, one to the other, and communicating with the back 248, of the computing device 242, at a mid-region 260, of the back 248, of the computing device 242.

FIG. 14 further shows that the pair of control modules 252 provide a confinement boss 262, and the confinement boss 262 provides a fastening detent 264. The fastening detent 264 interacts with a retention member 266, to secure the structural bridge 258, to the pair of control modules 252. In a preferred embodiment, the retention member 266 is responsive to a catch 268, which preferably is a spring activated catch 268, and the retention member 268 is preferably a spring loaded retention member 268. Still further, FIG. 14 shows that in a preferred embodiment, the structural bridge 258 provides a communication link 270, which passing signals between the pair of control modules 252.

Continuing with FIG. 14, in a preferred embodiment, the communication link 270, provides a communication module 272, and in the alternative, provides a signal pathway 274, for use in passing signals between the pair of control modules 252. In a preferred embodiment, the communication module 272 is a wireless communication module 272, which operates in a frequency range of 2.4 GHz. In an alternate preferred embodiment, the wireless communication module 272 is a personal area network. As those skilled in the art, a personal area network (PAN) is a computer network used for communication among computerized devices, including telephones and personal digital assistants. PANs can be used for communication among the personal devices themselves (intrapersonal communication), or for connecting to a higher level network and the Internet (an uplink). A wireless personal area network (WPAN) is a PAN carried over wireless network technologies such as IrDA, Bluetooth, Wireless USB, Z-Wave, ZigBee, or even Body Area Network. The reach of a WPAN varies from a few centimeters to a few meters. A PAN may also be carried over wired computer buses such as USB and FireWire.

In an embodiment that utilizes the signal pathway 274, as the communication link, the signal pathway 274 may be in the form of a metallic conductor, a fiber optic conductor, a conductive polymer, or the conductive layer of a flex circuit.

US 9,808,713 B1

9

The skilled artisan will further appreciate that the structural bridge **258** (of FIG. **14**), or **276** (of FIG. **15**) may be either formed from a ridged material, such as a ridged polymer, or from a flexible material, such as a flexible polymer. In a preferred embodiment, when a flexible material is selected, and the signal pathway **274** is a wired pathway, the signal pathway **274** may be coupled externally to the structural bridge **276**, as shown by FIG. **15**.

FIG. **15** further shows that in a preferred embodiment, the instructional input device **256**, may be an electronic game control module **278** (which may be either removable, or fixed), or a keyboard module **280** (of FIG. **13**, which may be either removable, or fixed).

FIG. **16** shows a back plan view of an alternative combination **300**, which preferably includes, but is not limited to, a computing device **302** that provides a plurality of sides **304**, each of the plurality of sides are disposed between an electronic display screen **306** (of FIG. **13**) of the computing device and a back **308** of the computing device **302**. Preferably, the alternative combination **300** further includes a communication port **310**, interacting with the computing device **302**. In a preferred embodiment, the communication port **310** provides a communication link **312** (which for purposes of illustration is shown as a wired connection **314**, but will be understood to be a wireless connection in an alternative embodiment). Preferably, the communication port **310** further provides a pair of confinement structures **316**, the pair of confinement structures **316**, which are preferably adjacent to and confining the computing device **302** on at least two opposing sides of the plurality of sides **304** of the computing device **302**.

The alternative combination **300**, further preferably includes an input device **318** (also referred to herein as input device **114**), attached to and in electronic communication with the communication port **310**. The input device **318** providing a pair of control modules **252**, the pair of control modules **252** providing input module apertures **224** (of FIG. **12**), each input module aperture **224** secures an instructional input device **356** (of FIG. **23**), or such as **120** of FIG. **11**, or **256** of FIG. **13**. Preferably, the input module apertures **224**, are adjacent each of the at least two opposing sides of the plurality of sides **304**, of the computing device **302**, and wherein the input device **356**, or such as **120** of FIG. **11**, or **256** of FIG. **13**, is a separate and distinct structure from the communication port **310**, forming no structural portion of the communication port **310**.

FIG. **16** further shows that in a preferred embodiment, the communication port **310** further includes a fastening mechanism **320**. In one embodiment, a soft draw latch, such as that provided by Southco, of 210 N. Brinton Lake Road Concordville, P.A. 19331, have been shown to be a useful fastening mechanism **320**.

FIG. **17** shows a top view of the communication port **310** that preferably includes a structural bridge **322**, securing the pair of confinement structures **316**, one to the other. The structural bridge **322** is preferably secured to a select confinement structure of the pair of confinement structures **316** by way of a solid connection **324**, and to remaining confinement structure of the pair of confinement structures **316** by way of a slip fit **326**. The fastening mechanism **320**, is preferably securely fastened to to a conduit **328**, of the structural bridge **322**, by way of a anchor member **330**, the anchor member **330** is preferably positioned in a location adjacent the slip fit **326**, and by way of an attachment member **332** (shown in FIG. **18**), securely attached to the remaining confinement structure of the pair of confinement structures **316**. The attachment member **332** is preferably

10

positioned in a location adjacent the slip fit **326**. Operation of the fastening mechanism **320** facilitates an expand and contract of the distance between the pair of confinement structures **316**. The expansion and contraction of the distance between the pair of confinement structures **316**, facilitates placement of the computing device **302** between the pair of confinement structures **316**, the application of sufficient compressive load being placed on the computing device **302** to securely hold the computing device between the pair of confinement structures **316**, and an ability to remove the compressive load and allow removal of the computing device from the communication port **310**.

FIG. **17** further shows that each of the pair of confinement structures **316**, provide a pair of controller docking pins **334**, while FIG. **18** shows that each of the pair of confinement structures **316** further provide a computing device cradle **336**, and that a select confinement structure of the pair of confinement structures **316** provides a computing device interface feature **338**. The interface feature **338**, facilitates at least, but not limited to, the provision of power to the computing device **302**.

FIG. **19** shows a front view **340**, of a first selected confinement structure of the pair of confinement structures **316**, which reveals a plurality of signal input lands **342** for use in receiving signals from the input device **318**, of FIG. **16**, and the pair of controller docking pins **334**.

Further shown by FIG. **19**, is a back view **344** of the first selected confinement structure of the pair of confinement structures **316**, which reveals computing device interface feature **338**, the computing device cradle **336**, and the slip fit **326**.

FIG. **20** shows a front view **346**, of a second selected confinement structure of the pair of confinement structures **316**, which reveals a plurality of signal input lands **342** for use in receiving signals from the input device **318**, of FIG. **16**, and the pair of controller docking pins **334**.

Further shown by FIG. **20**, is a back view **348** of the second selected confinement structure of the pair of confinement structures **316**, which reveals, the computing device cradle **336**, and the solid connection **324**.

FIG. **21** reveals, for purposes of disclosure and for consistency of views with remaining disclosed figures of an embodiment, a bottom right hand plan view of the input device **318** adjacent the second selected confinement structure of the pair of confinement structures **316**, of the communication port **310**. Preferably, the control module **252**, provides an attachment structure **350**, cooperating with the controller docking pins **334**, of the communication port **310**. The attachment structure **350**, secures the input device **318**, to the communication port **310**. In a preferred embodiment, the attachment structure **350** provides a sliding locking toggle **352**, and a fixed locking toggle **354**. In the embodiment presented, the sliding locking toggles, **352**, interact with the controller docking pins **334**, to securely (but removable) fasten the input device **318** to the communication port **310**. In a preferred embodiment, the sliding locking toggle **352** is selectively adjustable from an open position, shown in dashed lines, and a closed, or locked position, as shown in solid lines.

FIG. **22** shows the input device **318**, securely fastened to the communication port **310**, by way of the attachment structure **350**, while FIG. **23** shows the right control module **252**, of the input device **318**, with its accompanying attachment structure **350** in a locked position, and the special relationship of the control module **252**, relative to the confinement structure **316**. FIG. **23** further shows an instructional input device **356**, such as **120** of FIG. **11**, or **256** of

US 9,808,713 B1

11

FIG. 13, which in a preferred embodiment is a removable instructional input device 356.

FIG. 24 provides a more insightful presentation of a latch portion 358, of the fastening mechanism 320, relative to the attachment member 332, of the fastening mechanism 320.

FIG. 25 shows that in a preferred embodiment, the input device 318, includes an auxiliary power source 360, and an auxiliary data storage device 362, which preferably includes a cache portion 364.

FIG. 26 shows a front perspective view, with partial cutaway, of an alternate embodiment an electronic game control apparatus 400 (also referred to herein as an input device 400), constructed and operated in accordance with various embodiments disclosed and claimed herein. The input device 400 includes, but is not limited to, a first control module 402, and a second control module 404. The control modules (402, 404) are adjacent to and confine a computing device 406 (of FIG. 30) on at least two opposing sides 408 and 410 (each of FIG. 30), of the plurality of sides of the computing device 406.

In a preferred embodiment, the computing device 406 has a length 412, greater its width 414, as shown by FIG. 30. The pair of control modules (408, 410) are preferably configured such that the pair of control modules (408, 410) adaptively and snugly accommodate the width 414, of the computing device 406. Alternatively the pair of control modules (408,410) adaptively and snugly accommodate a width 416 (of FIG. 30), of a second computing device 418 (of FIG. 30). Preferably, the width 416, of the second computing device 418, is greater than the width 414, of the computing device 406, and preferably, the second computing device 418, has a length 420 (of FIG. 30) greater than the width 414, of the second computing device 418.

Preferably, the input device further provides a structural bridge 422, which secures the pair of control modules (402, 404), one to the other. The structural bridge 422 is preferably configured such that the structural bridge 422, adaptively and snugly accommodate the length 412, of the computing device 406. Alternatively, the structural bridge 422, adaptively and snugly accommodate the length 420, of the second computing device 418. Preferably, the length 420 of the second computing device 418 is greater than the length 412, of the computing device 406. Without limitations imposed upon the accompanying claims, in a preferred embodiment, the structural bridge 422, is formed from a flexible material, such as a flexible polymer, or alternatively, from a semi-ridge material, such as a semi-ridged polymer, fiber glass, metallic sheet material, carbon fiber, or other materials known to artisans skilled in the art.

FIG. 27 shows an exploded view in perspective of the first control module 402, of the input device 400, of FIG. 26. The first control module 402, of the pair of control modules (402, 404), preferably includes at least, but is not limited to, a retention mechanism 424, communicating with the structural bridge 422 (of FIG. 26), wherein the retention mechanism 424, secures the structural bridge 422 such that the structural bridge 422, adaptively accommodates the length of the computing device 406. Alternatively, the structural bridge 422 adaptively accommodates the length 420, of the second computing device 418. In a preferred embodiment, the length 420 of the second computing device 418 is greater than the length 412, of the computing device 406.

FIG. 27 further shows that the first control module 402 provides a base 426, which provides an adjustment feature 428. And preferably, the retention mechanism includes at least, but is not limited to, a boss 430, communicating with the structural bridge 422, and an adjustment structure 432,

12

interacting with the boss 430, by way of the adjustment feature 432. In a preferred embodiment, the base 426 is disposed between the adjustment structure 432, and the boss 424.

The first control module 402, preferably provides a restraint 434, cooperating with the boss 430. As shown by FIG. 29, the restraint 434, retains the structural bridge 422, in a first position 436, relative to the base 426, when the adjustment structure 432, is activated in a first direction 438, relative to the base 426. When positioned in the first position 436, the structural bridge 422, accommodates the second computing device 418, as more clearly shown in FIG. 30.

The adjustment structure 432, further retains the structural bridge 422, in a second position 440, relative to the base 426, when the adjustment structure 432, is activated in a second direction 442, relative to the base 426. When positioned in the second position 440, the structural bridge 422, accommodates the first computing device 406, as shown by FIG. 30. To accommodate the first position 436, and the second position 440, preferably the boss 432 provides a constraint feature 444, which cooperates with the base 426. The constraint feature 444, maintains the structural bridge 422, in the first position 436, relative to the base 426, following an activation of the adjustment structure 432, in the first direction 438. The constraint feature 444, further maintains the structural bridge 422, in the second position 440, relative to the base 426, following an activation of the adjustment structure 432, in the second direction 442. The second direction 442 is a direction opposite that of the first direction 438, and in the preferred embodiment, the restraint 434, is a spring member.

FIG. 28 shows an exploded view in perspective of the second control module 404, of the input device 400, of FIG. 26. The second control module 404, includes at least but is not limited to, a tensioning mechanism 446, communicating with the structural bridge 422, by way of a fastening mechanism 448 (also referred to herein as an attachment stay 448), of the tensioning mechanism 446 secured to the structural bridge 422, as shown by FIG. 26.

The tensioning mechanism 446, secures the structural bridge 422, to a bottom cover 450, of the second control module 404, such that the structural bridge 422, cooperating with the tensioning mechanism 446, snugly accommodates the length 412 (of FIG. 30), of the computing device 406 (of FIG. 30). Alternatively, the tensioning mechanism 446, secures the structural bridge 422 to the bottom cover 450, of the second control module 404, such that the structural bridge 422, cooperating with the tensioning mechanism 446, snugly accommodates the length 420 (of FIG. 30) of the second computing device 418 (of FIG. 30). In a preferred embodiment, the length 420, of the second computing device 418, is greater than the length 412, of the computing device 406.

In a preferred embodiment, the bottom cover 450, provides a position guide 454, and the tensioning mechanism 446, includes at least, but not limited to, the attachment boss 452, communicating with the structural bridge 422, an attachment support 456, cooperating with the attachment boss 452. Preferably, the attachment support 456, in cooperation with the attachment boss 452, confines the structural bridge 422 vertically, but permits lateral movement of the structural bridge 422 relative to the bottom cover 450.

Preferably, the structural bridge 422, is disposed between the bottom cover 450, and a top cover 458, which cooperates with the bottom cover 450, to facilitate lateral movement of a portion of the structural bridge 422, from its position associated with the first position 432 (of FIG. 29) of the

US 9,808,713 B1

13

adjustment structure **432** (of FIG. **29**), to its position associated with the second position **440** (of FIG. **29**) of the adjustment structure **432**, while a biasing structure **460**, communicating with the attachment stay **448** (of FIG. **26**), provides variable tension between the structural bridge **422**, and the second control module **404**, thereby accommodating a predetermined amount of lateral movement of the structural bridge **422**, relative to the bottom cover **450**, as shown by FIG. **26**.

In a preferred embodiment, the attachment stay **448**, includes at least, but not limited to, a guide aperture **462**, which is preferably slotted, interacting with a position guide **454**, of the attachment boss **452**. The interaction of the guide aperture **462**, with the position guide **454**, limits the extent of lateral alignment between the structural bridge **422**, and the second control module **404**. As further shown by FIG. **28**, in a preferred embodiment, the attachment support **456**, further supports a plurality of control switches **464**, interacting with a circuit structure **466**, which preferably is a flex circuit **466**, the biasing structure **460**, is a coiled spring **460**.

Preferably, each of the pair of control modules **402** of FIG. **27** and **404** of FIG. **28**, include at least, but not limited to, a sizing mechanism **468**, communicating with a computing device **406** (of FIG. **30**), else a second computing device **418** (of FIG. **30**). In a preferred embodiment, the sizing mechanism **468** is configured such that the sizing mechanism **468** adaptively accommodate the width **414**, of the computing device **406**. Alternatively the sizing mechanism **468**, adaptively accommodate the width **416**, of the second computing device **418**. In a preferred embodiment, the width **416**, of the second computing device **418**, is greater than the width **414**, of the computing device **406**.

As shown by FIG. **27**, the control module **402** includes the base **426**, which provides a sizing toggle confinement structure **470**, and a slide support confinement structure **472**. Preferably, the sizing mechanism **468** includes at least, but is not limited to, a sizing toggle **474**, communicating with the sizing toggle confinement structure **472**, a sizing toggle restraint **476**, interacting with the sizing toggle confinement structure **472**, the sizing restraint **476**, promotes rotation of the sizing toggle **474**, relative to the base **426**.

In a preferred embodiment, the sizing mechanism further includes a torsional force structure **478**, cooperating with the base **426**, and acting on the sizing toggle **474**. The torsional force structure **478**, facilitating the sizing toggle **474**, in a first position under a first torsional force. When in the first position, the sizing toggles **474** extend vertically from the base **450**, and the control module **402** is configured to accommodate the width **410**, of the computing device **406**. Alternatively, the torsional force structure **478**, facilitating the sizing toggle **474**, in a second position under a second torsional force. When in the second position, the sizing toggles **474**, lies nested in the sizing toggle confinement structure **472**, and horizontal the base **450**, and the control module **402** is configured to accommodate the width **416**, of the second computing device **418**. Preferably, the second torsional force is greater than the first torsional force, and the width **416**, of the second computing device **418**, is greater than the width **414**, of the computing device **406**.

In a preferred embodiment, the control module **402** further provides a computing device slide pad **480**, nested in the slide support confinement structure **472**. The computing device slide pad **480** is configured to deliver minimal sliding friction between the computing device **406**, or the second computing device **418**, and the control module **402**, when inserting either computing device (**406**, **418**) into the control module **402**. Likewise, the sizing toggle **474** is configured to

14

deliver minimal sliding friction between the computing device **406**, or the second computing device **418**, and the control module **402**, when inserting either computing device (**406**, **418**) into the control module **402**.

Preferably, the torsional force structure **478**, is a coiled spring, and the sizing toggle confinement structure **470**, provides a friction surface **482**, which mitigates an inadvertent movement of the sizing toggle **474**, from the first position to the second position when the computing device **406**, is constrained by the input device **400**.

Turning to FIG. **31**, shown therein are FIGS. **31***a* and **31***b*. As can be seen by FIG. **31***a*, the control modules (**402**, **404**), and the structural bridge **422**, of input device **400**, are positioned, relative to one another, to accommodate the computing device **406** (of FIG. **30**). While as can be seen by FIG. **31***b*, the control modules (**402**, **404**), and the structural bridge **422**, of input device **400**, are positioned, relative to one another, to accommodate the second computing device **418**, of FIG. **30**.

FIGS. **32**, **33**, and **34** collectively illustrate a preferred procedure to join the second computing device **418**, with the control module **404**. The first step in the procedure is to align the second computing device **418**, with the control module **404**, such that the corner of the second computing device **418**, is adjacent the sizing toggle **474** as shown by FIG. **32**. The next step in the procedure is to advance the second computing device **418**, into contact with the sizing toggle **474**, and continue to advance the second computing device **418**, into the control module **404**, which causes the sizing toggle **474**, to rotate into the sizing toggle confinement structure **470**, thereby permitting the second computing device **418** to be adaptively and snuggly accommodated by the control module **404**.

FIG. **35** shows a front view of an alternate embodiment of an electronic game control apparatus **500** (also referred to herein as an input device **500**), constructed and operated in accordance with various embodiments disclosed and claimed herein. The input device **500** includes, but is not limited to, a first control module **502**, and a second control module **504**. The control modules (**502**, **504**) are adjacent to and confine a computing device **506** (of FIG. **36**) on at least two opposing sides **508** and **510** (each of FIG. **36**), of the plurality of sides of the computing device **506**. Collectively, and when joined together, by way of a structural bridge **522**, the input device **500**, and the computing device **506**, form an electronic gaming system **511**, as shown in FIG. **36**.

In a preferred embodiment, the control module **504**, incorporates the eternal mechanisms and features of the control module **404**, of FIGS. **26** and **28**, including the tensioning mechanism **446**, but absent the sizing mechanism **468**. While the control module **502**, incorporates the eternal mechanisms and features of the control module **402**, of FIGS. **26** and **27**, but absent the adjustment feature **428**, and the sizing mechanism **468**. Accordingly, the input device **500** can accommodate computing devices of varying length and width by incorporating the tensioning mechanism **446**, into control module **504**, to accommodate a length **513**, of the computing device **560**, and configuring the control modules (**502**, **504**) to allow the sides (**508**, **510**) of the computing device **506**, to protrude, or extend beyond the confines of a length **515**, of the control modules (**502**, **504**), in a vertical direction along a width **517**, of the computing device **506**.

In a preferred embodiment, as shown by FIG. **35**, the structural bridge **522**, secures the pair of control modules (**502**, **504**) one to the other. Preferably, the structural bridge **522**, is configured such that the structural bridge **522**,

US 9,808,713 B1

15

adaptively and snugly accommodate the length 513, of the computing device 506, as shown in FIG. 36.

In a preferred embodiment, as shown by FIG. 37, the control module 504, includes at least, but is not limited to, a tensioning mechanism 546, communicating with the structural bridge 522. Preferably, the tensioning mechanism 546, secures the structural bridge 522, such that the structural bridge snugly accommodate the length 513 (of FIG. 36), of the computing device 506 (of FIG. 36).

In a preferred embodiment, as shown by FIG. 35, a communication link 519, is provided by the input device 500, which facilitating communication between the pair of control modules (502, 504) and the computing device 506 (of FIG. 36), and, as shown by FIG. 35, the structural bridge 522, masks a mid-portion of the back of the computing device.

Continuing with FIG. 35, in a preferred embodiment, the communication link 519, provides a communication module 521, and in the alternative, provides a signal pathway 523, for use in passing signals between the pair of control modules (502, 504). In a preferred embodiment, the communication module 521, is a wireless communication module 521, which operates in a frequency range of 2.4 GHz. In an alternate preferred embodiment, the wireless communication module 521, is a personal area network. As those skilled in the art, a personal area network (PAN) is a computer network used for communication among computerized devices, including telephones and personal digital assistants. PANs can be used for communication among the personal devices themselves (intrapersonal communication), or for connecting to a higher level network and the Internet (an uplink). A wireless personal area network (WPAN) is a PAN carried over wireless network technologies such as IrDA, Bluetooth, Wireless USB, Z-Wave, ZigBee, or even Body Area Network. The reach of a WPAN varies from a few centimeters to a few meters. A PAN may also be carried over wired computer buses such as USB and FireWire.

In an embodiment that utilizes the signal pathway 523, as the communication link 519, the signal pathway 523, may be in the form of a metallic conductor, a fiber optic conductor, a conductive polymer, or the conductive layer of a flex circuit. The skilled artisan will further appreciate that the structural bridge 522, may be either formed from a ridged material, such as a ridged polymer, or from a flexible material, such as a flexible polymer.

FIG. 38 shows an exploded view in perspective of the control module 504, of the input device 500, of FIG. 35. The control module 504, includes at least but is not limited to, a tensioning mechanism 546, communicating with the structural bridge 522, by way of a fastening mechanism 548 (also referred to herein as an attachment stay 548), of the tensioning mechanism 546 secured to the structural bridge 522, as shown by FIG. 37.

The tensioning mechanism 546, secures the structural bridge 522, to a bottom cover 550, of the control module 504, such that the structural bridge 522, cooperating with the tensioning mechanism 546, snugly accommodates the length 513 (of FIG. 36), of the computing device 506 (of FIG. 36).

In a preferred embodiment, the bottom cover 550, provides an attachment boss 552, supporting a position guide 554, and the tensioning mechanism 546, includes at least, but not limited to, the attachment boss 552, communicating with the structural bridge 522, an attachment support 556, cooperating with the attachment boss 552. Preferably, the attachment support 556, in cooperation with the attachment boss 552, confines the structural bridge 522 vertically, but

16

permits lateral movement of the structural bridge 522, relative to the bottom cover 550.

Preferably, the structural bridge 522, is disposed between the bottom cover 550, and a top cover 558, which cooperates with the bottom cover 450, to facilitate lateral movement of a portion of the structural bridge 522. Preferably, a biasing structure 560, communicating the attachment stay 548 (of FIG. 37), provides variable tension between the structural bridge 522, and the second control module 504, thereby accommodating a predetermined amount of lateral movement of the structural bridge 522, relative to the bottom cover 550, as shown by FIG. 37.

As shown by FIG. 37, in a preferred embodiment, the attachment stay 548, includes at least, but not limited to, a guide aperture 562, which is preferably slotted, interacting with the position guide 554, of the attachment boss 552 (of FIG. 38). The interaction of the guide aperture 562, with the position guide 554, limits the extent of lateral alignment between the structural bridge 522, and the control modules (502, 504). As further shown by FIG. 38, in a preferred embodiment, the attachment support 556, further supports a plurality of control switches 564, interacting with a circuit structure 566, which preferably is a flex circuit 566, and the biasing structure 560, is preferably a coiled spring 460.

In a preferred embodiment, the structural bridge 522, provides a width 525, less than its length 527, as shown by FIG. 37, and the back of the computing device 506, extending above and below the width 525, of the structural bridge 522.

Returning to FIG. 36, in a preferred embodiment, the input device 500, includes an auxiliary power source 529, and an auxiliary data storage device 531, which preferably includes a cache portion 533. Preferably, the auxiliary power source 529, is a lithium ion battery, which provides power to the input device 500, and the computing device 506, when the power source of the computing device 506 is depilated; and the auxiliary data storage device 531 is preferably a solid state hard drive.

FIG. 39 shows a further embodiment of the electronic gaming system 511, in which the input device 500, provides a keyboard module 535, and in which the keyboard module 535, passes signals to the computing device 506, the signals control images displayed on the display screen 537, of the computing device 506.

FIG. 40 shows a still further embodiment of the electronic gaming system 511, in which the input device 500, provides the keyboard module 535, and in which the keyboard module 535, passes signals to the computing device 506, the signals control images displayed on the display screen 537, of the computing device 506. FIG. 40 further shows that the communication link 519, via the communication module 521, is further configured to communicate with a second display 541 wirelessly. That is the second display 541, is remote from and mechanically disassociated from the electronic display screen 537, of the computing device 506.

Continuing with FIG. 40, preferably each control module (502, 504) provides a directional control device 543. In a preferred embodiment, each direction control device 543, is configured to facilitate a first position adjacent the top cover 558, of control module 504, or a first position adjacent a top cover 545, of control module 502, and a second position, the second position displaced a predetermined vertical distance away from the first position. Further in the preferred embodiment, each directional control module 543 is a joystick.

FIG. 41 discloses the electronic game control apparatus 400 (also referred to herein as an input device 400), which

17

in a preferred embodiment provides the first control module **402**, the second control module **404**, and the structural bridge **422**, which collectively secures the computing device **418**. In a preferred embodiment, a back of the structural bridge **422**, supports a touch sensitive control module **544**, which in a preferred embodiment is a touch screen **544**.

FIG. **42** discloses the electronic game control apparatus **400** (also referred to herein as an input device **400**), which in a preferred embodiment provides the first control module **402**, the second control module **404**, and the structural bridge **422**, which collectively secures the computing device **418**. In a preferred embodiment, a back **427**, of the second control module, supports the touch sensitive control module **544**, which in a preferred embodiment is a touch screen **544**.

FIG. **43** discloses the electronic game apparatus **500** (also referred to herein as an input device **500**), which in a preferred embodiment provides the first control module **502**, the second control module **504**, and the structural bridge **522**. In a preferred embodiment, a back of the structural bridge **522**, supports a touch sensitive control module **546**, which in a preferred embodiment is a touch screen **546**.

FIG. **44** discloses the electronic game control apparatus **500** (also referred to herein as an input device **500**), which in a preferred embodiment provides the first control module **502**, the second control module **504**, and the structural bridge **522**. In a preferred embodiment, a back side of the second control module **504**, supports the touch sensitive control module **546**, which in a preferred embodiment is a touch screen **546**.

It is to be understood that even though numerous characteristics and configurations of various embodiments of the present invention have been set forth in the foregoing description, together with details of the structure and function of various embodiments of the invention, this detailed description is illustrative only, and changes may be made in detail, especially in matters of structure and arrangements of parts within the principles of the present invention to the full extent indicated by the broad general meaning of the terms in which the appended claims are expressed. For example, the particular elements may vary depending on the particular computing device without departing from the spirit and scope of the present invention.

What is claimed is:

1. A combination comprising:

a computing device, the computing device providing an upper, lower, left and right side, collectively the sides of the computing device, and an electronic display screen, the electronic display screen having a corresponding side adjacent each of the sides of the computing device;

a pair of confinement structures, the pair of confinement structures adjacent to and confining the computing device on at least two opposing sides, but not more than three sides of the sides of the computing device, and in which a first confinement structure of the pair of confinement structures provides a first communication link, while a second confinement structure of the pair of confinement structures provides a second communication link;

a structural bridge disposed between the pair of confinement structures, the structural bridge comprising, a passageway between the pair of confinement structures, the passageway promotes communication between the first communication link and the computing device, the

18

passageway further promotes communication between the second communication link and the computing device;

fastening mechanisms, the fastening mechanisms secure the first confinement structure to a first side of the structural bridge, and further in which the fastening mechanisms secure the second confinement structure to a second side of the structural bridge; and

an input device, the input device comprising a pair of control modules, each control module of the pair of control modules secured to a corresponding confinement structure of the pair of confinement structures, each control module in electronic communication with the communication link of its corresponding confinement structure, each of the pair of control modules providing input module apertures, each input module aperture secures an instructional input device, wherein said input module apertures are adjacent each of the at least two opposing sides of the computing device, and wherein the input device is a separate and distinct structure from either of the pair of confinement structures, forming no structural portion of either of the pair of confinement structures, and in which the confinement structures are separate and distinct structures from the structural bridge, forming no structural portion of the structural bridge.

2. The combination of claim **1**, in which the structural bridge is a rigid structural bridge, the rigid structural bridge supports electronics associated with the computing device.

3. The combination of claim **2**, in which the computing device further comprising a back, the back provides an internal surface, an external surface, and upper, lower, left and right sides, collectively the sides of the back of the computing device, the back of the computing device cooperating with the sides of the computing device.

4. The combination of claim **3**, in which the rigid structural bridge cooperates with the back of the computing device.

5. The combination of claim **4**, in which the rigid structural bridge cooperating with the back of the computing device is adjacent to the external surface of the back of the computing device.

6. The combination of claim **4**, in which each instructional input device passes signals through its corresponding communication link to the computing device, the signals controlling images displayed on the electronic display screen of the computing device.

7. The combination of claim **4**, in which the input device is a pair of game control modules, and in which each game control module passes signals through its corresponding communication link to the computing device, the signals controlling images displayed on the electronic display screen of the computing device.

8. The combination of claim **2**, in which the electronics supported by the rigid structural bridge is a communication module associated with the computing device.

9. The combination of claim **2**, in which the rigid structural bridge, the pair of confinement structures, and the fastening mechanism form a communication port.

10. A combination comprising:

a computing device, the computing device providing an upper, lower, left and right side, collectively the sides of the computing device, and an electronic display screen, the electronic display screen having a corresponding side adjacent each of the sides of the computing device;

US 9,808,713 B1

19

a pair of modules, the pair of modules adjacent to and confining the computing device on at least two opposing sides, but not more than three sides of the computing device, a module of the pair of modules providing a communication link;

a structural bridge disposed between the pair of modules, the structural bridge includes, but is not limited to, a passageway between the pair of modules, and a fastening mechanism, the passageway promotes communication between the communication link and the computing device, while the fastening mechanism unifies the pair of modules with the structural bridge, and in which the structural bridge provides a void in the midsection of the structural bridge, the void having right, left, upper, and lower sides, each side communicating with a material of the structural bridge; and

a pair of instructional input devices, each instructional input device of the pair of instructional input devices interacting with a corresponding module of the pair of modules, each instructional input device in electronic communication with the communication link, each of the pair of instructional input devices adjacent a corresponding side of the at least two opposing sides of the sides of the computing device.

**11**. The combination of claim **10**, in which the structural bridge is a flexible structural bridge, the flexible structural bridge supports electronics associated with the computing device, and wherein the input device is a separate and distinct structure from the pair of modules, forming no structural portion of the pair of modules.

**12**. The combination of claim **11**, in which the electronics supported by the flexible bridge is fiber optics.

**13**. The combination of claim **12**, in which the computing device further comprising a back, the back provides an internal surface, and upper, lower, left and right sides, collectively the sides of the back of the computing device, the back of the computing device cooperating with the sides of the computing device.

**14**. The combination of claim **13**, in which the flexible structural bridge cooperates with the external surface of the back.

**15**. The combination of claim **14**, in which each instructional input device of the pair of instructional input devices passes signals through the communication link to the computing device, the signals controlling images displayed on the electronic display screen of the computing device.

**16**. A combination comprising:

a pair of confinement structures;

a first communication link, the first communication link confined by a first confinement structure of the pair of confinement structures;

20

a second communication link, the second communication link confined by a second confinement structure of the pair of confinement structures;

a structural bridge disposed between the first confinement structure and the second confinement structure, the structural bridge comprising an electronics communications passageway between the first and second confinement structures;

fastening mechanisms, the fastening mechanisms secure each the first confinement structure and the second confinement structure of the pair of confinement structures to the structural bridge; and

a pair of control modules, a first control module of the pair of control modules attached to the first confinement structure, and a second control module of the pair of control modules attached to the second confinement structure, the first control module in electronic communication with the first communication link, the second control module in electronic communication with the second communication link, each the first and the second control modules comprising a plurality of input module apertures, each input module aperture secures an instructional input device, and in which neither the first nor the second control module from a structural portion of either the first or second confinement structures.

**17**. The combination of claim **16**, further comprising a computing device, the computing device comprising an upper, lower, left and right side, collectively the sides of the computing device, the computing device disposed between and in contact adjacency with each the first and second confinement structure of the pair of confinement structures, the pair of confinement structures engaging the computing device on at least two opposing sides, but not more than three sides of the sides of the computing device, said pair of confinement structures are separate and distinct structures from the computing device.

**18**. The combination of claim **17**, in which the structural bridge is a rigid structural bridge, the rigid structural bridge supports electronics associated with the computing device.

**19**. The combination of claim **18**, in which the computing device further comprising a back, the back provides an internal surface, an external surface, and upper, lower, left and right sides, collectively the sides of the back of the computing device, the back of the computing device cooperating with the sides of the computing device, and in which the rigid structural bridge cooperates with the back of the computing device.

**20**. The combination of claim **19**, in which the rigid structural bridge, the pair of confinement structures, and the fastening mechanism form a communication port.

* * * * *

US010391393B2

## (12) United States Patent
Townley et al.

(10) Patent No.: US 10,391,393 B2
(45) Date of Patent: *Aug. 27, 2019

(54) **GAME CONTROLLER WITH STRUCTURAL BRIDGE**

(71) Applicant: **Wikipad, Inc.**, Simi Valley, CA (US)

(72) Inventors: **Fraser Townley**, Pembroke, MA (US); **Kelly Gamble**, Simi Valley, CA (US); **Daniel P. Dooley**, Oklahoma City, OK (US)

(73) Assignee: **Wikipad, Inc.**, Simi Valley, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/230,186**

(22) Filed: **Dec. 21, 2018**

(65) **Prior Publication Data**

US 2019/0118082 A1 Apr. 25, 2019

### Related U.S. Application Data

(63) Continuation of application No. 15/858,299, filed on Dec. 29, 2017, now Pat. No. 10,159,895, which is a continuation of application No. 15/663,171, filed on Jul. 28, 2017, now Pat. No. 9,855,498, which is a continuation of application No. 15/457,571, filed on
(Continued)

(51) **Int. Cl.**
  *A63F 13/24* (2014.01)
  *G06F 3/02* (2006.01)
  (Continued)

(52) **U.S. Cl.**
  CPC .............. *A63F 13/24* (2014.09); *A63F 9/24* (2013.01); *A63F 13/06* (2013.01); *A63F 13/08* (2013.01);
  (Continued)

(58) **Field of Classification Search**
  None
  See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,391,444 A | 7/1983 | Bromley |
| 5,967,898 A | 10/1999 | Takasaka et al. |
| (Continued) | | | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 201283220 Y | 10/2008 |
| JP | 2002-196859 | 7/2002 |
| (Continued) | | |

OTHER PUBLICATIONS

Chartier; "Preorders begin for iPhone, iPod touch game controller." Published Feb. 8, 2011; In Macworld website (online); http://www.macworld.com/article/1157741/icontrolpad.html; entire document especially p. 1.

(Continued)

*Primary Examiner* — Jason T Yen
(74) *Attorney, Agent, or Firm* — Hall Estill Attorneys at Law

(57) **ABSTRACT**

A device directed to a combination computing and input device. The computing device providing a plurality of sides, each of the plurality of sides are disposed between an electronic display screen and a back of the computing device. The input device communicates with the computing device and provides a pair of control modules adjacent to and confining the computing device on at least two opposing sides of the computing device. The input device further provides a structural bridge securing the pair of control modules one to the other, and a touch sensitive input module. The structural bridge adaptively and snugly accommodate the length of the computing device. A first of the pair of control modules features a retention mechanism communicating with the structural bridge. The retention mechanism adaptively secures the structural bridge such that the pair of control modules snugly accommodate the length of the computing device.

**23 Claims, 40 Drawing Sheets**





## US 10,391,393 B2
Page 2

### Related U.S. Application Data

Mar. 13, 2017, now Pat. No. 9,757,649, which is a continuation-in-part of application No. 14/840,184, filed on Aug. 31, 2015, now Pat. No. 9,592,453, which is a continuation-in-part of application No. 14/611,804, filed on Feb. 2, 2015, now Pat. No. 9,126,119, which is a continuation-in-part of application No. 13/779,987, filed on Feb. 28, 2013, now Pat. No. 8,529,357, which is a continuation-in-part of application No. 13/681,153, filed on Nov. 19, 2012, now Pat. No. 8,944,912, which is a continuation-in-part of application No. 13/494,801, filed on Jun. 12, 2012, now Pat. No. 9,005,026.

(60) Provisional application No. 61/577,709, filed on Dec. 20, 2011.

(51) **Int. Cl.**

| | |
|---|---|
| **G06F 13/40** | (2006.01) |
| **G06F 13/10** | (2006.01) |
| **A63F 13/2145** | (2014.01) |
| **A63F 13/31** | (2014.01) |
| **A63F 13/92** | (2014.01) |
| **A63F 9/24** | (2006.01) |
| **A63F 13/20** | (2014.01) |
| **A63F 13/90** | (2014.01) |
| **G06F 1/16** | (2006.01) |
| **A63F 13/23** | (2014.01) |
| **A63F 13/235** | (2014.01) |
| **A63F 13/98** | (2014.01) |
| **A63F 13/50** | (2014.01) |

(52) **U.S. Cl.**
CPC .......... *A63F 13/20* (2014.09); *A63F 13/2145* (2014.09); *A63F 13/23* (2014.09); *A63F 13/235* (2014.09); *A63F 13/31* (2014.09); *A63F 13/50* (2014.09); *A63F 13/92* (2014.09); *A63F 13/98* (2014.09); *G06F 1/1632* (2013.01); *G06F 1/1692* (2013.01); *G06F 3/0219* (2013.01); *G06F 13/102* (2013.01); *G06F 13/409* (2013.01); *G06F 13/4022* (2013.01); *G06F 13/4027* (2013.01); *G06F 13/4068* (2013.01); *A63F 2009/2457* (2013.01); *A63F 2300/1043* (2013.01); *A63F 2300/204* (2013.01)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,976,018 | A | 11/1999 | Druckman |
| 6,290,565 | B1 | 9/2001 | Galyean, III et al. |
| 6,512,511 | B2 | 1/2003 | Willner et al. |
| 6,530,838 | B2 | 3/2003 | Ha et al. |
| 6,584,382 | B2 | 6/2003 | Karem |
| 6,710,764 | B1 | 3/2004 | Burgel et al. |
| 7,200,702 | B2 | 4/2007 | Keely et al. |
| 7,298,613 | B2 | 11/2007 | Yin et al. |
| 7,653,771 | B2 | 1/2010 | Liberty |
| 7,733,637 | B1 | 6/2010 | Lam |
| 7,746,629 | B2 | 6/2010 | Assouad et al. |
| 7,758,424 | B2 | 7/2010 | Riggs et al. |
| 7,774,155 | B2 | 8/2010 | Sato et al. |
| 7,818,668 | B2 | 10/2010 | Michelstein et al. |
| 7,833,097 | B1 | 11/2010 | Maddox et al. |
| 7,933,118 | B2 | 4/2011 | Chiu et al. |
| 7,942,745 | B2 | 5/2011 | Ikeda et al. |
| 8,018,098 | B2 | 9/2011 | Lu et al. |
| 8,100,769 | B2 | 1/2012 | Rabin |
| 8,100,770 | B2 | 1/2012 | Yamazaki et al. |
| 8,180,295 | B2 | 5/2012 | Mao |
| 8,188,977 | B2 | 5/2012 | Kuwaki et al. |
| 8,192,285 | B2 | 6/2012 | Cheng et al. |
| 8,529,357 | B2 | 9/2013 | Joynes et al. |
| 9,114,319 | B2 | 8/2015 | Joynes et al. |
| 9,176,538 | B2 | 11/2015 | Boulanger |
| 9,539,507 | B2 | 1/2017 | Schoenith et al. |
| 9,711,980 | B2 | 7/2017 | Hodges et al. |
| 9,778,778 | B2 | 10/2017 | Helmes et al. |
| 2001/0045938 | A1 | 11/2001 | Willner et al. |
| 2002/0155890 | A1* | 10/2002 | Ha ........................ A63F 13/06 |
| | | | 463/36 |
| 2003/0147008 | A1 | 8/2003 | Liu |
| 2003/0231189 | A1 | 12/2003 | Williams |
| 2004/0222970 | A1 | 11/2004 | Martinez et al. |
| 2005/0092590 | A1 | 5/2005 | Sakou |
| 2005/0227761 | A1 | 10/2005 | Yoshino et al. |
| 2005/0255915 | A1 | 11/2005 | Riggs et al. |
| 2005/0272471 | A1 | 12/2005 | Sherman |
| 2006/0252537 | A1* | 11/2006 | Wu ........................ A63F 13/06 |
| | | | 463/36 |
| 2006/0291156 | A1 | 12/2006 | Allen |
| 2007/0054736 | A1 | 3/2007 | See |
| 2007/0268247 | A1 | 11/2007 | Quatro |
| 2009/0209288 | A1 | 8/2009 | Rofougaran |
| 2009/0280863 | A1 | 11/2009 | Shin et al. |
| 2009/0291760 | A1 | 11/2009 | Hepburn et al. |
| 2010/0069160 | A1 | 3/2010 | Barrett et al. |
| 2010/0081505 | A1* | 4/2010 | Alten ................ G06F 1/1632 |
| | | | 463/36 |
| 2010/0195279 | A1 | 8/2010 | Michael |
| 2010/0250815 | A1 | 9/2010 | Street et al. |
| 2010/0277415 | A1* | 11/2010 | Shanmugam ........ G06F 1/1624 |
| | | | 345/169 |
| 2011/0075339 | A1 | 3/2011 | Lam |
| 2011/0076003 | A1 | 3/2011 | Cho et al. |
| 2011/0118022 | A1 | 5/2011 | Aronzon et al. |
| 2011/0143835 | A1 | 6/2011 | Sizelove |
| 2011/0230178 | A1 | 9/2011 | Jones et al. |
| 2011/0249394 | A1 | 10/2011 | Nielsen et al. |
| 2011/0260969 | A1 | 10/2011 | Workman |
| 2012/0058821 | A1 | 3/2012 | Lan |
| 2012/0108335 | A1 | 5/2012 | Liotta et al. |
| 2012/0169597 | A1 | 7/2012 | Liotta |
| 2012/0236485 | A1 | 9/2012 | Staats et al. |
| 2012/0271967 | A1 | 10/2012 | Hirschman |
| 2012/0315989 | A1 | 12/2012 | Young et al. |
| 2013/0095925 | A1 | 4/2013 | Xu |
| 2013/0120258 | A1 | 5/2013 | Maus |
| 2013/0178285 | A1 | 7/2013 | Joynes et al. |
| 2013/0341214 | A1 | 12/2013 | King et al. |
| 2014/0274394 | A1* | 9/2014 | Willis .................. G06F 1/1632 |
| | | | 463/37 |
| 2014/0364231 | A1 | 12/2014 | Cramer et al. |
| 2014/0364232 | A1 | 12/2014 | Cramer et al. |
| 2015/0018101 | A1* | 1/2015 | Schoenith .............. A63F 13/98 |
| | | | 463/37 |
| 2015/0024844 | A1 | 1/2015 | Mon Pere |
| 2015/0134859 | A1 | 5/2015 | Hirschman |
| 2015/0205328 | A1* | 7/2015 | Lin .................... G06F 1/1632 |
| | | | 361/679.44 |
| 2015/0273325 | A1 | 10/2015 | Falc et al. |
| 2016/0147359 | A1* | 5/2016 | Helmes ................ G06F 3/0416 |
| | | | 345/173 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2003-018275 | 1/2003 |
| KR | 10-2011-0116892 | 10/2011 |
| WO | 2014079264 | 5/2014 |
| WO | 2014201029 | 12/2014 |

#### OTHER PUBLICATIONS

Wattanajantra; "iControlPad unofficial iPhone gamepad coming soon." In c/net Uk website (online); Published Aug. 27, 2010; http://crave.cnet.co.uk/mobiles/icontrolpad-unofficial-iphone-gamepad-coming-soon-50000514; entire document, especially pp. 3, 4.

US 10,391,393 B2

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

Atari Arcade; Website Printout; http://atari.com/buy-games/arcade/
atari-arcade-ipad; Nov. 30, 2011; pp. 1-3.
Ion iCade Arcade Cabinet; Website Printout; http://www.ionaudio.
com/products/details/icade; 2012; pp. 1-6.
Turner, Troy, "Gamepad for Tablets"; Yanko Design; article print-
out; http://www.yankodesign.com/2012/09/17/gamepad-for-
tablets/; 2012; pp. 1-7.

* cited by examiner



FIG. 1





FIG. 2



FIG. 3



FIG. 4



**128**

120

124

150

122

FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



**FIG. 10**



FIG. 11



FIG. 12



FIG. 13



FIG. 14



FIG. 15



FIG. 16



FIG. 17



FIG. 18



FIG. 19

FIG. 20



FIG. 21



FIG. 22



FIG. 23



FIG. 24



FIG. 25



FIG. 26



FIG. 27



FIG. 28



FIG. 29



FIG. 30



FIG. 31





FIG. 35



FIG. 36



FIG. 37



FIG. 38



FIG. 39



FIG. 40



FIG. 41



FIG. 42



FIG. 43



FIG. 44

US 10,391,393 B2

1

# GAME CONTROLLER WITH STRUCTURAL BRIDGE

## RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 15/858,299, filed Dec. 29, 2017, which issues as U.S. patent Ser. No. 10/159,895 on Dec. 25, 2018, which is a continuation of U.S. patent application Ser. No. 15/663,171 filed Jul. 28, 2017, now U.S. Pat. No. 9,855,498 issued on Jan. 2, 2018, which is a continuation of U.S. patent application Ser. No. 15/457,571 filed Mar. 13, 2017, now U.S. Pat. No. 9,757,649 issued on Sep. 12, 2017, which is a continuation-in-part of U.S. patent application Ser. No. 14/840,184 filed Aug. 31, 2015, now U.S. Pat. No. 9,592, 453 issued on Mar. 14, 2017, which is a continuation-in-part of U.S. patent application Ser. No. 14/611,804 filed on Feb. 2, 2015, now U.S. Pat. No. 9,126,119 issued on Sep. 8, 2015, which is a continuation-in-part of U.S. patent application Ser. No. 13/779,987 filed on Feb. 28, 2013, now U.S. Pat. No. 8,529,357 issued on Sep. 10, 2013, which is a continuation-in-part of U.S. patent application Ser. No. 13/681,153 filed on Nov. 19, 2012, now U.S. Pat. No. 8,944,912 issued on Feb. 3, 2015, which is a continuation-in-part of U.S. patent application Ser. No. 13/494,801 filed on Jun. 12, 2012, now U.S. Pat. No. 9,005,026 issued on Apr. 14, 2015, which in turn claims priority to U.S. Provisional Patent application Ser. No. 61/577,709 filed on Dec. 20, 2011.

## SUMMARY OF THE INVENTION

In a preferred embodiment, a combination includes at least, but is not limited to, a computing device, the computing device providing a plurality of sides, each of the plurality of sides are disposed between an electronic display screen of the computing device and a back of the computing device, an input device interacting with the computing device, and a communication link. The input device communicates with the computing device and providing a pair of control modules adjacent to and confining the computing device on at least two opposing sides of the computing device. The communication link facilitating communication between the pair of control modules and the computing device. The input device further provides a structural bridge securing the pair of control modules one to the other, and a touch sensitive input module. The touch sensitive module is preferably a touch screen, which relays instructions to the computing device to alter an image displayed on the electronic display. The structural bridge adaptively and snugly accommodates the length of the computing device by way of a retention mechanism of a first of the pair of control modules. The retention mechanism adaptively secures the structural bridge such that the pair of control modules snugly accommodates the length of the computing device.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a front perspective view, with partial cutaway, of an embodiment of an electronic game control apparatus constructed and operated in accordance with various embodiments disclosed.

FIG. 2 shows a back plan view of the apparatus of FIG. 1.

FIG. 3 displays a right side plan view, with partial cutaway, of the apparatus of FIG. 1, constructed in accordance with various embodiments disclosed and claimed herein.

2

FIG. 4 depicts a right side plan view of the apparatus of FIG. 1, constructed in accordance with various embodiments disclosed and claimed herein.

FIG. 5 illustrates a top perspective view of an embodiment of an input device of FIG. 1, constructed in accordance with various embodiments disclosed and claimed herein.

FIG. 6 is a block diagram of an embodiment of the apparatus of FIG. 1.

FIG. 7 is a block diagram of an alternate embodiment of the apparatus of FIG. 1.

FIG. 8 displays a front perspective view, with partial cutaway, of a combination electronic game control and information input device constructed and operated in accordance with various embodiments disclosed and claimed herein.

FIG. 9 depicts a back plan view of the combination of FIG. 8.

FIG. 10 illustrates a front perspective view, with partial cutaway, of an alternate embodiment of a combination electronic game control and information input device constructed and operated in accordance with various embodiments disclosed and claimed herein.

FIG. 11 shows a top perspective view of an embodiment of an input device with an integrated point of sale device, the input device is constructed in accordance with various embodiments disclosed and claimed herein.

FIG. 12 displays a front perspective view, with partial cutaway, of an alternate embodiment of a combination electronic game control and information input device, the information input device provides the integrated point of sale device.

FIG. 13 displays a front perspective view, with partial cutaway, of an alternative embodiment of a combination computing device and electronic game control, the electronic game control includes a pair of control modules linked one to the other by a bridge member.

FIG. 14 shows a back plan view of the combination computing device and electronic game control of FIG. 13.

FIG. 15 illustrates a top perspective view of the alternative embodiment of the combination computing device and electronic game control of FIG. 13.

FIG. 16 shows a back plan view of an alternative combination computing device with a communication port secured thereon, and an input device attached to the communication port.

FIG. 17 shows a top plan view of the communication port of FIG. 16.

FIG. 18 shows a side view in elevation of the communication port of FIG. 16.

FIG. 19 shows front and back views in elevation of a first selected confinement structure of the pair of confinement structures of the communication port of FIG. 16.

FIG. 20 shows front and back views in elevation of a second selected confinement structure of the pair of confinement structures of the communication port of FIG. 16.

FIG. 21 shows a bottom plan view of a first control module adjacent to a selected confinement structure of the pair of confinement structures of the communication port of FIG. 16.

FIG. 22 shows a bottom plan view of a first control module secured to a selected confinement structure of the pair of confinement structures of the communication port of FIG. 16.

FIG. 23 shows a side views in elevation of a first control module secured to a selected confinement structure of the pair of confinement structures of the communication port of FIG. 16.

FIG. **24** shows a view in perspective of a fastening mechanism of the communication port of FIG. **16**.

FIG. **25** shows a back plan view of the combination computing device and electronic game control of FIG. **16** revealing, in cutout, a data storage device and an auxiliary power source.

FIG. **26** shows a front perspective view, with partial cutaway, of an alternate embodiment of an electronic game control apparatus constructed and operated in accordance with various embodiments disclosed and claimed herein.

FIG. **27** shows an exploded view in perspective of a first control module of an input device of the electronic game control apparatus of FIG. **26**.

FIG. **28** shows an exploded view in perspective of a second control module of the input device of the electronic game control apparatus of FIG. **26**.

FIG. **29** shows a back perspective view of the electronic game control apparatus of FIG. **26**.

FIG. **30** shows a front perspective view of the electronic game control apparatus of FIG. **26**, configured to accommodate computing devices of varying size.

FIG. **31** shows a back perspective view of the electronic game control apparatus of FIG. **26**, configured to accommodate computing devices of varying size.

FIG. **32** shows a front perspective view of the second control module of the electronic game control apparatus of FIG. **26**, with a computing devices of maximum size staged to engage the first control module.

FIG. **33** shows a front perspective view of the second control module of the electronic game control apparatus of FIG. **26**, with the computing devices of maximum size commencing engagement with the first control module.

FIG. **34** shows a front perspective view of the second control module of the electronic game control apparatus of FIG. **26**, with the computing devices of maximum size fully engaged with the first control module.

FIG. **35** shows a front view of an alternative embodiment of an electronic game control apparatus constructed and operated in accordance with various embodiments disclosed and claimed herein.

FIG. **36** shows a front view of an alternative embodiment of an electronic game control apparatus, and a front perspective view of a computing device, which interfaces with the electronic game control apparatus to form an electronic gaming system.

FIG. **37** shows a front perspective view, with partial cutaway, of the alternative embodiment of then electronic game control apparatus of FIG. **36**, constructed and operated in accordance with various embodiments disclosed and claimed herein.

FIG. **38** shows an exploded view in perspective of a control module of the input device of the electronic game control apparatus of FIG. **37**.

FIG. **39** shows a front view of the alternative embodiment of the electronic gaming system of FIG. **36**, with a keyboard integrated into the control module of FIG. **38**.

FIG. **40** shows a front view of the alternative embodiment of the electronic gaming system of FIG. **39**, interacting with wirelessly with a display.

FIG. **41** shows a back view of the alternative embodiment of the electronic gaming system of FIG. **37**, with a touch sensitive module attached to a back side of the structural bridge of the electronic gaming controller.

FIG. **42** shows a back view of an alternate, alternative embodiment of the electronic gaming system of FIG. **37**, with a touch sensitive module attached to a back side of one of the control modules of the electronic gaming controller.

FIG. **43** shows a back view of the alternate, alternative embodiment of the electronic gaming system of FIG. **35**, with a touch sensitive module attached to a back side of the structural bridge of the electronic gaming controller.

FIG. **44** shows a back view of an alternate, alternative embodiment of the electronic gaming system of FIG. **35**, with a touch sensitive module attached to a back side of the control module of the electronic gaming controller.

## DETAILED DESCRIPTION

The present disclosure generally relates to a combination game controller and information input device directed to controlling electronic games and entry of information to a computing device, also referred to herein as video games, computer and applications games. The apparatus preferably includes a computing device, an electronic game communicating with the computing device, and an input device for controlling movement of a virtual object provided by the electronic game, and entry of information into the computing device. In a preferred embodiment, the input device includes a pair of opposing side structures adjacent opposing sides of plurality of sides of the computing device. The input device further preferably includes a plurality of input switches, wherein said input switches are adjacent each of the at least two opposing sides of the plurality of sides of the computing device, and a bridge structure disposed between the pair of sides to form a three sided structure. The third structure mitigates inadvertent removal of the computing device from the three sided structure when the computing device is fully nested within the three sided structure.

Turning to the drawings, FIG. **1** provides an exemplary game controller and information entry device ("G&D") **100** capable of being used in accordance with various embodiments of the present invention. The exemplary G&D **100** has at least a computing device **102** (also referred to herein as a computing device **102**), which provides a plurality of sides, such as **104**, **106**, **108**, and **126**. Each of the plurality of sides **104**, **106**, and **108** are disposed between an electronic display screen **110**, of the computing device **102**, and a back **112** (shown by FIG. **2**) of the computing device **102** operates. The G&D **100** further preferably includes an input device **114**. The computing device **102** may take the form of a tablet computer, smart phone, notebook computer, or other portable computing device,

In a preferred embodiment, the input device **114** provides a pair of side structures, **116** and **118**, with a bridge structure **115** disposed there between. One of the pair of side structures, for example **116**, is adjacent to and confines the computing device **102** on a first side, such as **104** of the plurality of sides **104**, **106**, **108**, and **126** of the computing device **102**. The second side structure of the pair of side structures, such as **118**, is adjacent to and confines the computing device **102** on a second side, such as **108**, of the plurality of sides **104**, **106**, **108**, and **126** of the computing device **102**, wherein the first and second sides, such as **104** and **108**, of the plurality of sides **104**, **106**, **108**, and **126** of the computing device **102** are opposing sides of the plurality of sides **104**, **106**, **108**, and **126**, of the computing device **102**.

In a preferred embodiment, the input device **114** further provides a plurality of removable game control modules **120** and **122**, wherein the removable game control modules **120** and **122** are adjacent each of the at least two opposing sides **104** and **108**, of the plurality of sides **104**, **106**, **108**, and **126**, of the computing device **102**, and a bridge structure **124**, disposed between the pair of side structures **116** and **118**, and

US 10,391,393 B2

5

adjacent the third side **126**, of the plurality of sides **104**, **106**, **108**, and **126**, of the computing device **102**.

In a preferred embodiment, the removable game control modules **120** and **122** may be removed from the input device **114**, and replaced by removable keyboard modules **164** and **166**, of FIG. **8**. To facilitate the exchange of modules, the input device preferably provides a pair of input module apertures **170**. The removable keyboard modules collectively form a full function keyboard and each provide an auxiliary electronic display screen ("ADS") **168**, each ADS **168** having at least the functionality of the electronic display screen **110**.

In an alternate embodiment, shown by FIG. **10**, the removable keyboard modules **164** and **166** are a pair of touch responsive electronic display screens **172** and **174**, each of the touch responsive electronic display screens having at least the functionality of the electronic display screen **110**, include the functionality of a mouse pad portions **176** and **178**, and selectively presents keys of a keyboard **180** and **182** for information entry. Preferably, the keys are virtual keys that respond to a touch by a user.

Returning to FIG. **1**, preferably, the bridge structure **124** in combination with the pair of side structures **116** and **118** form a three sided structure **128** (of FIG. **5**) (also referred to herein as a u-shaped structure **128** of the input device **114**), in which the computing device **102** nests, such that the computing device **102** is confined by the u-shaped structure **128**, and the u-shaped structure **128** mitigates inadvertent removal of the computing device **102** from the u-shaped structure **128** when the computing device **102** is fully nested within the three sided structure **128**.

The G&D **100** of FIG. **1**, further preferably includes a video game **130**. Preferably, the video game **130** provides a virtual object **132** displayed by the electronic display screen **110**, the virtual object **132** is responsive to input from the input device **114**. An example of a response of the virtual object **132** would be movement of the virtual object **132**, or the loading of an alternate computer game, based on a predetermined signal provided by the input device **114**, or an appearance of a character. It is noted that FIG. **1** displays the housings of the plurality of switches, whereas at least some of the plurality of switches are shown in the partial cutaway of FIG. **3**.

FIG. **2** depicts and reveals the back **112** of the computing device **102**. Further shown by FIG. **2**, is the input device **114**, which provides a pair of trigger switches **136** and **138**, supported by their corresponding side structures **116** and **118** respectively.

FIG. **3** shows that a predetermined number of the plurality of switches **140**, collaborate with each other to form an input apparatus **142**, the input apparatus **142** controls display of virtual objects displayed on the electronic display screen **110** of the computing device **102**. Preferably, the input apparatus **142** is a joystick **142**. FIG. **3** further shows that the input device **114** provides a plurality of buttons **144** and **119** of the removable game control modules **120**, which activate corresponding switches **145** and **121**. The main function of the trigger **138**, the joystick **142**, and the buttons **144** and **119** of the removable game control modules **120** is to govern the movement/actions of a playable body/object or otherwise influence events in a video game **130** (of FIG. **1**) or an alternate computer game.

FIG. **4** shows the G&D **100**, further includes a second joystick **146**, and a second button **148**, which are provided on the side structure **116**, adjacent the trigger **136**. While FIG. **5** shows the central processing unit (CPU) **150**, of the input device **114**.

6

FIG. **6** shows the input device **114** includes the CPU **150**, interacting with the plurality of switches **152**, which preferably include at least switches **119** of the removable game control modules **120** (of FIG. **1**), switches **117** of the removable game control modules **122** (of FIG. **1**), **136**, **138**, **142**, **144**, **146**, and **148** (of FIGS. **2** and **3**). FIG. **6** further shows the input device **114** includes a communications protocol **154** providing the communication link between the computing device **102**, and the input device **114**. In a preferred embodiment, a Universal Serial Bus (USB) communications protocol is utilized. However, as those skilled in the art will recognize, the communications protocol **154** is not limited to a USB protocol.

FIG. **6** further shows that the computing device **102** preferably includes at least a CPU **156**, interacting with the electronic display screen **110**, the video game **130**, a device driver **158**, which facilitates the interaction between the computing device **102** and the input device **114**, and a communications protocol **160** providing the communication link between the computing device **102**, and the input device **114**. In a preferred embodiment, a Universal Serial Bus (USB) communications protocol is utilized. However, as those skilled in the art will recognize, the communications protocol **160** is not limited to a USB protocol.

FIG. **7** shows an alternative embodiment of an exemplary game controller **162**, in which the device driver **158** and the video game **130** are located in the input device **114**.

FIG. **8** shows in a preferred embodiment, the G&D **100** includes a first camera **184**, on a first side of the computing device **102**, a second camera **186**, on the back side of the computing device **102** (shown by FIG. **9**), a third camera **188** on a first side of the input device **114**, and a fourth camera **190** on the back side of the input device **114** (shown by FIG. **9**).

In a preferred embodiment, each of the four cameras may selectively function independently, or may be used in conjunction with one another, and each of the four cameras **184**, **186**, **188**, and **190** are fully functional in capturing still and video images. Additionally, and preferably, the first and second cameras **184** and **186** are fully operative, even when the computing device **102** is detached from the input device **114**, while the third and fourth cameras **188** and **190** are fully functional, even when the input device **114** is detached from the computing device **102**.

In a preferred embodiment, when the computing device **102** is nested in the input device **114**, the first and second cameras, **184** and **186**, are responsive, either independently or simultaneously, to input from either the computing device **102**, or the input device **114**, depending on which device is selected for control of the first and second cameras, **184** and **186**. Further, in the preferred embodiment, each the computing device **102** and the input device **114**, are configured with a Bluetooth protocol stack communication feature, which permits the user to operate the first and second cameras, **184** and **186**, of the computing device **102** with the input device **114**, even when the computing device **102** is detached from the input device **114**. Likewise, when the computing device **102** and the input device **114** are configured with a Bluetooth protocol stack communication feature, the user may operate the third and fourth cameras, **188** and **190**, of the input device **114**, using the computing device **102**. In other words, in the preferred embodiment, each of the four cameras **184**, **186**, **188**, and **190**, may be selectively operated, individually or collectively, whether or not the computing device **102** is nested within the input device **114**.

FIG. **9** shows that in a preferred embodiment, the input device **114** includes an auxiliary power source **192**, and an

7

auxiliary data storage device **194**, which preferably includes a cache portion **196**. Preferably, the auxiliary power source **192** is a lithium ion battery, which provides power to the input device **114**, and the computing device **102**, when the power source of the computing device **102** is depilated; and the auxiliary data storage device **194** is a solid state hard drive.

In the preferred embodiment, the cache **196** is sized to buffer synchronized input from each of the cameras **184**, **186**, **188**, and **190**, such that the auxiliary data storage device **194** may store and retrieve images, still or video, for display seamlessly, including a simultaneous output of video images recorded by each of the cameras **184**, **186**, **188**, and **190**.

In a non-limiting exemplary application of utilizing the cameras **184**, **186**, **188**, and **190**, the first camera **184** could be trained on an information presenter, while the second camera **186** is trained on a portion of an audience attending the presentation. The third camera **188** could be trained on a screen used by the presenter for presenting their information to the audience, while the fourth camera is trained on an alternate portion of the audience. By simultaneously replaying the recorded presentation, a response of the audience to the information, and sequence of information being presented, may be analyzed for fostering improvements to the presentation.

FIG. **11** shows an alternative embodiment of a video game controller **200**, which provides an integrated transaction card input feature **202**. Preferably, the integrated transaction card input feature **202**, includes a transaction card slot **204**, and a transaction card reader **206**. In a preferred embodiment, the transaction card reader **206** is a magnetic strip reader, but as those skilled in the art will recognize, the transaction card reader can be, in the alternate: an optical character recognition reader; a barcode reader; an object recognition reader, or a pattern recognition reader.

FIG. **12** shows that in a preferred embodiment, a combination computing device and electronic game controller with an integrated point of sale device **210** preferably includes a computing device **212**, having a plurality of sides **214**, each of the plurality of sides **214**, are disposed between an electronic display screen **216**, of the computing device and a back **218** of the computing device, and an input device **220**, in electronic communication with the computing device **212**. The input device **220** preferably provides side structures **222**, adjacent to and confining the computing device on at least two opposing sides of the plurality of sides **214** of the computing device **212**. The input device **220**, further preferably provides input module apertures **224**, each input module aperture **224**, selectively accepts either a game control module, such as **102** and **122** of FIG. **1**, or a removable keyboard module, such as **226** and **228**. Preferably, the input module apertures **224** are adjacent each of the at least two opposing sides of the plurality of sides **214** of the computing device **212**.

FIG. **12** further shows that in a preferred embodiment, the combination computing device and electronic game controller with an integrated point of sale device **210** preferably includes a camera **230**, communicating with each the input device **220**, and the computing device **212**. The camera **230**, selectively captures either still or video images, and that the input device **220**, further provides an integrated transaction card input feature **232**, which interacts with a transaction card **234**, and that preferably, the input device is an electronic game controller **220**. Preferably, the camera **230** is a first camera, having a lens facing the user while the user is facing the electronic display screen **216**, and includes at least

8

a second camera, such as **186** or **190** (of FIG. **9**), having a lens facing in a direction opposite that of the first camera **184**.

FIG. **12** additionally shows an application **236**, displayed on the electronic display screen **216**, of the computing device **212**. Preferably, the application **236**, displayed on the electronic display screen **216** of the computing device **212**, is a point of sale transactional computer application, which interacts with the electronic game controller **220** and the computing device **212**.

FIG. **13** shows an alternative embodiment of a combination computing device and electronic game control **240** (also referred to herein as a device **240**). The computing device **242**, preferably provides a plurality of sides **244**, each of the plurality of sides are disposed between an electronic display screen **246**, of the computing device **242**, and a back **248** of the computing device **242**.

Preferably, the electronic game controller **250** (also referred to herein as input device **250**), is in electronic communication with the computing device **242**. Preferably, the input device **250** provides a pair of control modules **252**. The pair of control modules **252**, are adjacent to and confining the computing device **242**, on at least two opposing sides of the plurality of sides **244**, of the computing device **242**. The pair of control modules **252** preferably provide input module apertures **254**, each input module aperture **254**, secures an instructional input device **256**. Preferably, the input module apertures **254** are adjacent each of the at least two opposing sides of the plurality of sides **244**, of the computing device **242**.

FIG. **14** shows the back **248**, of the computing device **242**, and the computing device **242**, partially positioned within the input device **250**. FIG. **14** further shows a structural bridge **258**, securing the pair of control modules **252**, one to the other, and communicating with the back **248**, of the computing device **242**, at a mid-region **260**, of the back **248**, of the computing device **242**.

FIG. **14** further shows that the pair of control modules **252** provide a confinement boss **262**, and the confinement boss **262** provides a fastening detent **264**. The fastening detent **264** interacts with a retention member **266**, to secure the structural bridge **258**, to the pair of control modules **252**. In a preferred embodiment, the retention member **266** is responsive to a catch **268**, which preferably is a spring activated catch **268**, and the retention member **268** is preferably a spring loaded retention member **268**. Still further, FIG. **14** shows that in a preferred embodiment, the structural bridge **258** provides a communication link **270**, which passing signals between the pair of control modules **252**.

Continuing with FIG. **14**, in a preferred embodiment, the communication link **270**, provides a communication module **272**, and in the alternative, provides a signal pathway **274**, for use in passing signals between the pair of control modules **252**. In a preferred embodiment, the communication module **272** is a wireless communication module **272**, which operates in a frequency range of 2.4 GHz. In an alternate preferred embodiment, the wireless communication module **272** is a personal area network. As those skilled in the art, a personal area network (PAN) is a computer network used for communication among computerized devices, including telephones and personal digital assistants. PANs can be used for communication among the personal devices themselves (intrapersonal communication), or for connecting to a higher level network and the Internet (an uplink). A wireless personal area network (WPAN) is a PAN carried over wireless network technologies such as IrDA, Bluetooth, Wireless USB, Z-Wave, ZigBee, or even Body

US 10,391,393 B2

9

Area Network. The reach of a WPAN varies from a few centimeters to a few meters. A PAN may also be carried over wired computer buses such as USB and FireWire.

In an embodiment that utilizes the signal pathway **274**, as the communication link, the signal pathway **274** may be in the form of a metallic conductor, a fiber optic conductor, a conductive polymer, or the conductive layer of a flex circuit. The skilled artisan will further appreciate that the structural bridge **258** (of FIG. **14**), or **276** (of FIG. **15**) may be either formed from a ridged material, such as a ridged polymer, or from a flexible material, such as a flexible polymer. In a preferred embodiment, when a flexible material is selected, and the signal pathway **274** is a wired pathway, the signal pathway **274** may be coupled externally to the structural bridge **276**, as shown by FIG. **15**.

FIG. **15** further shows that in a preferred embodiment, the instructional input device **256**, may be an electronic game control module **278** (which may be either removable, or fixed), or a keyboard module **280** (of FIG. **13**, which may be either removable, or fixed).

FIG. **16** shows a back plan view of an alternative combination **300**, which preferably includes, but is not limited to, a computing device **302** that provides a plurality of sides **304**, each of the plurality of sides are disposed between an electronic display screen **306** (of FIG. **13**) of the computing device and a back **308** of the computing device **302**. Preferably, the alternative combination **300** further includes a communication port **310**, interacting with the computing device **302**. In a preferred embodiment, the communication port **310** provides a communication link **312** (which for purposes of illustration is shown as a wired connection **314**, but will be understood to be a wireless connection in an alternative embodiment). Preferably, the communication port **310** further provides a pair of confinement structures **316**, the pair of confinement structures **316**, which are preferably adjacent to and confining the computing device **302** on at least two opposing sides of the plurality of sides **304** of the computing device **302**.

The alternative combination **300**, further preferably includes an input device **318** (also referred to herein as input device **114**), attached to and in electronic communication with the communication port **310**. The input device **318** providing a pair of control modules **252**, the pair of control modules **252** providing input module apertures **224** (of FIG. **12**), each input module aperture **224** secures an instructional input device **356** (of FIG. **23**), or such as **120** of FIG. **11**, or **256** of FIG. **13**. Preferably, the input module apertures **224**, are adjacent each of the at least two opposing sides of the plurality of sides **304**, of the computing device **302**, and wherein the input device **356**, or such as **120** of FIG. **11**, or **256** of FIG. **13**, is a separate and distinct structure from the communication port **310**, forming no structural portion of the communication port **310**.

FIG. **16** further shows that in a preferred embodiment, the communication port **310** further includes a fastening mechanism **320**. In one embodiment, a soft draw latch, such as that provided by Southco, of 210 N. Brinton Lake Road Concordville, Pa. 19331, have been shown to be a useful fastening mechanism **320**.

FIG. **17** shows a top view of the communication port **310** that preferably includes a structural bridge **322**, securing the pair of confinement structures **316**, one to the other. The structural bridge **322** is preferably secured to a select confinement structure of the pair of confinement structures **316** by way of a solid connection **324**, and to remaining confinement structure of the pair of confinement structures **316** by way of a slip fit **326**. The fastening mechanism **320**, is

10

preferably securely fastened to to a conduit **328**, of the structural bridge **322**, by way of a anchor member **330**, the anchor member **330** is preferably positioned in a location adjacent the slip fit **326**, and by way of an attachment member **332** (shown in FIG. **18**), securely attached to the remaining confinement structure of the pair of confinement structures **316**. The attachment member **332** is preferably positioned in a location adjacent the slip fit **326**. Operation of the fastening mechanism **320** facilitates an expand and contract of the distance between the pair of confinement structures **316**. The expansion and contraction of the distance between the pair of confinement structures **316**, facilitates placement of the computing device **302** between the pair of confinement structures **316**, the application of sufficient compressive load being placed on the computing device **302** to securely hold the computing device between the pair of confinement structures **316**, and an ability to remove the compressive load and allow removal of the computing device from the communication port **310**.

FIG. **17** further shows that each of the pair of confinement structures **316**, provide a pair of controller docking pins **334**, while FIG. **18** shows that each of the pair of confinement structures **316** further provide a computing device cradle **336**, and that a select confinement structure of the pair of confinement structures **316** provides a computing device interface feature **338**. The interface feature **338**, facilitates at least, but not limited to, the provision of power to the computing device **302**.

FIG. **19** shows a front view **340**, of a first selected confinement structure of the pair of confinement structures **316**, which reveals a plurality of signal input lands **342** for use in receiving signals from the input device **318**, of FIG. **16**, and the pair of controller docking pins **334**.

Further shown by FIG. **19**, is a back view **344** of the first selected confinement structure of the pair of confinement structures **316**, which reveals computing device interface feature **338**, the computing device cradle **336**, and the slip fit **326**.

FIG. **20** shows a front view **346**, of a second selected confinement structure of the pair of confinement structures **316**, which reveals a plurality of signal input lands **342** for use in receiving signals from the input device **318**, of FIG. **16**, and the pair of controller docking pins **334**.

Further shown by FIG. **20**, is a back view **348** of the second selected confinement structure of the pair of confinement structures **316**, which reveals, the computing device cradle **336**, and the solid connection **324**.

FIG. **21** reveals, for purposes of disclosure and for consistency of views with remaining disclosed figures of an embodiment, a bottom right hand plan view of the input device **318** adjacent the second selected confinement structure of the pair of confinement structures **316**, of the communication port **310**. Preferably, the control module **252**, provides an attachment structure **350**, cooperating with the controller docking pins **334**, of the communication port **310**. The attachment structure **350**, secures the input device **318**, to the communication port **310**. In a preferred embodiment, the attachment structure **350** provides a sliding locking toggle **352**, and a fixed locking toggle **354**. In the embodiment presented, the sliding locking toggles, **352**, interact with the controller docking pins **334**, to securely (but removable) fasten the input device **318** to the communication port **310**. In a preferred embodiment, the sliding locking toggle **352** is selectively adjustable from an open position, shown in dashed lines, and a closed, or locked position, as shown in solid lines.

US 10,391,393 B2

11

FIG. **22** shows the input device **318**, securely fastened to the communication port **310**, by way of the attachment structure **350**, while FIG. **23** shows the right control module **252**, of the input device **318**, with its accompanying attachment structure **350** in a locked position, and the special relationship of the control module **252**, relative to the confinement structure **316**. FIG. **23** further shows an instructional input device **356**, such as **120** of FIG. **11**, or **256** of FIG. **13**, which in a preferred embodiment is a removable instructional input device **356**.

FIG. **24** provides a more insightful presentation of a latch portion **358**, of the fastening mechanism **320**, relative to the attachment member **332**, of the fastening mechanism **320**.

FIG. **25** shows that in a preferred embodiment, the input device **318**, includes an auxiliary power source **360**, and an auxiliary data storage device **362**, which preferably includes a cache portion **364**.

FIG. **26** shows a front perspective view, with partial cutaway, of an alternate embodiment an electronic game control apparatus **400** (also referred to herein as an input device **400**), constructed and operated in accordance with various embodiments disclosed and claimed herein. The input device **400** includes, but is not limited to, a first control module **402**, and a second control module **404**. The control modules (**402**, **404**) are adjacent to and confine a computing device **406** (of FIG. **30**) on at least two opposing sides **408** and **410** (each of FIG. **30**), of the plurality of sides of the computing device **406**.

In a preferred embodiment, the computing device **406** has a length **412**, greater than its width **414**, as shown by FIG. **30**. The pair of control modules (**408**, **410**) are preferably configured such that the pair of control modules (**408**, **410**) adaptively and snugly accommodate the width **414**, of the computing device **406**. Alternatively the pair of control modules (**408**,**410**) adaptively and snugly accommodate a width **416** (of FIG. **30**), of a second computing device **418** (of FIG. **30**). Preferably, the width **416**, of the second computing device **418**, is greater than the width **414**, of the computing device **406**, and preferably, the second computing device **418**, has a length **420** (of FIG. **30**) greater than the width **414**, of the second computing device **418**.

Preferably, the input device further provides a structural bridge **422**, which secures the pair of control modules (**402**, **404**), one to the other. The structural bridge **422** is preferably configured such that the structural bridge **422**, adaptively and snugly accommodate the length **412**, of the computing device **406**. Alternatively, the structural bridge **422**, adaptively and snugly accommodate the length **420**, of the second computing device **418**. Preferably, the length **420** of the second computing device **418** is greater than the length **412**, of the computing device **406**. Without limitations imposed upon the accompanying claims, in a preferred embodiment, the structural bridge **422**, is formed from a flexible material, such as a flexible polymer, or alternatively, from a semi-ridge material, such as a semi-ridged polymer, fiber glass, metallic sheet material, carbon fiber, or other materials known to artisans skilled in the art.

FIG. **27** shows an exploded view in perspective of the first control module **402**, of the input device **400**, of FIG. **26**. The first control module **402**, of the pair of control modules (**402**, **404**), preferably includes at least, but is not limited to, a retention mechanism **424**, communicating with the structural bridge **422** (of FIG. **26**), wherein the retention mechanism **424**, secures the structural bridge **422** such that the structural bridge **422**, adaptively accommodates the length **412** of the computing device **406**. Alternatively, the structural bridge **422** adaptively accommodates the length **420**, of the

12

second computing device **418**. In a preferred embodiment, the length **420** of the second computing device **418** is greater than the length **412**, of the computing device **406**.

FIG. **27** further shows that the first control module **402** provides a base **426**, which provides an adjustment feature **428**. And preferably, the retention mechanism includes at least, but is not limited to, a boss **430**, communicating with the structural bridge **422**, and an adjustment structure **432**, interacting with the boss **430**, by way of the adjustment feature **428**. In a preferred embodiment, the base **426** is disposed between the adjustment structure **432**, and the boss **424**.

The first control module **402**, preferably provides a restraint **434**, cooperating with the boss **430**. As shown by FIG. **29**, the restraint **434**, retains the structural bridge **422**, in a first position **436**, relative to the base **426**, when the adjustment structure **432**, is activated in a first direction **438**, relative to the base **426**. When positioned in the first position **436**, the structural bridge **422**, accommodates the second computing device **418**, as more clearly shown in FIG. **30**.

The adjustment structure **432**, further retains the structural bridge **422**, in a second position **440**, relative to the base **426**, when the adjustment structure **432**, is activated in a second direction **442**, relative to the base **426**. When positioned in the second position **440**, the structural bridge **422**, accommodates the first computing device **406**, as shown by FIG. **30**. To accommodate the first position **436**, and the second position **440**, preferably the boss **432** provides a constraint feature **444**, which cooperates with the base **426**. The constraint feature **444**, maintains the structural bridge **422**, in the first position **436**, relative to the base **426**, following an activation of the adjustment structure **432**, in the first direction **438**. The constraint feature **444**, further maintains the structural bridge **422**, in the second position **440**, relative to the base **426**, following an activation of the adjustment structure **432**, in the second direction **442**. The second direction **442** is a direction opposite that of the first direction **438**, and in the preferred embodiment, the restraint **434**, is a spring member.

FIG. **28** shows an exploded view in perspective of the second control module **404**, of the input device **400**, of FIG. **26**. The second control module **404**, includes at least but is not limited to, a tensioning mechanism **446**, communicating with the structural bridge **422**, by way of a fastening mechanism **448** (also referred to herein as an attachment stay **448**), of the tensioning mechanism **446** secured to the structural bridge **422**, as shown by FIG. **26**.

The tensioning mechanism **446**, secures the structural bridge **422**, to a bottom cover **450**, of the second control module **404**, such that the structural bridge **422**, cooperating with the tensioning mechanism **446**, snugly accommodates the length **412** (of FIG. **30**), of the computing device **406** (of FIG. **30**). Alternatively, the tensioning mechanism **446**, secures the structural bridge **422** to the bottom cover **450**, of the second control module **404**, such that the structural bridge **422**, cooperating with the tensioning mechanism **446**, snugly accommodates the length **420** (of FIG. **30**) of the second computing device **418** (of FIG. **30**). In a preferred embodiment, the length **420**, of the second computing device **418**, is greater than the length **412**, of the computing device **406**.

In a preferred embodiment, the bottom cover **450**, provides a position guide **454**, and the tensioning mechanism **446**, includes at least, but not limited to, the attachment boss **452**, communicating with the structural bridge **422**, an attachment support **456**, cooperating with the attachment boss **452**. Preferably, the attachment support **456**, in coop-

13

eration with the attachment boss **452**, confines the structural bridge **422** vertically, but permits lateral movement of the structural bridge **422** relative to the bottom cover **450**.

Preferably, the structural bridge **422**, is disposed between the bottom cover **450**, and a top cover **458**, which cooperates with the bottom cover **450**, to facilitate lateral movement of a portion of the structural bridge **422**, from its position associated with the first position **432** (of FIG. **29**) of the adjustment structure **432** (of FIG. **29**), to its position associated with the second position **440** (of FIG. **29**) of the adjustment structure **432**, while a biasing structure **460**, communicating with the attachment stay **448** (of FIG. **26**), provides variable tension between the structural bridge **422**, and the second control module **404**, thereby accommodating a predetermined amount of lateral movement of the structural bridge **422**, relative to the bottom cover **450**, as shown by FIG. **26**.

In a preferred embodiment, the attachment stay **448**, includes at least, but not limited to, a guide aperture **462**, which is preferably slotted, interacting with a position guide **454**, of the attachment boss **452**. The interaction of the guide aperture **462**, with the position guide **454**, limits the extent of lateral alignment between the structural bridge **422**, and the second control module **404**. As further shown by FIG. **28**, in a preferred embodiment, the attachment support **456**, further supports a plurality of control switches **464**, interacting with a circuit structure **466**, which preferably is a flex circuit **466**, the biasing structure **460**, is a coiled spring **460**.

Preferably, each of the pair of control modules **402** of FIG. **27** and **404** of FIG. **28**, include at least, but not limited to, a sizing mechanism **468**, communicating with a computing device **406** (of FIG. **30**), else a second computing device **418** (of FIG. **30**). In a preferred embodiment, the sizing mechanism **468** is configured such that the sizing mechanism **468** adaptively accommodate the width **414**, of the computing device **406**. Alternatively the sizing mechanism **468**, adaptively accommodate the width **416**, of the second computing device **418**. In a preferred embodiment, the width **416**, of the second computing device **418**, is greater than the width **414**, of the computing device **406**.

As shown by FIG. **27**, the control module **402** includes the base **426**, which provides a sizing toggle confinement structure **470**, and a slide support confinement structure **472**. Preferably, the sizing mechanism **468** includes at least, but is not limited to, a sizing toggle **474**, communicating with the sizing toggle confinement structure **472**, a sizing toggle restraint **476**, interacting with the sizing toggle confinement structure **472**, the sizing restraint **476**, promotes rotation of the sizing toggle **474**, relative to the base **426**.

In a preferred embodiment, the sizing mechanism further includes a torsional force structure **478**, cooperating with the base **426**, and acting on the sizing toggle **474**. The torsional force structure **478**, facilitating the sizing toggle **474**, in a first position under a first torsional force. When in the first position, the sizing toggles **474** extend vertically from the base **450**, and the control module **402** is configured to accommodate the width **410**, of the computing device **406**. Alternatively, the torsional force structure **478**, facilitating the sizing toggle **474**, in a second position under a second torsional force. When in the second position, the sizing toggles **474**, lies nested in the sizing toggle confinement structure **472**, and horizontal the base **450**, and the control module **402** is configured to accommodate the width **416**, of the second computing device **418**. Preferably, the second torsional force is greater than the first torsional force, and the width **416**, of the second computing device **418**, is greater than the width **414**, of the computing device **406**.

14

In a preferred embodiment, the control module **402** further provides a computing device slide pad **480**, nested in the slide support confinement structure **472**. The computing device slide pad **480** is configured to deliver minimal sliding friction between the computing device **406**, or the second computing device **418**, and the control module **402**, when inserting either computing device (**406**, **418**) into the control module **402**. Likewise, the sizing toggle **474** is configured to deliver minimal sliding friction between the computing device **406**, or the second computing device **418**, and the control module **402**, when inserting either computing device (**406**, **418**) into the control module **402**.

Preferably, the torsional force structure **478**, is a coiled spring, and the sizing toggle confinement structure **470**, provides a friction surface **482**, which mitigates an inadvertent movement of the sizing toggle **474**, from the first position to the second position when the computing device **406**, is constrained by the input device **400**.

Turning to FIG. **31**, shown therein are FIGS. **31a** and **31b**. As can be seen by FIG. **31a**, the control modules (**402**, **404**), and the structural bridge **422**, of input device **400**, are positioned, relative to one another, to accommodate the computing device **406** (of FIG. **30**). While as can be seen by FIG. **31b**, the control modules (**402**, **404**), and the structural bridge **422**, of input device **400**, are positioned, relative to one another, to accommodate the second computing device **418**, of FIG. **30**.

FIGS. **32**, **33**, and **34** collectively illustrate a preferred procedure to join the second computing device **418**, with the control module **404**. The first step in the procedure is to align the second computing device **418**, with the control module **404**, such that the corner of the second computing device **418**, is adjacent the sizing toggle **474** as shown by FIG. **32**. The next step in the procedure is to advance the second computing device **418**, into contact with the sizing toggle **474**, and continue to advance the second computing device **418**, into the control module **404**, which causes the sizing toggle **474**, to rotate into the sizing toggle confinement structure **470**, thereby permitting the second computing device **418** to be adaptively and snuggly accommodated by the control module **404**.

FIG. **35** shows a front view of an alternate embodiment of an electronic game control apparatus **500** (also referred to herein as an input device **500**), constructed and operated in accordance with various embodiments disclosed and claimed herein. The input device **500** includes, but is not limited to, a first control module **502**, and a second control module **504**. The control modules (**502**, **504**) are adjacent to and confine a computing device **506** (of FIG. **36**) on at least two opposing sides **508** and **510** (each of FIG. **36**), of the plurality of sides of the computing device **506**. Collectively, and when joined together, by way of a structural bridge **522**, the input device **500**, and the computing device **506**, form an electronic gaming system **511**, as shown in FIG. **36**.

In a preferred embodiment, the control module **504**, incorporates the eternal mechanisms and features of the control module **404**, of FIGS. **26** and **28**, including the tensioning mechanism **446**, but absent the sizing mechanism **468**. While the control module **502**, incorporates the eternal mechanisms and features of the control module **402**, of FIGS. **26** and **27**, but absent the adjustment feature **428**, and the sizing mechanism **468**. Accordingly, the input device **500** can accommodate computing devices of varying length and width by incorporating the tensioning mechanism **446**, into control module **504**, to accommodate a length **513**, of the computing device **560**, and configuring the control modules (**502**, **504**) to allow the sides (**508**, **510**) of the

US 10,391,393 B2

15 16

computing device **506**, to protrude, or extend beyond the confines of a length **515**, of the control modules (**502**, **504**), in a vertical direction along a width **517**, of the computing device **506**.

In a preferred embodiment, as shown by FIG. **35**, the structural bridge **522**, secures the pair of control modules (**502**, **504**) one to the other. Preferably, the structural bridge **522**, is configured such that the structural bridge **522**, adaptively and snugly accommodate the length **513**, of the computing device **506**, as shown in FIG. **36**.

In a preferred embodiment, as shown by FIG. **37**, the control module **504**, includes at least, but is not limited to, a tensioning mechanism **546**, communicating with the structural bridge **522**. Preferably, the tensioning mechanism **546**, secures the structural bridge **522**, such that the structural bridge snugly accommodate the length **513** (of FIG. **36**), of the computing device **506** (of FIG. **36**).

In a preferred embodiment, as shown by FIG. **35**, a communication link **519**, is provided by the input device **500**, which facilitating communication between the pair of control modules (**502**, **504**) and the computing device **506** (of FIG. **36**), and, as shown by FIG. **35**, the structural bridge **522**, masks a mid-portion of the back of the computing device.

Continuing with FIG. **35**, in a preferred embodiment, the communication link **519**, provides a communication module **521**, and in the alternative, provides a signal pathway **523**, for use in passing signals between the pair of control modules (**502**, **504**). In a preferred embodiment, the communication module **521**, is a wireless communication module **521**, which operates in a frequency range of 2.4 GHz. In an alternate preferred embodiment, the wireless communication module **521**, is a personal area network. As those skilled in the art, a personal area network (PAN) is a computer network used for communication among computerized devices, including telephones and personal digital assistants. PANs can be used for communication among the personal devices themselves (intrapersonal communication), or for connecting to a higher level network and the Internet (an uplink). A wireless personal area network (WPAN) is a PAN carried over wireless network technologies such as IrDA, Bluetooth, Wireless USB, Z-Wave, ZigBee, or even Body Area Network. The reach of a WPAN varies from a few centimeters to a few meters. A PAN may also be carried over wired computer buses such as USB and FireWire.

In an embodiment that utilizes the signal pathway **523**, as the communication link **519**, the signal pathway **523**, may be in the form of a metallic conductor, a fiber optic conductor, a conductive polymer, or the conductive layer of a flex circuit. The skilled artisan will further appreciate that the structural bridge **522**, may be either formed from a ridged material, such as a ridged polymer, or from a flexible material, such as a flexible polymer.

FIG. **38** shows an exploded view in perspective of the control module **504**, of the input device **500**, of FIG. **35**. The control module **504**, includes at least but is not limited to, a tensioning mechanism **546**, communicating with the structural bridge **522**, by way of a fastening mechanism **548** (also referred to herein as an attachment stay **548**), of the tensioning mechanism **546** secured to the structural bridge **522**, as shown by FIG. **37**.

The tensioning mechanism **546**, secures the structural bridge **522**, to a bottom cover **550**, of the control module **504**, such that the structural bridge **522**, cooperating with the tensioning mechanism **546**, snugly accommodates the length **513** (of FIG. **36**), of the computing device **506** (of FIG. **36**).

In a preferred embodiment, the bottom cover **550**, provides an attachment boss **552**, supporting a position guide **554**, and the tensioning mechanism **546**, includes at least, but not limited to, the attachment boss **552**, communicating with the structural bridge **522**, an attachment support **556**, cooperating with the attachment boss **552**. Preferably, the attachment support **556**, in cooperation with the attachment boss **552**, confines the structural bridge **522** vertically, but permits lateral movement of the structural bridge **522**, relative to the bottom cover **550**.

Preferably, the structural bridge **522**, is disposed between the bottom cover **550**, and a top cover **558**, which cooperates with the bottom cover **450**, to facilitate lateral movement of a portion of the structural bridge **522**. Preferably, a biasing structure **560**, communicating the attachment stay **548** (of FIG. **37**), provides variable tension between the structural bridge **522**, and the second control module **504**, thereby accommodating a predetermined amount of lateral movement of the structural bridge **522**, relative to the bottom cover **550**, as shown by FIG. **37**.

As shown by FIG. **37**, in a preferred embodiment, the attachment stay **548**, includes at least, but not limited to, a guide aperture **562**, which is preferably slotted, interacting with the position guide **554**, of the attachment boss **552** (of FIG. **38**). The interaction of the guide aperture **562**, with the position guide **554**, limits the extent of lateral alignment between the structural bridge **522**, and the control modules (**502**, **504**). As further shown by FIG. **38**, in a preferred embodiment, the attachment support **556**, further supports a plurality of control switches **564**, interacting with a circuit structure **566**, which preferably is a flex circuit **566**, and the biasing structure **560**, is preferably a coiled spring **460**.

In a preferred embodiment, the structural bridge **522**, provides a width **525**, less than its length **527**, as shown by FIG. **37**, and the back of the computing device **506**, extending above and below the width **525**, of the structural bridge **522**.

Returning to FIG. **36**, in a preferred embodiment, the input device **500**, includes an auxiliary power source **529**, and an auxiliary data storage device **531**, which preferably includes a cache portion **533**. Preferably, the auxiliary power source **529**, is a lithium ion battery, which provides power to the input device **500**, and the computing device **506**, when the power source of the computing device **506** is depilated; and the auxiliary data storage device **531** is preferably a solid state hard drive.

FIG. **39** shows a further embodiment of the electronic gaming system **511**, in which the input device **500**, provides a keyboard module **535**, and in which the keyboard module **535**, passes signals to the computing device **506**, the signals control images displayed on the display screen **537**, of the computing device **506**.

FIG. **40** shows a still further embodiment of the electronic gaming system **511**, in which the input device **500**, provides the keyboard module **535**, and in which the keyboard module **535**, passes signals to the computing device **506**, the signals control images displayed on the display screen **537**, of the computing device **506**. FIG. **40** further shows that the communication link **519**, via the communication module **521**, is further configured to communicate with a second display **541** wirelessly. That is the second display **541**, is remote from and mechanically disassociated from the electronic display screen **537**, of the computing device **506**.

Continuing with FIG. **40**, preferably each control module (**502**, **504**) provides a directional control device **543**. In a preferred embodiment, each direction control device **543**, is configured to facilitate a first position adjacent the top cover

US 10,391,393 B2

17                                                              18

558, of control module 504, or a first position adjacent a top cover 545, of control module 502, and a second position, the second position displaced a predetermined vertical distance away from the first position. Further in the preferred embodiment, each directional control module 543 is a joystick.

FIG. 41 discloses the electronic game control apparatus 400 (also referred to herein as an input device 400), which in a preferred embodiment provides the first control module 402, the second control module 404, and the structural bridge 422, which collectively secures the computing device 418. In a preferred embodiment, a back of the structural bridge 422, supports a touch sensitive control module 544, which in a preferred embodiment is a touch screen 544.

FIG. 42 discloses the electronic game control apparatus 400 (also referred to herein as an input device 400), which in a preferred embodiment provides the first control module 402, the second control module 404, and the structural bridge 422, which collectively secures the computing device 418. In a preferred embodiment, a back 427, of the second control module, supports the touch sensitive control module 544, which in a preferred embodiment is a touch screen 544.

FIG. 43 discloses the electronic game control apparatus 500 (also referred to herein as an input device 500), which in a preferred embodiment provides the first control module 502, the second control module 504, and the structural bridge 522. In a preferred embodiment, a back of the structural bridge 522, supports a touch sensitive control module 546, which in a preferred embodiment is a touch screen 546.

FIG. 44 discloses the electronic game control apparatus 500 (also referred to herein as an input device 500), which in a preferred embodiment provides the first control module 502, the second control module 504, and the structural bridge 522. In a preferred embodiment, a back side of the second control module 504, supports the touch sensitive control module 546, which in a preferred embodiment is a touch screen 546.

It is to be understood that even though numerous characteristics and configurations of various embodiments of the present invention have been set forth in the foregoing description, together with details of the structure and function of various embodiments of the invention, this detailed description is illustrative only, and changes may be made in detail, especially in matters of structure and arrangements of parts within the principles of the present invention to the full extent indicated by the broad general meaning of the terms in which the appended claims are expressed. For example, the particular elements may vary depending on the particular computing device without departing from the spirit and scope of the present invention.

What is claimed is:

1. A combination comprising:
a computing device;
a pair of confinement structures, the pair of confinement structures interacting with the computing device and adjacent at least two opposing sides of the computing device, but not more than three sides of the sides of the computing device, each of the pair of confinement structures comprising a communication link, each of the communication links configured for electronic communication with the computing device;
a rigid structural bridge disposed between and secured to the pair of confinement structures, the rigid structural bridge comprising a passageway between the pair of confinement structures, the passageway promotes electrical communication between the communication link

of a first confinement structure of the pair of confinement structures and the computing device, the passageway further promotes electrical communication between the communication link of a second confinement structure of the pair of confinement structures and the computing device; and
a pair of electronic game control modules, each electronic game control module of the pair of electronic game control modules is secured to and interacts with a corresponding confinement structure of the pair of confinement structures, each electronic game control module in electronic communication with the communication link of its corresponding confinement structure, wherein each electronic game control module is a separate and distinct structure from each of their corresponding confinement structures, forming no structural portion of their corresponding confinement structures, and in which each of the pair of confinement structures are separate and distinct structures from the structural bridge, forming no structural portion of the structural bridge.

2. The combination of claim 1, in which the rigid structural bridge supports electronics associated with the computing device.

3. The combination of claim 2, in which the computing device further comprising a back, the back provides an internal surface, an external surface and cooperates with the at least two opposing sides of the computing device.

4. The combination of claim 3, in which the rigid structural bridge cooperates with the back of the computing device.

5. The combination of claim 4, in which the rigid structural bridge cooperating with the back of the computing device is adjacent to the external surface of the back of the computing device.

6. The combination of claim 4, in which the computing device comprises an electronic display screen, and wherein at least one electronic game control module of the pair of electronic game control modules passes signals through its corresponding communication link to the computing device, the signals passed to the computing device controlling images displayed on the electronic display screen of the computing device.

7. The combination of claim 2, in which the electronics supported by the rigid structural bridge is a communication module associated with the computing device.

8. A combination comprising:
a structural bridge, the structural bridge having a first end associated with a first electronic game control module of a pair of electronic game control modules and a second end associated with a second electronic game control module of the pair of electronic game control modules, the structural bridge configured for adaptation to a computing device, the computing device having a length greater than its width, the structural bridge accommodates the length of the computing device, and in which the structural bridge provides a void, the void disposed between the first end of the structural bridge and the second end of the structural bridge, the void having right, left, upper, and lower sides, each side of the void communicating with a material of the structural bridge.

9. The device of claim 8, in which the first of the pair of electronic game control modules further comprises a retention mechanism, a bottom cover, wherein the bottom cover provides a position guide, and in which the retention mechanism comprises:

an attachment boss communicating with the structural bridge;

an attachment support cooperating with the attachment boss, the attachment support in cooperation with the attachment boss secures the structural bridge, the structural bridge disposed between the attachment boss and the attachment support; and

a biasing structure communicating with the attachment support, the biasing structure provides tension between the structural bridge and the second of the pair of electronic game control modules.

**10.** The device of claim **9**, in which the attachment support comprises a guide aperture interacting with the position guide, the interaction of the guide aperture with the position guide maintains alignment between the structural bridge and the second of the pair of electronic game control modules.

**11.** The device of claim **9**, in which at least one of the pair of electronic game control modules is a video game control module, and in which the video game control module passes signals to the computing device, the signals control images displayed on an electronic display screen of the computing device.

**12.** A combination comprising:

a first electronic game control module of a pair of electronic game control modules, and a second electronic game control module of the pair of electronic game control modules each the first and the second electronic game control modules includes at least a plurality of instructional input devices, and at least one of the first and the second electronic game control modules further comprising a restraint, the restraint providing at least a spring member; and

a structural bridge interposed between said first and second electronic game control module, said structural bridge comprising a first side, said first side of said structural bridge in contact adjacency with said first electronic game control module, said structural bridge further comprising a second side, said second side of said structural bridge in contact adjacency with said second electronic game control module, said structural bridge still further comprising a retention mechanism, the retention mechanism providing at least a boss, an interaction of the spring member of the restraint with the boss of the retention mechanism couples the structural bridge to at least one of the first and the second electronic game control modules.

**13.** The combination of claim **12**, further comprising a computing device, the computing device comprising an upper, lower, left and right side, collectively the sides of the computing device, the computing device disposed between and in contact adjacency with each the first and second electronic game control modules of the pair of electronic game control modules, the pair of electronic game control modules engaging the computing device on at least two opposing sides of the computing device, but not more than three sides of the sides of the computing device, said pair of electronic game control modules are separate and distinct structures from the computing device.

**14.** The combination of claim **13**, in which the structural bridge is a rigid structural bridge, the rigid structural bridge comprising a signal pathway, the signal pathway passes signals from each said first and second electronic game control modules.

**15.** The combination of claim **14**, in which the computing device further comprising a back, the back provides an internal surface, an external surface, and upper, lower, left

and right sides, collectively the sides of the back of the computing device, the back of the computing device cooperating with the sides of the computing device, and in which the rigid structural bridge cooperates with the back of the computing device.

**16.** An apparatus comprising:

a first means for attaching an input device to a computing device, said computing device provides a central processing unit and plurality of sides, each of the plurality of sides cooperating with the electronic display screen of said computing device; and

a second means for controlling a movement of a virtual object displayed on said electronic display screen of said computing device, said virtual object provided by an electronic game, said electronic game interacting with said central processing unit, and wherein said second means is accommodated by said input device.

**17.** The apparatus of claim **16**, in which the computing device having a length greater than its width, and wherein the first means for attaching the input device to a computing device comprising:

a pair of confinement structures, the pair of confinement structures interacting with the computing device and adjacent at least two opposing sides of the computing device, the at least two opposing sides adjacent the electronic display screen and define end points of the length of the computing device, the pair of confinement structures adapt to and are in pressing contact with said end points of the length of the computing device, each of the pair of confinement structures comprising a communication link, each of the communication links configured for electronic communication with the central processing unit;

a rigid structural bridge disposed between and secured to the pair of confinement structures, the rigid structural bridge includes at least a passageway between the pair of confinement structures, the passageway promotes electrical communication between the communication link of a first confinement structure of the pair of confinement structures and the computing device, the passageway further promotes electrical communication between the communication link of a second confinement structure of the pair of confinement structures and the computing device; and

wherein the input device is a pair of control modules, each control module of the pair of control modules mechanically interacting with a corresponding confinement structure of the pair of confinement structures, wherein each control module is a separate and distinct structure from the pair of confinement structures, forming no structural portion of the pair of confinement structures, and in which each of the pair of confinement structures are separate and distinct structures from the structural bridge, forming no structural portion of the structural bridge.

**18.** The apparatus of claim **17**, in which the second means for controlling movement of the virtual object displayed on said electronic display comprising:

each control module of the pair of control modules is in electronic communication with the communication link of its corresponding confinement structure, each of the pair of control modules provides a plurality of instructional input devices, wherein said instructional input devices are adjacent each of the at least two opposing sides of the computing device, and wherein the instructional input devices in conjunction with the central

US 10,391,393 B2

21

processing unit control movement of the virtual object displayed on the electronic display screen.

**19**. The apparatus of claim **16**, in which the computing device having a length greater than its width, and wherein the first means for attaching the input device to a computing device comprising:

the input device in electronic communication with the central processing unit, the input device providing a pair of control modules, the pair of control modules are adjacent to and confine the computing device on at least two opposing sides of the computing device, the at least two opposing sides adjacent the electronic display screen define end points of the length of the computing device, the pair of control modules each adapt to and are in pressing contact with said opposing end points of the length of the computing device; and

a structural bridge, the structural bridge secures the pair of control modules one to the other, and wherein a first of the pair of control modules comprising a retention mechanism communicating with the structural bridge, and wherein the retention mechanism secures the structural bridge to the first of the pair of control modules, such that the structural bridge accommodates the length of the computing device, and in which the structural bridge provides a void in the mid-section of the structural bridge, the void having right, left, upper, and lower sides, each side communicating with a material of the structural bridge.

**20**. The apparatus of claim **19**, in which the second means for controlling a movement of a virtual object displayed on said electronic display comprising:

a communication link, the communication link facilitates communication between the pair of control modules and the central processing unit, each of the pair of control modules provides instructional input devices, wherein said instructional input devices are adjacent each of the at least two opposing sides of the computing device, wherein the instructional input devices in conjunction with the central processing unit control movement of the virtual object displayed on the electronic display screen.

**21**. The apparatus of claim **16**, in which the computing device having a length greater than its width, and wherein the first means for attaching the input device to a computing device comprising:

the input device in electronic communication with the central processing unit of the computing device, the input device providing a pair of control modules a first control module of a pair of control modules, and a second control module of the pair of control modules, at least one of the first and the second control modules further comprising a fastening latch;

22

a structural bridge disposed between said first and second control module, said structural bridge comprising a first side, said first side of said structural bridge in contact adjacency with said first control module, said structural bridge further comprising a second side, said second side of said structural bridge in contact adjacency with said second control module, said structural bridge still further comprising a retention member, the retention member interacts with the fastening latch, the interaction of the fastening latch with the retention member restrains the structural bridge to a control module of the pair of control modules, and the pair of control modules to the computing device.

**22**. The apparatus of claim **21**, in which the second means for controlling a movement of the virtual object displayed on said electronic display comprising:

a communication link, the communication link facilitates communication between the pair of control modules and the central processing unit of the computing device; and

each the first and the second control modules of the pair of control modules comprising a plurality instructional input devices, and wherein the plurality of instructional input devices in conjunction with the central processing unit control movement of the virtual object displayed on the electronic display screen.

**23**. The apparatus of claim **16**, in which the means for controlling the movement of the object displayed on the electronic display screen is provided by an input device, the input device comprises:

input module apertures, each input module aperture accepts either a game control module or a keyboard module as selected by a user, wherein said input module apertures are adjacent each of the at least two opposing sides of the plurality of sides of the computing device; and

a camera communicating with each the input device and the computing device, the camera capturing either still or video images as selected by the user, and in which the camera is responsive to at least the removable keyboard module when said keyboard module is operatively installed by the user within the input module aperture, and in which the removable keyboard module is a pair of touch responsive electronic display screens, each of the touch responsive electronic display screens having at least the functionality of the electronic display screen, includes the functionality of a mouse pad, and presents virtual keys of a keyboard for information entry.

\* \* \* \* \*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 24-1467

**Short Case Caption:** Gamevice, Inc. v. Nintendo Co., Ltd.

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes  9,447  words.

☐ the filing has been prepared using a monospaced typeface and includes _____ lines of text.

☐ the filing contains _____ pages / _____ words / _____ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. _____).

Date: 05/15/2024

Signature: /s/ Smith R. Brittingham IV

Name: Smith R. Brittingham IV